STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
BERTRAND HENRY,                                  :

                    Petitioner,                          :

             -against-                            :

DONITA MCINTOSH, Superintendent                  :
of Clinton Correctional Facility,
                                 :

                    Respondent.
-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF A PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

# TABLE OF CONTENTS

PROCEDURAL HISTORY ......................................................................... 1

PRELIMINARY STATEMENT ................................................................. 2

STATEMENT OF FACTS ......................................................................... 3

    A. When Confronted by Her Abusive Mother After Her Pregnancy was Discovered, Thirteen-Year-Old C.R. Claimed Petitioner was Her Only Sexual Partner, but DNA Excluded Him as the Father. ................................................. 3

    B. The Trial Court Refused to Allow Cross-Examination About C.R.'s Motive to Fabricate Due to Her Fear of Abuse, Over Repeated Defense Objections........ 5

    C. The Appellate Division Affirmed Petitioner's Conviction and the New York Court of Appeals Denied Leave to Appeal ....................................................... 11

LEGAL STANDARD ................................................................................ 12

REASONS THE WRIT SHOULD BE GRANTED ...................................... 13

    I. The State Court's Restriction on Cross-Examination was "Contrary To" Clearly Established Supreme Court Precedent.

        A. The Supreme Court Has Zealously Protected the Ancient Right to Reveal a Witness's Motive to Falsely Testify Through Confrontation. ................ 13

        B. The Supreme Court Has Consistently Reversed Convictions When a Defendant is Denied the Right to Present a Motive to Fabricate Defense Through Cross-Examination .................................................... 15

            1) *Olden v. Kentucky* ..................................................... 16

            2) *Davis v. Alaska* ......................................................... 18

            3) The State Court Ruling is Contrary to Second Circuit Opinions Applying *Olden* and *Davis.* ......................................................... 19

    II. The Constitutional Violation Was Not Harmless. ......................................... 22

    III. Petitioner Exhausted This Federal Constitutional Claim. ........................... 24

RELIEF REQUESTED .............................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Alvarez v. Ercole*, 763 F.3d 223, 230 (2d Cir. 2014).....................................................15

*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) ........................................................22

*Brinson v. Walker,* 547 F.3d 387, 392 (2d Cir. 2008)...................................................14

*Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)......................................................13

*Cotto v. Herbert*, 331 F.3d 217, 257 (2d Cir. 2003) ......................................................24

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986)...........................................................13, 19

*Davis v. Alaska*, 415 U.S. 308 (1974) ..............................................................passim

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) .................................................passim

*Eze v. Senkowski*, 321 F.3d 110, 133 (2d Cir. 2003) .....................................................24

*Garlick v. Lee*, 1 F.4th 122, 128 (2d Cir. 2021) ............................................................23

*Greene v. McElroy,* 360 U.S. 474, 496, n. 25 (1959).....................................................13

*Harrington v. Richter*, 562 U.S. 86, 98 (2011) .............................................................15

*Henry v. Speckard*, 22 F.3d 1209 (2d Cir. 1994)......................................15, 19, 20, 21

*Jackson v. Conway*, 763 F.3d 115, 141 (2d Cir. 2014).................................................23

*Kennedy v. Louisiana*, 554 U.S. 407, 444, *as modified* (Oct. 1, 2008) ......................23

*Kotteakos v. United States*, 328 U.S. 750 (1946)...........................................................22

*Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109, 121 (2d Cir. 2015)............12

*Mateos v. West*, 357 F.Supp.2d 572, 575 (E.D.N.Y. 2005) ..........................................25

*Nappi v. Yelich*, 793 F.3d 246 (2d Cir. 2015)..................................................19, 20, 21

*Nevada v. Jackson*, 569 U.S. 505 (2013) .......................................................................13

*Olden v. Kentucky*, 488 U.S. 227 (1988).............................................................passim

*United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004).......................................24

*United States v. Vayner*, 769 F.3d 125, 134 (2d Cir. 2014) .........................................24

*Washington v. Texas,* 388 U.S. 14, 23 (1967).................................................................. 13

*Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) ............................................. 25

*Williams v. Taylor*, 529 U.S. 362, 405-13 (2000) ..................................................... 12, 16

## Statutes

28 U.S.C. § 2244.............................................................................................................. 25

28 U.S.C. § 2254......................................................................................................... 11, 17, 21

## Other Authorities

O'Donohue W., Cummings C., Willis B., *The Frequency of False Allegations of Child Sexual Abuse: A Critical Review* J CHILD SEX ABUS. 27(5):459-475 (2018)............ 15

5 Wigmore on Evidence 3d ed. 1940 §1364.................................................................. 13

## PROCEDURAL HISTORY

1.      Petitioner was convicted after a jury trial in the Supreme Court of the State of New York, Kings County, of first-degree rape, second-degree rape, and criminal sexual act, and sentenced, under multiple counts of the same indictment, to a 25-year prison term (Del Giudice, J., at trial and sentence).[1]  The date of the judgment of conviction was April 4, 2016.

2.      Petitioner is currently incarcerated by the New York State Department of Corrections and Community Supervision, DIN 16-A-1407, with a maximum sentence expiration date of February 23, 2041.

3.      Petitioner appealed his conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department, which affirmed petitioner's conviction on May 6, 2020.[2]

4.      Petitioner's application for leave to appeal to the New York Court of Appeals was denied on September 8, 2020.  Petitioner's request for reconsideration of that order was denied on November 5, 2020.[3]

5.      Aside from the direct appeal from the judgment, petitioner has not filed any actions with respect to the judgment in any state court.

---

[1] New York Penal Law §§ 130.35; 130.30; 130.50.

[2] *People v. Henry*, 183 A.D.3d 607 (2d Dep't 2020) (Exhibit A).

[3] *People v. Henry*, 35 N.Y.3d 1094 (2020 (Fahey, J.) (denying leave) (Exhibit B); *People v. Henry*, 36 N.Y.3d 929 (2020) (Fahey, J.) (denying reconsideration) (Exhibit C).  The papers filed by both parties in the Appellate Division are attached collectively as Exhibit D, the papers filed by both parties in the Court of Appeals are attached collectively as Exhibit E.

## PRELIMINARY STATEMENT

Thirteen-year-old C.R. first accused petitioner of sexual assault when she was confronted by her mother minutes after her pregnancy was discovered.  She told her mother that petitioner, her mother's ex-boyfriend, was her only sexual partner and had raped her.  But DNA testing excluded petitioner as the father, and no other physical evidence or eyewitness testimony corroborated C.R.'s claims.

C.R.'s motive to fabricate her allegation against petitioner was clear:  She came from an abusive household and was terrified that her mother would send her back to her abusive father in Jamaica.  Rather than explain whether she was sexually active with her fourteen-year-old boyfriend, she said petitioner impregnated her.  C.R.'s fears of abuse were outlined in a letter to her teacher just months after DNA testing proved petitioner had not caused her pregnancy.

At trial, however, the court prohibited the defense from cross-examining C.R. and her mother about the threats and abuse and excluded the letter, believing the evidence to be irrelevant and prejudicial.  This ruling effectively gutted petitioner's defense, which depended on revealing C.R.'s motivations for falsely accusing him. The trial court's restriction on cross-examination on this crucial issue was contrary to clearly established Supreme Court precedent in *Davis v. Alaska*, 415 U.S. 308 (1974) and *Olden v. Kentucky*, 488 U.S. 227 (1988), and violated petitioner's constitutionally guaranteed right to present a defense through cross-examination.

2

## STATEMENT OF FACTS[4]

A.   <u>When Confronted by Her Abusive Mother After Her Pregnancy was Discovered, Thirteen-Year-Old C.R. Claimed Petitioner was Her Only Sexual Partner, but DNA Excluded Him as the Father</u>.

C.R.'s mother, Angella, moved to America when C.R. was very young, and C.R. was left behind in Jamaica with her abusive father and her sister.[5]  In 2011, when C.R. was eleven, she and her sister were finally able to move to America, and the two sisters joined their mother in Brooklyn.  When C.R. moved in with her mother, Angella and petitioner were in an "off-and-on" relationship.[6]  Petitioner provided substantial financial support to the family, including paying for expenses like groceries, subway cards, and cell phones.  C.R.'s sister described petitioner as a "generous person" and the "go-to person" for anything that anyone in the family needed.[7]  Petitioner also took on a parental role with C.R. while he dated her mother.  C.R. was eager to get out of the small apartment she shared with her sister and mother, and often went on excursions with petitioner to parks, friends' homes, and, at her request, the movies.[8]

On one occasion in 2012, however, petitioner brought C.R. to his home in Queens and C.R. discovered that he was dating another woman, who screamed at

---

[4] Citations to the trial transcripts will be prefaced with a "T___," and citations to the People's exhibits admitted at trial are prefaced with an "Ex.__."

[5] App. Br. at 6, 21.

[6] T 244.

[7] App. Br. at 6; T 352, 254, 283, 261.

[8] T 261.

C.R.  C.R. told Angella that petitioner was living with another woman and petitioner stopped visiting as often.[9]

In August 2013, Angella took C.R. to the doctor because she was feeling sick. On August 14, 2013, the clinic staff informed C.R. and Angella that C.R. was approximately two months pregnant.  When Angella confronted C.R., demanding to know who the father was, C.R. told her and medical personnel at the clinic that she had sex with only one person—petitioner—who had raped and impregnated her.[10]

Angella and C.R. gave inconsistent accounts about how and when petitioner was confronted with C.R.'s allegations.[11]  But both agreed that Angella did not go to the police immediately after hearing that her young daughter had allegedly been raped.  Instead, a couple of days later, she asked petitioner—the man who had supposedly been raping her daughter—to drive C.R. and her to the doctor.  With C.R. in the backseat, Angella recorded a conversation with petitioner in which petitioner appears to acquiesce to Angella's accusations.[12]  Angella then told petitioner that if he did not sign a paper admitting he had sex with C.R. and agreeing to pay Angella $20,000.00 for the care of C.R.'s baby, Angella would go to the police.[13]  At trial, petitioner explained that he signed this purported "contract" because he was scared of Angella and her accusations.  He said whatever she wanted him to say because he knew the DNA would exonerate him.  Angella claimed that she arranged the meeting

---

[9] T 316, 482.

[10] T 177, 217, 304.

[11] App. Br. At 13-16.

[12] Ex. 3, 3A.

[13] Ex. 4.

4

with her daughter's supposed rapist—with her daughter in attendance—because she "wanted to get to the bottom" of C.R.'s allegation "to see if it is true or a lie."[14]  Angella waited until August 19, 2013, to inform law enforcement of her daughter's sexual assault, several days after Angella claimed to have learned that her daughter had sex with petitioner and at least three days after she claimed to have obtained the necessary "proof."[15]

Petitioner was arrested on August 26, 2013, and voluntarily provided a DNA sample, cooperated with law enforcement in all respects, and denied sexually assaulting C.R., explaining that Angella was trying to extort money from him.  DNA testing conclusively excluded petitioner as the father of C.R.'s fetus.[16]  The record does not contain any evidence that law enforcement attempted to do any further DNA testing on any other potential fathers, even though C.R. had a fourteen-year-old boyfriend.[17]

B.     The Trial Court Refused to Allow Cross-Examination About C.R.'s Motive to Fabricate Due to Her Fear of Abuse, Over Repeated Defense Objections.

Petitioner's primary defense at trial was C.R.'s motive to fabricate.  As the defense told the jury in its opening statement, C.R. was physically and psychologically abused by her parents and "living in constant fear of her mother," who threatened her with being sent back to Jamaica to live with an abusive father.[18]

---

[14] T 114.
[15] T 375.
[16] T 443-444.
[17] T 304.
[18] T 34.

5

Defense counsel's understanding of C.R.'s family environment was informed by a letter C.R. had written to a teacher, and disclosed by the People prior to trial.  In the letter, which was written two months after DNA testing revealed petitioner had not impregnated C.R., she described an abusive relationship with her parents and her fear of being sent back to Jamaica:

> The reason I have been acting a little weird is because my mother hates me and is going to send me back to Jamaica because I told her that her boyfriend basically had sex with me against my will. . . . My mom says its [sic] my fault and that I have no respect for her.  Ms. Yeh put me on promotion in doubt because I am failing math, I'm trying to pass her class but in the end I have nothing to lose because I'm going back to Jamaica to live with my abusive father, who's always beating me.  She says she is done with me when she sends me back.  She's not going to send money for me to go to school, to buy uniforms, or even to eat.

As a result of this letter, C.R.'s teacher made a report to the Administration for Child Services (ACS), which generated a report indicating C.R. had been neglected.[19]

The trial court, however, would not permit cross-examination concerning parental abuse or threats, nor would it allow the letter itself into evidence, because it was "ex post facto."[20]  During Angella's cross-examination, the court sustained objections to the following questions: whether Angella had "problems with C.R"; whether Angella had ever hit C.R.; whether C.R. had ever run away from home; and whether she lived with her father before coming to the United States.[21]

---

[19] A copy of C.R.'s letter and the ACS report were included in the Supreme Court file and redacted copies are attached to this Petition as Exhibit F.

[20] T 144.

[21] T 101-02.

At the ensuing bench conference, the court questioned why "parental discipline" was relevant.  Defense counsel explained this issue was critically important to this case: "[A]s I said in my opening statement, <u>this child was terrified of her mother</u>.  She was scared, there were threats made, there was abuse done.  I have a good faith basis on this," referencing the letter C.R. had written to her teacher.[22]

The court categorically rejected defense counsel's theory, asserting that such abuse had "nothing to do with what's going on with this case" and was collateral because "[t]hat letter was written by [C.R.] after the event"; in the court's view, it merely showed "a reaction by [C.R.'s] parent when being advised that her child was having inappropriate sexual relations with [her] boyfriend."[23]  Defense counsel further protested that the letter also referenced abuse by C.R.'s father and the threat of being sent back to him, implying a long-standing abusive relationship that could have motivated C.R. to lie.[24]  But the court stood by its ruling.

When Angella's cross-examination resumed, defense counsel attempted to ask her about the ACS report generated based on C.R.'s letter.  Yet again, the court sustained the prosecution's objection to this question because it would "tarnish" Angella before the jury:

> You are impeaching [Angella] with an alleged prior bad act that she didn't do. Just the mention of the fact that she was investigated by ACS is somehow to tarnish this woman. Now you tried to impeach her with a letter from her child

---

[22] T 103-04 (emphasis added).
[23] T 103.
[24] T 103-04.

> that occurred afterward, that everything is in the past
> tense; all right? The child never said in that letter that my
> mother abused me and that's why she made up this story
> about being raped; all right?[25]

Defense counsel explained that he was not questioning Angella about the reported

abuse to impeach her credibility.  Instead, the letter gave him a good faith basis to

inquire about parental abuse which was directly relevant to C.R.'s motive to fabricate.

The court, however, adhered to its ruling:

> **[DEFENSE COUNSEL]:** She's also saying she's afraid to
> go home because her father is abusive.
>
> **THE COURT:** How's that relevant to whether or not this
> person is testifying truthfully and honestly? How's that
> impeachment?
>
> **[DEFENSE COUNSEL]:** I think it relates to all of this.
>
> **THE COURT:** To what?
>
> **[DEFENSE COUNSEL]:** To the entire[…]
>
> **THE COURT:** No, no, no, no, counsel. Give me the
> specifics now because you want to bring in, all right, a
> statement by a third party, which is the child, to impeach
> this witness with the adding of the foundation when the
> document itself explains that it's post facto.
>
> **[DEFENSE COUNSEL]:** What I'm trying to do, Judge is,
> I'm –
>
> **THE COURT:** I know what you're trying to do, but tell me
> how that's admissible; all right?
>
> **[DEFENSE COUNSEL]:** <u>I'm not impeaching her with the
> document. The document's what's given me a good faith
> basis to ask the question.</u>

---

[25] T 141-142.

**THE COURT:** The document itself <u>how can it give you a good faith basis if it says it didn't happen until afterward.</u> This is the wrong witness to bring it out with (emphasis added).[26]

Before beginning his cross-examination of C.R., and despite the court's prior ruling, defense counsel again requested that he be permitted to question C.R. about the parental abuse outlined in the letter because C.R.'s fear of abuse and banishment, and corresponding motive to fabricate, was essential to his theory of the case:

> **[DEFENSE COUNSEL]:** Well, here's the thing, Judge. I think it gives belief, a good faith basis to go into the relationship between [C.R.] and her mother <u>from that letter.</u> I think <u>it gives me the ability to at least ask questions whether she was abused or threatened by her mom.</u>
>
> **THE COURT:** I'll allow you to ask the question of what – how you describe your relationship with your mother when you were 12 years old, but not going into any content of that letter, and I'm not going to let you try and do that as a prior inconsistent statement because it wouldn't be inconsistent.
>
> **[DEFENSE COUNSEL]:** It's not inconsistent, <u>but again, Judge, it goes to my theory of the case.</u>
>
> **THE COURT:** <u>I don't care what your theory of the case is.</u> The issue that you have is it's not admissible evidence; all right? I'll give you ample opportunity to cross-examine her as to the domestic, the parameters, the environment of the family with her and the defendant and her mother for the times that are relevant, <u>but anything subsequent</u>
>
> **[DEFENSE COUNSEL]:** No, nothing subsequent.
>
> **THE COURT:** The letter's not coming into evidence. You have your exception.

---

[26] T 142-43.

9

**[DEFENSE COUNSEL]:** I just want to be able to ask those questions.

**THE COURT:** I just gave you permission to inquire as to the domestic surroundings of the family before and during the time period of the questioning.[27]

In line with its ruling, the court sustained the prosecution's objections to the following questions during C.R.'s cross-examination: whether C.R.'s mother had threatened to send her back to Jamaica; whether C.R.'s mother was "upset" when she learned of C.R.'s pregnancy; whether there was a "particular reason" C.R. avoided conversation with her mother; and whether her mother ever hit her.[28]

The court allowed defense counsel to ask only what C.R.'s "relationship was like with [her] mother"; whether C.R. ever had "disputes with [her] mom" or "arguments with [her] mom about things other than school"; and whether she had ever run away from home.[29]  C.R. testified that she and her mother had an "okay relationship," kept disputes to "a minimum," and had only normal teenage daughter/mother tensions.[30]

As a result of the court's ruling, the jury never heard any evidence of Angella's abuse and threats, or of C.R.'s fear of being sent back to Jamaica to an abusive father if she got into trouble with Angella.  Nor did the jury ever see the contents of C.R.'s letter.  Instead, the jury heard only C.R.'s testimony that she and Angella had a normal mother/daughter relationship.

---

[27] T 236-37 (emphasis added).
[28] T 241-43.
[29] *Id.*
[30] *Id.*

The jury convicted petitioner of first-degree rape, second-degree rape, and first-degree criminal sex act.[31]

C.   The Appellate Division Affirmed Petitioner's Conviction and the New York Court of Appeals Denied Leave to Appeal.

Petitioner argued on appeal, *inter alia*, that his rights under the Sixth and Fourteenth Amendments to present a complete defense were violated by the court's refusal to allow him to cross-examine the prosecution's witnesses and present extrinsic evidence concerning C.R.'s fear of her abusive parents and corresponding motive to fabricate her allegations.  The abuse provided a powerful motive for C.R. to allege that petitioner, an adult, raped her rather than admit to her mother that she was sexually active with her fourteen-year-old boyfriend.  And, the fact that the trial court allowed defense counsel to ask basic questions about C.R.'s relationship with her mother, but prohibited questions about abuse, was insufficient to put petitioner's defense of fabrication before the jury.  C.R.'s testimony that she had a normal relationship with her mother, with minimum disputes, was also inconsistent with the prior written statement she made to her teacher, and the defense should have been permitted to explore the inconsistency.[32]

In a decision dated May 6, 2020, the Appellate Division, Second Department, reduced petitioner's sentence but affirmed his conviction without specifically

---

[31] T 653-54.
[32] App. Br. at 41-43.

11

addressing his argument that he was denied the right to present a complete defense, ruling merely that his "remaining contentions are without merit."[33]

The Court of Appeals denied Petitioner's application for leave to appeal on September 8, 2020.[34]  Petitioner then submitted a request for reconsideration of the leave denial under the Court of Appeals' Rule of Practice 500.20(f).  The Court of Appeals denied his request for reconsideration in an order issued on November 5, 2020.[35]

## LEGAL STANDARD

The writ of habeas corpus is a bulwark against unconstitutional convictions and must issue if the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1).  A state court's determination is "contrary to" clearly established Supreme Court precedent when it (a) "arrives at a conclusion opposite to that reached by the [Supreme Court] on a question of law"; or (b) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court.   *Williams v. Taylor*, 529 U.S. 362, 405-13 (2000); *Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109, 121 (2d Cir. 2015).

---

[33] *People v. Henry*, 183 A.D.3d 607, 608 (2d Dep't 2020).
[34] *People v. Henry*, 35 N.Y.3d 1094 (2020) (Fahey, J.).
[35] *People v. Henry*, 36 N.Y.3d 929 (2020) (Fahey, J.).

## REASONS THE WRIT SHOULD BE GRANTED

I.   **The State Court's Restriction on Cross-Examination was "Contrary To" Clearly Established Supreme Court Precedent.**

The trial court's limitation on cross-examination into parental abuse because it was collateral, "*ex post facto*," and prejudicial violated clearly established Supreme Court precedent rejecting those very same rationales as bases to limit cross-examination in this context. *Olden v. Kentucky*, 488 U.S. 227 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Davis v. Alaska*, 415 U.S. 308 (1974). New York's courts thus deprived petitioner of his constitutionally guaranteed right to present a defense and confront the prosecution's witnesses. *Nevada v. Jackson*, 569 U.S. 505 (2013) ("The constitution guarantees a defendant a meaningful opportunity to present a complete defense"); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (The constitutional guarantee to criminal defendants of "a meaningful opportunity to present a complete defense" is rooted in the Due Process Clause of the Fourteenth Amendment and the Sixth Amendment's Confrontation and Compulsory Process clauses); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Washington v. Texas,* 388 U.S. 14, 23 (1967).

A.   **The Supreme Court Has Zealously Protected the Ancient Right to Reveal a Witness's Motive to Falsely Testify Through Confrontation.**

The right to present a defense through confrontation and cross-examination of the prosecution's witnesses has "ancient roots" and is the cornerstone of a fair trial. *Greene v. McElroy,* 360 U.S. 474, 496, n. 25 (1959) (citing 5 Wigmore on Evidence 3d ed. 1940 §1364). For as long as it has existed, the Supreme Court has carefully guarded these "fundamental guaranties of life and liberty" provided by the Sixth

Amendment.  *See, e.g.*, *Kirby v. United States*, 174 U.S. 47, 55 (1899) (recognizing the long-recognized right of defendants "in all criminal prosecutions" to be "confronted by the witnesses against him").

Included within the right of cross-examination and confrontation is "[t]he right to expose the ulterior motivations and biases of a witness," which has "remained relatively immutable in our jurisprudence."  *Greene*, 360 U.S. at 496.  Indeed, this right is crucial to a fair trial, as it is the "principal means by which the believability of a witness and the truth of his testimony are tested."  *Davis*, 415 U.S. at 316; *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 51–52, (1987) ("[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable.").

The Supreme Court has, correspondingly, long recognized that a violation of the Confrontation Clause occurs when a defendant is prevented "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness."  *Van Arsdall*, 475 U.S. at 680; *see also Davis*, 415 U.S. at 316 (purpose of cross-examination includes "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand"); *Brinson v. Walker,* 547 F.3d 387, 392 (2d Cir. 2008) ("It is a clearly established principle of Supreme Court jurisprudence that the Confrontation Clause requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against him in order to show bias or improper motive for their testimony") (citations omitted)).

To be sure, "[t]he witness's motivation and potential bias are especially important areas for cross-examination" where, like here, "the witness is the complainant and the sole witness to the acts of which she accuses the defendant." *Henry v. Speckard*, 22 F.3d 1209 (2d Cir. 1994).[36]  In such circumstances, the complainant's motive to fabricate can form the defense's theory of the case.  While trial courts possess "wide latitude" to limit cross-examination that would result in "harassment, prejudice, confusion of the issues" or irrelevant interrogation, they are nevertheless obligated to allow reasonable cross-examination about a witness's motive to fabricate.  *Van Arsdall*, 475 U.S. at 679 (1986); *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Alvarez v. Ercole*, 763 F.3d 223, 230 (2d Cir. 2014) ("On habeas corpus . . . we do not sit to review the trial judge's exercise of discretion, but rather to assess whether the state court's denial of [the defendant's] Confrontation Clause claim was reasonable.").

**B.   The Supreme Court Has Consistently Reversed Convictions When a Defendant is Denied the Right to Present a Motive to Fabricate Defense Through Cross-Examination.**

In *Olden* and *Davis*, the Supreme Court held that courts cannot exclude cross-examination that has the "potential to demonstrate the witness is motivated to lie." *See Olden*, 488 U.S. at 232; *Davis*, 415 U.S. at 318.  Confronted with this exact issue,

---

[36] The rate of false allegations of child sexual abuse has been a topic of research spanning back to as early as the 1970s.  Adolescents are more likely than younger children to intentionally fabricate these allegations, and research in this area shows that 8% of sexual abuse allegations made by adolescents are false.  O'Donohue W., Cummings C., Willis B., *The Frequency of False Allegations of Child Sexual Abuse: A Critical Review* J CHILD SEX ABUS. 27(5):459-475 (2018).

however, the state court here reached a decision contrary to this clearly established Supreme Court precedent.

        1)     *Olden v. Kentucky*

The state court's limitation of cross-examination into C.R.'s motive is diametrically opposed to the Supreme Court's holding in *Olden*. *See* W*illiams*, 529 U.S. at 389 (interpreting the "contrary to" clause to include decisions "diametrically different" or "opposite to" clearly established law).

James Olden, a Black man, was charged with the kidnaping, rape, and forcible sodomy of a white woman. *Olden*, 488 U.S. at 228. Her story was corroborated only by her Black boyfriend, who had seen her get out of Olden's car that night. At the time of the incident, both the complainant and her boyfriend were married to other people, but following the incident, they separated from their respective spouses and moved in together. *Id.* at 229-30. Olden's defense was that he and the complainant had consensual sex, and he sought to introduce evidence of the couple's cohabitation at the time of trial to show the complainant was motivated to fabricate the rape to avoid angering her then boyfriend. *Id.* The trial court, however, excluded all evidence of cohabitation, sustaining the prosecutor's objection when the defense attempted to pursue this line of inquiry—even after the complainant falsely testified that she was living with her mother. *Id.* The Supreme Court reversed the Kentucky Court of Appeals' holding that the evidence of this interracial relationship was properly excluded as prejudicial, because it violated the defendant's Sixth Amendment right to confrontation. *Id.* at 231 ("A reasonable jury might have received a significantly

different impression of [the witness's] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.").

The similarities between *Olden* and this case are undeniable. Both the *Olden* complainant and C.R. were the sole witnesses to the alleged crimes and gave testimony that was "crucial to the prosecution's case" and uncorroborated by any physical evidence. *Id.* at 233. In both cases, the defense's theory was the complainant's motive to fabricate—the *Olden* complainant wanted to avoid angering her boyfriend and C.R. wanted to avoid angering her mother. In both cases, moreover, the complainants gave contradictory testimony concealing their motivations to fabricate—the *Olden* complainant falsely testified that she lived with her mother and C.R. falsely testified that she had a normal relationship with her mother. *Id.* at 230. And finally, in both cases, defense counsel had a good faith basis to inquire about the complainants' motives to fabricate based on facts that postdated the incident—the *Olden* complainant's subsequent decision to leave her spouse and move in with her boyfriend, and C.R.'s letter reporting parental abuse and fear of her parents.

That the *Olden* complainant lived with her boyfriend by the time of trial, even if at the time of the incident they were married to other people and living separately, nonetheless implied a long-standing relationship serious enough to implicate a motivate to fabricate, as the Supreme Court concluded. By the same measure, C.R.'s letter, though written after the incident, evidenced a long-standing fear of her parents: C.R. had lived with her father before coming to the United States and thus

feared being returned to him long before she claimed to have been raped.  Even if the letter itself referenced a threat made after C.R. accused appellant, it strongly suggested that an abusive relationship between C.R. and her mother had existed for years.  In short, petitioner, like James Olden, was deprived of his constitutional right to ask C.R. potentially dispositive questions about her motive to fabricate.  The limitation on cross-examination exploring petitioner's legitimate defense theory was thus "contrary to" the holding in *Olden*.  *Id.* at 232; 28 U.S.C. § 2254(d)(1).

2)    *Davis v. Alaska*

The state court decision here were also contrary to the Supreme Court's holding in *Davis* that the Sixth Amendment requires that defendants be permitted to explore the full scope of a witness's motive to fabricate.  The trial court in *Davis* permitted cross-examination about a witness's motivation to lie to avoid becoming a suspect but denied the defense's request to cross-examine him on his related motivation to avoid having his probation revoked.  *Davis*, 415 U.S. at 311-13.  While the Alaska Supreme Court upheld the conviction on the grounds that the defense's theory was sufficiently presented to the jury, the Supreme Court reversed because the trial court's restriction on the scope of the inquiry meant that the jury did not "have the benefit of the defense theory before them."  *Davis* at 317.  The limited cross-examination the trial court permitted was insufficient and harmful because "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness."  *Id.* at 318.

Like the trial court in *Davis*, allowing petitioner to ask general questions about C.R.'s relationship with her mother, while prohibiting the questions that could have revealed C.R.'s abuse and fear, did not "adequately" put petitioner's defense before the jury. *Id.* at 315. C.R.'s fear of being banished to Jamaica and of being physically and psychologically abused is an entirely different—and much more extreme—motive to fabricate, one that the jury never heard. Like in *Davis*, the court's erroneous restriction here meant the jury heard only that C.R. and Angella had a normal mother/daughter relationship, which contradicted the theory presented by the defense during its opening statement—that fear of abuse led C.R. to lie. Defense counsel was thus unable to adequately "make a record from which to argue why" C.R. was motivated to fabricate. *Id.* Petitioner "should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to" C.R.'s "reliability." *Id.* The state court's ruling was thus contrary to the Supreme Court's holding in *Davis*, and petitioner was correspondingly deprived of a "meaningful opportunity to present a <u>complete</u> defense." *Crane*, 476 U.S. at 690 (emphasis added).

3) <u>The State Court Ruling is Contrary to Second Circuit Opinions Applying *Olden* and *Davis*.</u>

The Second Circuit's opinions in *Henry* and *Nappi v. Yelich*, 793 F.3d 246 (2d Cir. 2015), further demonstrate that the state court decision in this case violated clearly established Supreme Court precedent. In *Henry*, the defense attempted to cross-examine the complainant about babysitting and chores "to show that she resented being required to babysit and therefore had a motive to fabricate her

charges" of sexual abuse against her stepfather. *Henry*, 22 F.3d at 1212. The trial court prohibited this line of questioning as irrelevant over defense counsel's objection that he had a "good faith basis" to explore "this particular limited issue of motive to lie." *Id.* at 1212-1213. The Second Circuit, relying on the Supreme Court's decisions in *Davis*, *Van Arsdall*, and *Olden*, found "no justification" for the trial court's refusal to allow the cross-examination, particularly because defense counsel had shown that "there was plainly a foundation for the proposition that [the complainant] had performed babysitting chores." *Id.* at 1215.[37]

Similarly, in *Nappi*, the defendant claimed that his wife reported his gun possession to parole authorities to ensure he would be re-incarcerated, leaving her free to continue her romantic relationship with another man. *Nappi*, 793 F.3d at 249. On appeal, the "Appellate Division concluded that the trial court acted within its discretion to limit cross-examination on collateral matters." *Id.* at 250. The Second Circuit reversed because this evidence—the basis for the entire defense—was not collateral or immaterial if its purpose was "to explore more than general credibility." *Id.* at 251. The trial court's ruling that "cross-examination as to [the complainant's] motive was a collateral matter" was thus "contrary to clearly established law" as set out in *Davis*, *Van Arsdall*, and *Olden*. *Nappi*, 793 F.3d at 251.

---

[37] The Second Circuit ultimately found the error harmless because there was strong physical evidence of rape, and the complainant had not voluntarily disclosed the rape to anyone, but rather had written about it in a note to herself that was discovered by chance, which did not support a fabrication defense. *Henry*, 22 F.3d at 1216. Here, by contrast, there was no physical evidence of rape and the complainant made her "outcry" only when her pregnancy was discovered and she was confronted by her abusive mother.

The state court's ruling here mirrors the errors made by the state courts in *Nappi* and *Henry*.   Like defense counsel in *Nappi*, petitioner's trial lawyer told the court that the complainant's motive to fabricate—her fear of her abusive parents—was the defense's "theory of the case."[38]   The trial court here refused to allow the questioning for the same reason the trial court prohibited it in *Nappi*—that the inquiry was irrelevant, a justification rejected by the Second Circuit as wholly inconsistent with Supreme Court precedent.  *Nappi*, 793 F.3d at 251-52.

Petitioner's lawyer also presented the trial court with the very same justification for his proposed inquiry as the defense did in *Henry*—a good faith basis to explore a motive to lie.  *Henry*, 22 F.3d at 1212-13.  Like in *Henry*, there was no legitimate reason not to allow this line of questioning here in a case that turned entirely on one witness, a child, who had every reason to fabricate her allegations. Allowing petitioner to introduce evidence of the complainant's fear of parental abuse and banishment, a far more compelling reason to fabricate than the *Henry* complainant's resentment over babysitting, would have prejudiced no one.  It would merely have protected petitioner's right to cross-examine his accuser and fulsomely present his defense.  *See, e.g.*, *Crane* 476 U.S. at 690; *Davis*, 415 U.S. at 316-17 (exposing a witness's "motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.").

*   *   *

---

[38] T 236.

For all these reasons, the Appellate Division's decision to affirm petitioner's conviction despite the trial court's unconstitutional limit on his right to present a defense and cross-examine his accuser stands in direct opposition to the clearly established Supreme Court precedent described above.   28 U.S.C. § 2254(d)(1). Alternatively, for the same reasons, the writ should be granted because the state court decision in this case was "an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States." *Id.*

## II.   __The Constitutional Violation Was Not Harmless__.

Because C.R. was the sole witness to the alleged offenses, her credibility was paramount, and the defense's inability to fully reveal her motive to fabricate had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750 (1946); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that "the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type."); *accord Fry v. Pliler*, 551 U.S. 112, 120 (2007) (affirming that "the *Brecht* standard of review in assessing the prejudicial impact of federal constitutional error in a state-court criminal trial" is correct).   "Whether a Confrontation Clause violation amounts to harmless error depends on 'the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's

case.'" *Garlick v. Lee*, 1 F.4th 122, 128 (2d Cir. 2021) (quoting *Van Arsdall*, 475 U.S. at 684).

First, there was no inculpatory physical evidence supporting C.R.'s allegations. In fact, the only physical evidence introduced, the DNA testing of C.R.'s fetus, was exculpatory—it excluded petitioner as a potential paternal donor.

Second, without any physical evidence or other eyewitnesses, the prosecution's case hinged on C.R.'s credibility, which was already in doubt given the DNA results. As the trial court itself noted, the case revolved around credibility:

> . . . [C]learly there's issue of credibility which is uniquely suited for the jury.  If they believe the defendant, no crime was committed.  If they believe the complainant, he's a monster.  That's pretty much what it is, so okay.[39]

In these circumstances, any additional evidence of C.R.'s motive to lie may have led the jury to disregard her testimony completely.  *See Kennedy v. Louisiana*, 554 U.S. 407, 444, *as modified* (Oct. 1, 2008) (child rape cases present "special risks of unreliable testimony"); *Jackson v. Conway*, 763 F.3d 115, 141 (2d Cir. 2014) ("We have previously commented on the particular importance of physical evidence in child sexual abuse cases, which often can turn into credibility contests") (internal quotation marks omitted)).  C.R.'s testimony was a "but for" factor necessary for petitioner's conviction, as only she could establish the necessary elements of the crimes petitioner was charged with, and her motive to fabricate that testimony was of critical importance to the defense.

Petitioner's inability to demonstrate C.R.'s motive to fabricate her testimony was thus not harmless and substantially influenced the jury's verdict.  *See Eze v.*

---

[39] T 541.

*Senkowski*, 321 F.3d 110, 133 (2d Cir. 2003) (in a case "built predominantly" on a child's testimony, "it is hard to imagine anything more important for the defense than calling into question the veracity of the children's testimony about the abuse."); *Cotto v. Herbert*, 331 F.3d 217, 257 (2d Cir. 2003) (Confrontation error not harmless because the witness was the sole living person to identify the petitioner, and his cross-examination "could well have significantly undermined his credibility, causing the jury to disbelieve, or at least seriously doubt, his prior statement"); *see also United States v. Vayner*, 769 F.3d 125, 134 (2d Cir. 2014) (holding that the district court's error was not harmless "[b]ecause the wrongly admitted evidence was the sort of evidence that might well sway a jury confronted with a case otherwise turning solely on the word of single witness whose credibility was weak") (internal quotations omitted); *United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004) ("Where the erroneously admitted evidence goes to the heart of the case against the defendant, and the other evidence against the defendant is weak, we cannot conclude that the evidence was unimportant or was not a substantial factor in the jury's verdict").

## III.   <u>Petitioner Exhausted This Federal Constitutional Claim.</u>

Petitioner exhausted this federal Sixth Amendment claim because he challenged, at every level of the state proceedings, the court's refusal to allow him to adequately present his defense through cross-examination of the prosecution's witnesses about C.R.'s fear of banishment and abuse as described in her letter. Further, this petition is timely as it has been filed within a year of February 5, 2021, the date on which the 90-day period expired to seek a writ of certiorari from the

decision of the New York Court of Appeals denying petitioner's request for reconsideration of its denial of leave to appeal. *See* 28 U.S.C. § 2244(d)(1)(A); *Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001); *Mateos v. West*, 357 F.Supp.2d 572, 575 (E.D.N.Y. 2005).

## RELIEF REQUESTED

For the reasons set forth above, this Court should grant the petition and order respondent to release petitioner.

WHEREFORE, petitioner prays that this Court:

(1)    Issue a writ of habeas corpus;

(2)    Order respondent to discharge petitioner from his unconstitutional custody unless, within a reasonable time, petitioner is afforded a new trial, and;

(3) Grant petitioner such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Hannah Kon
Hannah Kon (HK3713)
APPELLATE ADVOCATES
111 John Street, 9th Floor
New York, New York 10038
(212) 693-0085, ext. 549
hkon@appad.org

Attorney For Petitioner

October 29, 2021