# EXHIBIT D

*To be argued by*
HANNAH KON
*(15 minutes)*

# New York Supreme Court

### APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

– *against* –

BERTRAND HENRY,

*Defendant-Appellant.*

*TO BE HEARD ON
THE ORIGINAL
RECORD*

Kings County
Ind. No. 7388/13

A.D. No. 2016-03720

## BRIEF FOR DEFENDANT-APPELLANT

PAUL SKIP LAISURE
*Attorney for Defendant-Appellant*
111 John Street, 9th Floor
New York, NY 10038
(212) 693-0085 x. 211

HANNAH KON
*Of Counsel*
hkon@appad.org

JULY 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iv

PRELIMINARY STATEMENT ....................................................................... 1

QUESTIONS PRESENTED .............................................................................. 1

STATEMENT OF FACTS

Introduction ............................................................................................. 2

Defense Counsel Objects to Broad Time Periods Charged in the Indictment ............................................................................................. 3

The Trial Evidence ................................................................................. 4

C.R. Emigrates From Jamaica and Her Family Leans on Appellant for Support ........................................................................................... 6

C.R.'s Inconsistent Accounts of Her Relations with Appellant ........ 6

C.R. Substantially Narrows the Time Periods Alleged in the Indictment ......................................................................................... 7

C.R. and Her Mother Give Materially Inconsistent Testimony Concerning the Discovery of C.R.'s Pregnancy and Confrontation of Appellant ..................................................................................... 11

Days after Allegedly Learning that Appellant Raped Her Daughter, Angella Finally Brings C.R. to the Police ..................... 13

The People Introduce Call Records Between Appellant and C.R. .... 17

Over Objection, the Court Allows a Phone Recording and Screenshots of Text Messages Into Evidence ................................. 17

The Court Refuses to Allow Appellant to Present Evidence of C.R.'s Relationship with Her Parents ............................................. 18

The Defense Case: DNA Excludes Appellant as the Source of C.R.'s Pregnancy and Three Witnesses Testify that Appellant Followed a Regular Schedule ......................................................... 21

............................................................................................................. 25

i

The Summations.................................................................................27

Deliberations, Verdict, and Sentencing........................................29

ARGUMENT.......................................................................................30

POINT I

THE PEOPLE FAILED TO PROVE APPELLANT'S GUILT
BEYOND A REASONABLE DOUBT, AND THE VERDICT WAS
AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE (1)
APPELLANT'S PHYSICAL APPEARANCE IS MARKEDLY
DIFFERENT FROM WHAT C.R. DESCRIBED; (2) C.R. WAS
HIGHLY MOTIVATED TO ACCUSE MR. HENRY; AND (3) THE
PEOPLE'S WITNESSES GAVE INCONSISTENT TESTIMONY
AND THEIR EVIDENCE WAS UNRELIABLE.................................30

    A. Appellant's Physical Appearance is Markedly Different from
What C.R. Described.......................................................................32

    B. C.R. was Highly Motivated to Accuse Appellant......................33

    C. The People's Key Witnesses and Evidence Were Not Credible....34

POINT II

THE COURT ABUSED ITS DISCRETION AND DEPRIVED
APPELLANT OF DUE PROCESS AND A FAIR TRIAL WHEN IT
PRECLUDED DEFENSE COUNSEL FROM INQUIRING INTO
PARENTAL DISCIPLINE AND C.R.'S MOTIVE TO FABRICATE.....38

    A. C.R.'s Fear of Her Parents was Relevant to Her Motive to
Fabricate.........................................................................................39

    B. C.R.'s Intimate Relationship with Her Boyfriend Established a
Motive to Fabricate........................................................................44

POINT III

APPELLANT WAS DEPRIVED OF DUE PROCESS, NOTICE OF
THE CHARGES AGAINST HIM, AND A FAIR TRIAL DUE TO
THE OVERLY BROAD TIME PERIODS CHARGED IN THE
INDICTMENT............................................................................................47

POINT IV

THE COURT DENIED APPELLANT A FAIR TRIAL WHEN,
OVER OBJECTION, IT ALLOWED INADMISSIBLE HEARSAY
AND UNRELIABLE EVIDNCE...................................................................50

    A. The Court Improperly Admitted Unreliable Hearsay Evidence....................50

    B. The Court, Over Objection, Improperly Allowed Unreliable
    Text Messages and Voice Recordings ...................................................52

POINT V

APPELLANT'S EXCESSIVE PRISON SENTENCE SHOULD BE
REDUCED IN LIGHT OF HIS VETERAN STATUS, MINIMAL
CRIMINAL RECORD, AND STABLE EMPLOYMENT HISTORY ......................55

CONCLUSION ...........................................................................................57

PRINTING SPECIFICATIONS STATEMENT

STATEMENT PURSUANT TO RULE 5531

## TABLE OF AUTHORITIES

### CASES

Chambers v. Mississippi, 410 U.S. 284 (1973) ................................................38

Crane v. Kentucky, 476 U.S. 683 (1986) ....................................................38

Jackson v. Virginia, 443 U.S. 307 (1979) ............................................31, 37

Nevada v. Jackson, 569 U.S. 505 (2013) ................................................38

People v. Bennett, 57 A.D.3d 688 (2d Dept. 2008) ..............................49, 50

People v. Bhattacharjee, 51 A.D.3d 684 (2d Dept. 2008) ..........................57

People v. Bleakley, 69 N.Y.2d 490 (1987) ..........................................31, 37

People v. Bornholdt, 33 N.Y.2d 75 (1973) ..............................................43

People v. Bradley, 99 A.D.3d 934 (2d Dept. 2012) ....................................39

People v. Carroll, 95 N.Y.2d 375 (2000) ............................................38, 42

People v. Crimmins, 36 N.Y.2d 230 (1975) ..............................................46

People v. Evangelista, 155 A.D.3d 972 (2d Dept. 2017) ............................51

People v. Fisher, 104 A.D.3d 868 (2d Dept. 2013) ....................................45

People v. Grant, 60 A.D.3d 865 (2d Dept. 2009) ............................39, 41, 43

People v. Hill, 34 A.D.3d 1130 (3d Dept. 2006) ........................................56

People v. Jovanovic, 263 A.D.2d 182 (1st Dept. 1999) ..........................44, 45

People v. Keith, 154 A.D.3d 877 (2d Dept. 2017) ....................................56

People v. Loja, 305 A.D.2d 189 (1st Dept. 2003) ......................................45

People v. Masucci, 266 A.D.2d 579 (3d Dept. 1999) ................................57

People v. McMitchell, 110 A.D.3d 923 (2d Dept. 2013) ..........................30, 31

People v. Melendez, 129 A.D.2d 449 (2d Dept. 1987) ................................56

iv

People v. Ocampo, 28 A.D.3d 684 (2d Dept. 2006)...................................... 40, 44

People v. Ortiz, 135 A.D.3d 649 (1st Dept. 2016)......................................51

People v. Rosario, 17 N.Y.3d 501 (2011) .............................................51

People v. Sedlock, 8 N.Y.3d 535 (2007).................................... 47, 48, 49

People v. Stavris, 75 A.D.2d 507 (2d Dept. 1980) ...............................43

People v. Thompson, 111 A.D.3d 56 (2d Dept. 2013) .........................46

People v. Tillman, 57 A.D.3d 1021 (2008) ...................................... 52, 53

People v. Vo, 166 A.D.3d 1587 (4th Dept. 2009) ...............................41

Schozer v. William Penn Life Insurance Co., 84 N.Y.2d 639 (1994) ............... 53, 54, 55

Shanmugam v. SCI Eng'g, P.C., 122 A.D.3d 437 (1st Dept. 2014).........................54

Washington v. Texas, 388 U.S. 14 (1967)...............................................38

## CONSTITUTIONAL PROVISIONS

U.S. Const., Amend. VI..............................................................38

U.S. Const., Amend. XIV....................................................... 31, 38

N.Y. Const., Art. I, § 6............................................................ 31, 38

## STATUTES

C.P.L. § 60.42.........................................................................44

C.P.L. § 470.15.......................................................................31

P.L. § 130.30............................................................................1

P.L. § 130.35............................................................................1

P.L. § 130.50........................................................................ 1, 6

N.Y. Soc. Serv. Law § 413..........................................................13

## OTHER AUTHORITIES

NYC Department of Education School Calendar for 2012-2013 ...................................12

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

-------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,      :

                             :

             Respondent,        :

                             :

         - against -         :

                             :

BERTRAND HENRY,                :

                             :

         Defendant-Appellant.    :

-------------------------------------------------------------------------x

## PRELIMINARY STATEMENT

Appellant, Bertrand Henry, appeals from a judgment of the Supreme Court, Kings County, rendered March 21, 2016, convicting him, upon a jury verdict, of rape in the first degree (P.L. § 130.35), rape in the second degree (P.L. § 130.30), and criminal sexual act (P.L. § 130.50), and sentencing him to consecutive prison terms for each count of rape in the first degree and criminal sexual act and seven years for rape in the second degree (S 10). (Del Giudice, J.).

Timely notice of appeal was filed, and on May 8, 2017, this Court granted appellant leave to appeal as a poor person and assigned Paul Skip Laisure as appellate counsel.

Appellant is incarcerated pursuant to the judgment.  There was no application for a stay.

1

## QUESTIONS PRESENTED

1. Did the People fail to prove appellant's guilt beyond a reasonable doubt, and was the verdict against the weight of the evidence, because (1) appellant's physical appearance is markedly different from what the complainant described; (2) the complainant was highly motivated to fabricate her accusations against appellant; and (3) the People's witnesses gave inconsistent testimony revealing their extortion scheme?

2. Did the court abuse its discretion and deprive appellant of due process and a fair trial when it prevented him from presenting a defense that the complainant was motivated to fabricate the accusations against appellant to protect herself and her boyfriend once her pregnancy was discovered?

3. Was appellant deprived of due process, notice of the charges against him, and a fair trial because the time periods charged in the indictment were unreasonably overly broad, which in turn prevented him from establishing an alibi and other defenses?

4. Did the court abuse its discretion and deprive appellant of a fair trial when it allowed unreliable hearsay into evidence under the "outcry" exception even though the complainant made the supposed outcry two months after the last alleged assault?

5. Did the court abuse its discretion and deprive appellant of a fair trial when, over objection, it allowed unreliable phone recordings into evidence?

6. Did the court abuse its discretion and deprive appellant of a fair trial when, over objection, it allowed text message screenshots into evidence where the screenshots violated

the best evidence rule because the People never explained the unavailability of the original text messages, did not establish the absence of bad faith, and failed to show the screenshots were reliable and accurate?

7.     Should appellant's prison sentence be reduced in light of his veteran status, lack of criminal record, and stable employment history?

## STATEMENT OF FACTS

### Introduction

C.R. found herself in a frightening situation in the summer of 2013: She was 13, pregnant, and afraid of her domineering mother.  To shield herself and her 14-year-old boyfriend from the trouble they would find themselves in once her pregnancy was discovered, C.R. told her mother that appellant Bertrand Henry, a 55-year-old ex-boyfriend of her mother's, had been having sex with her over the course of nine months.

Rather than go directly to the police, C.R.'s mother arranged to meet appellant—shockingly, she brought C.R. along—and induced appellant to draw up and sign a written contract promising to pay C.R.'s mother thousands of dollars. C.R.'s mother did not report this supposed crime to law enforcement until days later, after appellant refused her subsequent demand for even more money.  Appellant has maintained his innocence of the charges since being arrested and a DNA test proved that he did not impregnate C.R.

3

Inconsistencies in C.R.'s story came to light during the trial. C.R. was unable to accurately describe appellant's chest, which had scarring and discoloration from injuries he sustained in the Iraq war, despite claiming that she had seen him naked multiple times. Contrary to C.R.'s testimony that appellant's chest was covered in thick, dark hair, photographs of appellant's chest showed he had almost no chest hair at all. C.R. was unable to give consistent testimony about the events that took place on the days that she was supposedly raped. C.R. and her mother—the People's two key witnesses—also gave inconsistent testimony about when and how appellant supposedly admitted that he had sex with C.R.

Throughout the trial, unbalanced decisions by the court prevented the jury from hearing evidence of C.R.'s strong motive to fabricate her allegations while allowing it to hear inadmissible evidence that unfairly bolstered her credibility. At several points, the court restricted questioning by defense counsel about C.R.'s home life and relationship with her mother. Conversely, the court allowed unreliable phone recordings and text message screenshots into evidence, despite that the possibility of tampering.

<u>Defense Counsel Objects to Broad Time Periods Charged in the Indictment</u>[1]

After a partially successful motion to dismiss, appellant was tried on nine counts: Two counts of rape in the first degree (counts one and three); five counts of

---

[1] Citations without prefix refer to the trial transcript, "H" refers to hearing transcripts, and "S" to sentencing.

rape in the second degree (counts five through nine); and two counts of criminal sex act in the first degree (counts two and four).   For the first two counts, the period charged was approximately one month; for counts three and four, the period charged was over six weeks; for count five the period charged was three days; for counts six through seven the periods charged were approximately two months; and for count eight the period charged was approximately one month.   Only count nine referenced a specific date.

During a pretrial hearing on March 7, 2016, defense counsel noted that it was "very difficult" to defend against the allegations charged in the indictment because of the significant range of time during which each charged offense was alleged to have occurred (H 8).   The court flatly rejected defense counsel's objection to the broad time frame, incorrectly asserting that the issue had been previously ruled on during the motions phase of the proceedings.   In fact, the court had previously ruled only that no more than one criminal act could be charged for each time period so as to prevent unconstitutional duplicity of the counts.   See February 4, 2014 Order.   The court made no ruling concerning whether the breadth of each of those charged periods was sufficiently narrow.   Despite this, the court cautioned defense counsel not to bring the matter up again and refused to hear additional argument concerning the issue (H 8-9).

<u>The Trial Evidence</u>

<u>C.R. Emigrates From Jamaica and Her Family Leans on Appellant for Support</u>

In September 2011, when she was 11, <u>C.R.</u> emigrated from Jamaica with her sister, <u>Valentina Valentine</u> (C.R. 181).  C.R. and Valentina joined their mother, <u>Angella</u>, in a two-bedroom apartment in Brooklyn (C.R. 181, 238, 239).  C.R.'s home life was difficult.  In the small apartment shared by three people, she often avoided conversation with her mother (C.R. 243).  C.R. did not want to spend time in her house and took every opportunity to leave (C.R. 283).  C.R. told her teacher that her mother hated her and threatened to send her back to her abusive father in Jamaica (103-104).

Money was tight in Angella's household and she struggled to pay various living expenses (A.R. 48).  Appellant, Angella's sometimes-boyfriend, would often chip in and pay for expenses like groceries or Metrocards.  <u>Id.</u>  Valentina described appellant as a "generous person" and the "go-to person" for anything that anyone in the family, including Valentina, needed (Valentine 352:8-13).

Appellant tried to help C.R. adjust to her new home.  He took her on trips to the park or, at her request, to the movies (C.R. 254, 283).  He bought her a cell phone when she wanted one (C.R. 261).  C.R. testified that appellant was a father figure to her (C.R. 254).

6

Appellant's involvement with the family was described in positive terms by Angella during the trial:

> I'm a single parent and certain things I couldn't afford at times . . . you know, <u>he's a kind person</u> and I was good with that (A.R. 48) (emphasis added).

While Angella testified that she objected to appellant picking up C.R. or spending time with her alone (A.R. 49), C.R. said that, in fact, her mother signed the permission card authorizing appellant to pick C.R. up from school and often directed him to do so (C.R. 296).

<u>C.R.'s Inconsistent Accounts of Her Relations with Appellant</u>

C.R. testified that appellant first had sex with her in September 2012 (C.R. 190). Appellant came to the house when C.R. was alone and offered her rum as they watched a movie together. <u>Id.</u> C.R. told the jury that appellant led her to the couch once she was drunk and had sex with her, then warned her not to tell anyone because he was a "respectable person in the community" and no one would believe her (C.R. 192-93, 195).

Sometime between October 1, 2012 and November 11, 2012, C.R. said that appellant found her in the park, drove her around in his car and then forced her to perform oral sex on him before having sexual intercourse with her (C.R. 197-204). C.R. said she did not tell anyone about the incident because appellant was "contributing to the bills" and buying her clothes (C.R. 195).

7

C.R. also testified that appellant had sex with her on her 13th birthday, November 12, 2012, but her description of the events of this day during her direct testimony differed significantly from the version she provided on cross-examination.

During her direct examination, C.R. told the jury that, on the morning of her birthday, appellant came over to C.R.'s house (C.R. 206-207). Valentina was at home when appellant arrived but left shortly after for work (C.R. 206). Once Valentina left, appellant went to his car, brought back a cake and gifts, and sang C.R. "Happy Birthday" (C.R. 207). C.R. then "left [appellant] in the house and went to the park and took my keys, and I started hanging out with my friends" (C.R. 207, 208). Appellant eventually came to the park in his car, approached C.R., and asked her to come with him (C.R. 208). C.R. said that she went with him and did nothing but sit in a chair in the park for four hours while appellant socialized with his friends (C.R. 209).

While she claimed during her direct testimony that only appellant sang her happy birthday and gave her a cake, during her cross-examination C.R. testified that appellant brought the cake while her mother and sister were still home and they had an impromptu birthday party at around 11:00 a.m. (C.R. 278-279). C.R. at first claimed that she only skipped school the morning of her birthday:

Q: So you went to school late?

A: Yeah.

8

C.R. 280.  But when she became aware that this would contradict the timeline she had earlier provided, C.R. quickly changed her testimony:

> Q. You told us that after the birthday party, you went to the park.
> A. Uh-huh.
> . . .
>
> Q. That's not what happened? You went to the school?
>
> A. I went to school to drop off the note. You have to have a note or they're going to call you.
> . . .
>
> I just dropped off the note.
>
> Q: What was the note; that it was your birthday and you need to be excused?
>
> A: No. My mom said I went to the doctor's appointment.
>
> Q. And you told us that there was a point in time when you went to the park; right?
>
> A. Yes.
>
> Q. And you were playing with your friends?
>
> A. Yes.
>
> Q. Your friends cut school or skipped school?
>
> A. Yeah, basically.

C.R. 280.  C.R. said that, despite her friends skipping school to spend time with her in the park, she left them behind and went with appellant.

9

C.R. claimed to have spent four hours in the park while appellant was with his friends during both versions of her testimony, never once asking to leave (C.R. 283, 287). This portion of C.R.'s narrative had to account for a substantial gap between when she said appellant picked her up in the park (early afternoon) and when she alleged that they had sex (after dark to avoid the risk of being seen) (C.R. 280-81, 289).

C.R. told the jury that she had sex with appellant four more times in her house over the course of the next seven months (C.R. 210-212). Despite having allegedly seen appellant naked on all these occasions, C.R. denied that appellant had scars or discoloration and claimed that he had thick dark hair covering his chest:

> Q: . . . was there anything that you saw on his body that stood out in your mind?
>
> A: No.
>
> Q: Is there any detail you can give us and tell us to say yes, I've seen this man naked because he has this or he has this particular feature? Any detail you can give us?
>
> A: He has hair on his chest.
>
> Q: How much hair?
>
> A: Like, full of hair.
>
> Q: Like dark hair? Course [sic] hair?
>
> A: Yeah.
>
> . . .

10

Q: Anything about the skin or marks on the skin, can you give us any detail?

A: No (C.R. 292-293).

C.R. told no one that she was having sex with appellant during the entire nine-month period in which this supposedly occurred because appellant was "assisting with everything" and she was worried that if his financial assistance stopped her mother would not be able to pay the rent (C.R. 213). C.R. also said that appellant told her that if he "ever face[d] going to jail" he would kill himself or kill her mother (C.R. 234). Angella claimed that after C.R.'s pregnancy was discovered, C.R. told her mother that she delayed reporting appellant's assaults because he had threatened to shoot C.R. and himself (A.R. 114).

Despite failing to report to anyone that she was having sex with appellant, C.R. told her mother that appellant was living with another woman, Nadine Hamilton, and that Ms. Hamilton had screamed and yelled at C.R. when appellant had brought her to his home in Queens (C.R. 316).

C.R. Substantially Narrows the Time Periods Alleged in the Indictment

During cross-examination, C.R. significantly narrowed the time periods during which the charged offenses allegedly occurred. For counts one and two, she narrowed the time frame from a month down to approximately four days (sometime between September 1, 2012 and September 4, 2012) (C.R. 255-257). Specifically, C.R. testified that she had sex with appellant in the first few days of September and that the

11

day after they had sex the school year had not yet begun.  Id.  That year, the Brooklyn public schools started on Thursday, September 6, 2012.  See NYC Department of Education School Calendar for 2012-2013, available at: https://www.nctq.org/dmsView/NYC_2012-2013_Calendar (last viewed: June 6, 2019).  Thus, according to C.R.'s testimony, the rape must have occurred between September 1, 2012 and September 4, 2012 (it could not have occurred on September 5, 2012, because September 6, 2012 was a school day) (C.R. 255-257).

C.R. similarly narrowed the relevant time frame for counts three and four from six weeks down to approximately four days (the two first weekends in November 2012) (C.R. 275).  C.R. told the jury that she and appellant had sex on her birthday, November 12, 2012.  C.R. claimed to have relayed this date to the detective and prosecutors, though they failed to specify that date in count five of the indictment, which charged that the crime occurred between November 12, 2012 and November 14, 2012 (C.R. 278, 290-91).  C.R. likewise testified on cross-examination that she had sex with appellant "a week after New Year's," thus narrowing the time period charged in count six from almost two months to a single week (C.R. 294).  C.R. further specified that she had sex with appellant on a school day in the month of May, eliminating the weekends charged in count 8 (C.R. 298).

<u>C.R. and Her Mother Give Materially Inconsistent Testimony Concerning the
Discovery of C.R.'s Pregnancy and Confrontation of Appellant</u>

C.R. and Angella agreed that sometime in mid-August 2013, C.R.'s mother took her to the doctor because C.R. was feeling sick. (A.R. 54:1-6). According to C.R., the doctors took some tests during this first visit (C.R. 216). When C.R. and her mother returned to the doctor, on or about August 14, 2013, the clinic staff informed C.R. and Angella that C.R. was approximately two months pregnant (C.R. 2165, 299-300).[2]

C.R. and Angella gave several inconsistent, and at times contradictory, accounts of how and when C.R. told Angella about her supposed sexual encounters with appellant. Both Angella and C.R. initially testified that, upon learning for the first time at the doctor's office that C.R. was pregnant, Angella immediately asked C.R. who she was having sex with and C.R. identified appellant (A.R. 54-56, C.R. 217). Angella said she immediately called appellant on the phone and demanded an explanation. <u>Id.</u> This testimony directly contradicted A.R.'s cross-examination testimony, wherein she claimed that C.R. told her that she was having sex with appellant while in the car with both appellant and Angella on the way to the doctor's office, where they later learned that she was pregnant (A.R. 114-115, 119). Angella then gave a third version of her narrative, saying that C.R. first told Angella that she

---

[2] There was no evidence that the doctor's office ever contacted the police pursuant to a health care provider's mandatory duty to report child abuse. <u>See</u> N.Y. Soc. Serv. Law § 413 (McKinney 2018).

had sex with appellant at the hairdressing shop, <u>before</u> anyone knew she was pregnant (A.R. 131).   Finally, Angella said that C.R. actually told her that she had sex with appellant in the car on the way to the hair salon and she called appellant, who said he would come speak with her in person (A.R. 132-33).

C.R.'s direct examination testimony differed from all four narratives provided by her mother.  C.R. testified that she told Angella at the doctor's office that appellant was responsible for her pregnancy (C.R. 216-217).  They then went to the hair salon so that Angella could have her hair done and Angella called and confronted appellant for the first time by phone from the hair salon (C.R. 217).

Angella and C.R. both testified on direct examination that Angella asked appellant to pick up both C.R. and her from the hair salon at some point after C.R. had told her mother that they had had sex (A.R. 56-57; C.R. 218).  While C.R. sat in the backseat of appellant's car, Angella confronted appellant and he admitted to repeatedly having sex with C.R. (A.R. 57-58; C.R. 219).   He and Angella then discussed financial support concerning the pregnancy in front of C.R.  <u>Id.</u>  Angella said that appellant wanted C.R. to be sent to his home, St. Vincent's Island, to have the baby and offered to give Angella a thousand dollars a month, up to $20,000.00, for C.R. and the baby's care in St. Vincent[3] (A.R. 58).  When their discussion was over, Angella returned to the hairdresser and finished having her hair done (A.R. 63:4-

---

[3] Angella's testimony is inaccurate in that appellant is from Grenada, not St. Vincent's Island (Henry, 469).

14

5).   Angella did not go to the police.   Instead, a couple of days later, she asked appellant—the man who had supposedly been raping her young daughter—to drive C.R. and her to the doctor (A.R. 63:22-64:12).   With C.R. once again in the backseat, Angella secretly opened her phone and recorded appellant (A.R. 65:20-66:8).   Angella claimed that she did not go to the police but instead arranged multiple meetings with her daughter's supposed rapist—with her daughter in attendance—because she "wanted to get to the bottom" of C.R.'s allegation "to see if it is true or a lie" (A.R. 114).

C.R. changed her story yet again during her cross-examination, but it was still inconsistent with her mother's varying accounts.   In this version, after learning at the doctor's office that she was pregnant, C.R. went downstairs with her mother where appellant was waiting in his car (C.R. 306-307).   Angella informed appellant in the car that C.R. was pregnant and there was a discussion about appellant's providing financial support (C.R. 308, 310).   C.R. said that her mother and appellant discussed C.R. having an abortion and appellant suggested that C.R. be sent to live in his country and he would pay a monthly stipend for her care (C.R. 219-220).   After the discussion, appellant dropped C.R. and Angella off at the hair salon so that Angella could have her hair done (C.R. 311).   In this version of C.R.'s narrative, appellant did not return to the hair salon and they did not see him again that day (C.R. 313).

C.R. and Angella also differed on another key point: whether appellant was forced to write and sign the contract requiring him to pay thousands of dollars to

Angella.  Angella told the grand jury that she demanded that appellant write down his admission that he had sex with C.R. and that he would give her money to support C.R.'s child because she wanted "proof" to bring to the police. (A.R. 128).  Angella gave completely contradicting testimony during the trial, however, claiming instead that writing the arrangement down was appellant's idea" (A.R. 74).  Unsatisfied with his writing, Angella added a paragraph and then she, appellant, and C.R. all signed the paper (A.R. 74-75; People's Exhibit 4).  Angella denied at trial that she had asked appellant to write and sign the contract (A.R. 126).  Notwithstanding her new contention that it was appellant's idea to write the contract, Angella continued to insist at trial that she delayed going to the police to report her daughter's supposed rape so that she could obtain "proof" of appellant's guilt (A.R. 123).

C.R. told the jury that when appellant drove Angella and C.R. to the doctor, Angella told him to write down "what [he] did" (C.R. 221, 222).  Angella wrote down what appellant had supposedly done and told appellant that if he did not sign it "I'm gonna get out the car and go to the cops" (C.R. 222-223).  On cross-examination, however, C.R. changed the timeline of these events significantly, claiming that she met with appellant and her mother on the same day that they reported him to the police, August 19, 2013, days after they had last been at the doctor's office (C.R. 313).  It was during that meeting, C.R. claimed, that Angella forced appellant to sign a paper admitting that he had sex with C.R. and agreeing to pay a monthly amount (C.R. 314).

16

Days after Allegedly Learning that Appellant Raped Her Daughter, Angella
Finally Brings C.R. to the Police.

Angella waited until August 19, 2013 to inform law enforcement of her daughter's sexual assault, several days after she claimed to have learned that her daughter had sex with appellant and at least three days after she claimed to have obtained the necessary "proof" (Det. Danielle Kenny 375). Angella brought C.R. to the 73rd Precinct to make a report, and the 73rd Precinct transferred the matter to Detective Kenny with the Brooklyn Special Victims Unit (Det. Kenny 374). Appellant was arrested on August 26, 2013 and brought to Detective Kenny for questioning (Det. Kenny 376; 394). Appellant voluntarily provided a DNA sample, cooperated with Detective Kenny in all respects, and denied sexually assaulting C.R., explaining that Angella was trying to extort money from him. (Det. Kenny 394).

The People Introduce Call Records Between Appellant and C.R.

The People introduced records of calls between C.R.'s cell phone and appellant's cell phone for March, April, May, and June 2013. See People's Exhibits 6A-6B. An employee of T-Mobile Metro, Ronald Witt, gave evidence as to how the records were kept (Witt 157-158). The People did not introduce call records for September 2012 through February 2013, i.e., the first six months charged in the indictment. See People's Exhibits 6A-6B. The People similarly did not introduce call records for 2011 and 2012, the period when C.R. testified she had a loving, father-daughter-like relationship with appellant (C.R. 254). In the approximately three-

17

month period reflected in the call logs, appellant called C.R.'s phone 187 times, but only 13 of those calls lasted more than two minutes. <u>See</u> People's Exhibits 6A-6B. There were 260 calls from C.R.'s phone number to appellant's number, but only 24 of them were over two minutes long. <u>See</u> People's Exhibits 6A-6B. The vast majority of the calls between the two phones thus likely involved no conversation between C.R. and appellant because the call was either terminated or went to voicemail (<u>Witt</u> 170). The call log also does not indicate who actually made the call and appellant testified that Angella sometimes used C.R.'s phone (Henry 482).

<u>Over Objection, the Court Allows a Phone Recording and Screenshots of Text Messages Into Evidence.</u>

Angella testified that she met appellant in person and surreptitiously recorded him on her cell phone (A.R. 65). The recording was transcribed and, because Angella and appellant spoke in Jamaican Patois, translated. Appellant did not object to the translation of the transcription, but objected to the admissibility of the recording itself on the grounds that the People did not lay the proper foundation (67). The court overruled this objection after Angella testified that she had personally recorded the conversation (67).

In the recording, appellant appears to agree that he has wronged Angella and has hurt her. People's Exhibit 3, 3A. When Angella asks appellant where he had sex with C.R. "the first time," appellant seems to respond with the words "in the car." People's Exhibit 3A. At one point during the recording, appellant says "thirteen,"

18

seemingly in response to Angella asking him how old C.R. was when he first had sex with her,[4] and says "I shouldn't have," seemingly in response to Angella asking him why he had sex with C.R.  Id.  At no point during the recording does appellant ever verbalize that he had sex with C.R. or impregnated her.  See generally id.  Rather, Angella directs the entire conversation and appellant appears to agree at certain points to accusations made by Angella.  Id.

The People also introduced screenshots of text messages that appellant supposedly sent from his phone to Angella's phone and to C.R.'s phone (90).  The only phone number that appears on the screenshots is Angella's cell phone number and C.R.'s cell phone number, respectively.  See People's Exhibits 4-5, 10. Appellant's phone number does not appear, nor does his name.  Id.  The text message to C.R. reads:

> I deceive you and I want to amend
>
> I will do whatever it takes to make you feel better I hurt you bad and I cannot apologize enough just spare my life I beg you
>
> I'm not hiding I will face the consequent [sic].

People's Exhibit 10.

The text messages to Angella read:

> You want me to say yes again yes
>
> You want me to say yes again yes

---

[4] C.R. was 12 when she claims she first had sex with appellant.

19

> I think $1000 a month is ok for now I really don't get that amount each month I finish my life is gone
>
> Are you still going to the clinic tomorrow I have the money for you day [sic]

People's Exhibit 5.

The court overruled defense counsel's objection that the text messages lacked foundation (91-92). The court ruled that Angella's testimony and C.R.'s testimony that they received the messages displayed in the screenshots rendered the screenshots admissible (92).

Detective Kenny testified that C.R. and her mother emailed her the screenshots and that the only phone numbers that appear on the screenshots are C.R.'s and Angella's (Det. Kenny 384-385). No information identifying appellant as the sender of these text messages, such as a phone number or a name, appears on the screenshot (Det. Kenny 385). Detective Kenny confirmed that the screenshot was all she saw— she never looked at C.R.'s and Angella's phones and confirmed the messages' sender (Det. Kenny 385). Detective Kenny similarly never made any effort to contact the cell phone company to find out where the messages were sent from, nor did she conduct any other investigation to determine for herself who sent the text messages (Det. Kenny 386-387).

<u>The Court Refuses to Allow Appellant to Present Evidence of C.R.'s Relationship with Her Parents.</u>

The court refused to allow defense counsel to question witnesses concerning C.R.'s abusive home life or to submit evidence that C.R. feared her mother. The court sustained the People's objections to questions about whether Angella had "problems with C.R.," whether Angella had ever hit C.R., and whether C.R. had ever run away from home (A.R. 102). The court also refused to allow defense counsel to elicit testimony from C.R. concerning whether Angella was angry with C.R. because she had gotten pregnant or whether they had any disagreement over it (C.R. 307). At a bench conference, defense counsel explained that these questions were relevant to appellant's defense because they showed that C.R. was "terrified" of her mother (A.R. 102-103). Defense counsel told the court that he had a good faith basis to ask these questions due to a letter C.R. had written her teacher in 2013 (A.R. 103). In the letter, C.R. explains that her mother "hates" her and had threatened to send her back to Jamaica to live with her abusive father (103). The court refused to allow the letter to come into evidence and also refused to allow questioning about the letter or based on it (103-104). In response to defense counsel's protestation that the letter talked about abuse by both C.R.'s mother and father, the judge responded that such abuse had "nothing to do with what's going on with this case" (104).

Before beginning his cross-examination of C.R., defense counsel once again implored the court to allow him to delve into C.R.'s relationship with her mother, and

the abuse she had outlined in the letter to her teacher, because it was essential to his theory of the case (C.R. 236, 19-20). Relying on the letter, defense counsel stated that it gave him "the ability to at least ask questions whether she was abused or threatened by her mom" (236). The court refused to allow this line of questioning:

> I don't care what your theory of the case is. The issue that you have is that it's not admissible evidence, all right? I'll give you ample opportunity to cross-examine her as to the domestic, the parameters, the environment of the family with her and the defendant and her mother for the times that are relevant, but anything subsequent . . . (236, 21-237).

The court allowed only general questions about the relationship between C.R. and her mother. Defense counsel was permitted to ask what C.R.'s "relationship was like with [her] mother" and whether C.R. ever had "disputes with [her] mom" or "arguments with [her] mom about things other than school" (C.R. 240-41). The court also allowed defense counsel to ask C.R. whether she had ever run away from home (C.R. 241-42). However, the court sustained objections to defense counsel's questions as to whether there was friction between C.R. and her mother; to whether C.R.'s mother had threatened to send her back to Jamaica; to the reasons why C.R. did not want to engage in too much conversation with her mother; and to whether her mother ever hit her (C.R. 242, 243).

Similarly, the court refused to allow defense counsel to question Angella concerning an Administration for Child Services (ACS) report charging her with

neglect based on C.R.'s claim that Angella knew her ex-boyfriend was having sex with C.R. (140-141):[5]

> Q: Were you contacted by ACS in regards to what –
>
> THE COURT: Sustained. Sidebar right now. . . .
>
> Where you going with this?
>
> MR. RABAH: Uhmm, there is a report from ACS where she was identified for possible lack of parental guidance.
>
> THE COURT: Based on the pregnancy of a child?
>
> MR. RABAH: Uhmm, based upon that letter that the child wrote to the school.
>
> THE COURT: How is that relevant? Now we'll go back to that one more time and see if you can catch the drift; all right?
>
> That letter was written by the child after the event. It has no relevance or probative value that there was some type of domestic incident in the home where this child would fabricate against your client. For you to try and impeach this witness because ACS commenced an investigation because the child advised the teacher that she was essentially statutorily raped by your client and somehow now that casts [a]spersions on the mother, that's not right. That's not proper, okay?
>
> You are impeaching her with an alleged prior bad act that she didn't do. Just the mention of the fact that she was investigated by ACS is somehow to tarnish this woman. . . . The child never said in that letter that my mother abused me and that's why she made up this story about being raped; all right?

---

[5] C.R.'s letter does not identify appellant by name, so it is unknown whether the ex-boyfriend she refers to in the letter is appellant or someone else.

23

Id.  When defense counsel tried to clarify that he was not questioning Angella about the ACS Report to impeach her but rather because these questions were relevant to his client's defense, the court simply cut him off and told him that the report, because it was "ex post facto," was irrelevant:

> . . . What does [the ACS Report] have to do with anything? What is the probative value of that? That, oh, after the kid wrote the letter that you're not allowed to put into evidence, all right, that there was an investigation concluded? Come on. I wasn't born yesterday. Get back out there. Let's go (144).

The court also limited appellant's ability to expose C.R.'s misstatements to medical personnel concerning her sexual activity.  C.R. did not tell her mother or the doctors that she was sexually active with her 14-year-old boyfriend (C.R. 217, 304). When C.R. went to a Planned Parenthood clinic to terminate the pregnancy, she lied and told the Planned Parenthood staff that she had no sexual partners other than appellant (177).  The jury was prevented from learning that C.R. had her pregnancy terminated and lied to the Planned Parenthood staff again about the father of her fetus (H 26-27).  When defense counsel asked C.R. if she was having sex with her 14-year-old boyfriend, to expose her motive to fabricate her allegations against appellant and her prior inconsistent statements to medical personnel and law enforcement, the court threatened him with contempt (C.R. 301).

<u>The Defense Case: DNA Excludes Appellant as the Source of C.R.'s Pregnancy</u>
<u>and Three Witnesses Testify that Appellant Followed a Regular Schedule.</u>

Appellant served in the United States military in Iraq between 2002 and 2004, at which point he was honorably discharged. (Henry 468). While serving his country in Iraq, appellant was involved in an accident near an oil well. (Henry 509-510). This left him with scarring and discoloration on his chest and almost no hair on his chest. (Henry 509-510). Appellant also has scars on his arms from another injury he suffered in Iraq. (Henry 511). Defense counsel submitted photos of appellant's chest and arms into evidence during the trial.[6] In addition to his physical scars, appellant's service in Iraq left him with deep emotional trauma. The court did not allow appellant to testify concerning the fact that he was diagnosed and treated for post-traumatic stress disorder (471). However, appellant was able to testify that when he is confronted with stress-inducing situations it is "like being back in Iraq again." (Henry 487).

Appellant testified that he tried to help C.R. adjust to her new life in America. He took her to play with the twin daughters of a friend of his and to netball games at the park (Henry 476). Appellant and Angella eventually ceased being intimate (A.R. 50), and he entered into a relationship with another woman, Nadine Hamilton. (Henry

---

[6] Black and white copies of the pictures will be attached under separate cover. Despite repeated requests to defense counsel, this office was unable to obtain the original color pictures of appellant's chest that were used at trial. Unfortunately, the black and white copies do not adequately show the discoloration and scarring displayed in the color photographs and referenced during trial.

478). Appellant also started a job at JFK airport in August 2012 which required him to work Wednesdays through Sundays every week (Henry 480-81). Appellant was a routine-oriented "workaholic" who was set in his ways (Ainsely Cummings, 451). Not only did appellant work five days a week at JFK, but he would also help his friend, Ainsley Cummings, with the construction of Mr. Cummings' basement remodel every Monday and Tuesday, his two days off. (Cummings 450; Zephania Farquharson 461-465). A second friend, Zephania Farquharson, confirmed that appellant was at Mr. Cummings' house on his days off every week without fail during 2012-2013 (Farquharson 461-462, 465).

Appellant's busy schedule meant that he saw C.R. and her family dramatically less after August, 2012 (Henry 482). C.R. was not happy with this turn of events, and Angella texted appellant repeatedly to tell him that C.R. requested that he visit (Henry 482).

After Angella told him that C.R. was pregnant and had identified him as the father of her fetus, appellant agreed to meet with Angella in person to gain some kind of understanding as to why she would make this allegation (Henry 488). During this meeting, Angella held up a phone with C.R.'s father on the other line in Jamaica (Henry, 489-491). C.R.'s father threatened appellant that if he did not provide Angella the funds she asked for, he would kill appellant's infant son, who was currently in Jamaica (Henry 491-492).

26

The thought of harm coming to his son sent appellant into a tailspin. He started sweating. (Henry 492). His heart was pounding.  Id.  Due to the emotional trauma he suffered in Iraq, appellant went into a state of panic (Henry 487). He "thought [he] was back in Iraq again." Id.  Appellant was so scared for his infant son that he decided to agree to whatever Angella demanded, knowing that eventually a DNA test would clear him (and it did) (Henry 501-502).  He "went along" because it was "life or death" for his family" (Henry 492).  Appellant signed a contract agreeing to pay Angella $1,000.00 a month, up to $20,000.00 for the care of C.R.'s child (Henry 493).  He said whatever she wanted him to say (Henry 493-494).  But it was not enough.  Angella texted him the next day, demanding more money (Henry 504). With the benefit of time and distance, appellant was able to think rationally and, knowing that he was innocent and would be exonerated by the DNA test, he refused to submit to any further extortion from Angella (Henry 505).

After his arrest, appellant voluntarily submitted his DNA to be compared against that of C.R.'s fetus (Henry 506).  The DNA test conclusively ruled out appellant as the father (Gajewski 443-444).

The Summations

During his summation, defense counsel asked the jury to imagine C.R.'s shock and fear when she found out she was pregnant and was confronted by Angella (550). To avoid getting into trouble with her mother, C.R. identified appellant as the father of her child, before the DNA testing proved this to be false. C.R.'s lie "snowballed"

and once she had told her mother and police she could not reveal that she had not been truthful (555). Defense counsel attempted to attack C.R.'s credibility, pointing out that she could not remember a single date on which she was supposedly assaulted, except for June 18, 2013. This date was, conveniently, exactly two months prior to when she found out she was two months pregnant (553-54). Defense counsel reminded the jury that C.R. told her mother about visiting Ms. Hamilton's house and having Ms. Hamilton scream at her (556-57). This interaction, defense counsel argued, would have equally jeopardized appellant's position in the family yet C.R. reported it to her mother. This undercut C.R.'s claim that she was afraid to report that appellant had had sex with her for fear of losing his support (558). Defense counsel also highlighted C.R.'s inability to correctly describe what appellant's chest looked like and her lies to medical personnel about her sexual activity (558-560).

Defense counsel also attacked the People's evidence during his summation, pointing out that the call records had been cherry-picked and were not probative and the phone recording and text messages were unreliable and susceptible to tampering (566-568).

The People's summation focused on the relationship between appellant and C.R. and the testimony C.R. gave about the specific instances she supposedly had sex with appellant (575-578). The People emphasized appellant's supposed admissions in the recording and written agreement (582-83). The People tried to explain C.R.'s long delay in reporting the supposed crimes and poke holes in appellant's claim that his

28

work and social schedule prevented him from regularly visiting C.R. and her mother after August 2012 (589-594).

<u>Deliberations, Verdict, and Sentencing</u>

The court submitted all nine counts to the jury. During their deliberations, the jury first requested more copies of the recording transcript and later sent notes requesting assistance in playing the CD of the recording that had been provided to them as it would not play (632, 648-49). The jury then sent a note requesting the photographs of appellant's body that were admitted into evidence, the maps depicting where C.R. testified the sexual assaults in appellant's car took place, the written agreement, and the text messages. <u>See</u> Jury Notes. The jury also requested that portions of C.R.'s testimony concerning "incidents between [September 1, 2012] and [November 12th]" be read back. <u>Id.</u> Finally, upon request by the deliberating jury, the court later re-read the instruction concerning reasonable doubt (640). The jury found appellant guilty on all nine counts (653-655).

Appellant, a 58-year old living in Queens at the time of sentencing, is an Iraqi War veteran who suffered extensive injuries in Iraq (S 4-5). Appellant served in the army for 23 years and then worked as a corrections officer with the New York City Department of Corrections for over 20 years (Henry, 467; Presentence Report at 5). Appellant had a single violation conviction for disorderly conduct prior to his conviction in this case (H 12). The court imposed consecutive prison terms of 25 years for counts one through four (Rape in the First Degree and Criminal Sex Act in

the First Degree), and a prison term of 7 years for counts five through nine (Rape in

the Second Degree) (S 10). Thus, in *toto*, the court sentenced appellant to a prison

term of 107 years. Id. After sentencing appellant, the court noted the following:

> I am aware that the Legislature has indicated that the
> maximum amount of time a person can serve on the
> consecutive B violent felonies, which is what you've been
> convicted of, is 50 years. But I want to send a message to
> any parole authority or any other authority when they have
> to make the determination of whether you should be
> released to society, all right.

S 10.


### ARGUMENT

### POINT I

THE PEOPLE FAILED TO PROVE APPELLANT'S
GUILT BEYOND A REASONABLE DOUBT, AND
THE VERDICT WAS AGAINST THE WEIGHT OF
THE EVIDENCE, BECAUSE (1) APPELLANT'S
PHYSICAL APPEARANCE IS MARKEDLY
DIFFERENT FROM WHAT C.R. DESCRIBED; (2) C.R.
WAS HIGHLY MOTIVATED TO ACCUSE MR.
HENRY; AND (3) THE PEOPLE'S WITNESSES GAVE
INCONSISTENT TESTIMONY AND THEIR
EVIDENCE WAS UNRELIABLE.

It "would not have been unreasonable based upon the evidence presented" for

the jury to have acquitted appellant because the evidence did not credibly support

appellant's conviction. People v. McMitchell, 110 A.D.3d 923, 924 (2d Dept. 2013).

The inconsistencies between C.R. and Angella's accounts and between their own

narratives were glaring. The People did not prove their case beyond a reasonable

doubt given the incredible testimony of the People's two key witnesses, combined with C.R.'s inability to physically describe appellant and her strong motive to fabricate the charges.   Under all these circumstances, the verdict was decidedly against the weight of the evidence.   U.S. Const. Amend. XIV, N.Y. Const. Art. I, § 6; Jackson v. Virginia, 443 U.S. 307 (1979); People v. Bleakley, 69 N.Y.2d 490 (1987); C.P.L. § 470.15(5).

In McMitchell, this Court reversed the defendant's conviction for sexual abuse against two sisters who were of a similar age to C.R. when the abuse occurred.   Id.   In reversing, the McMitchell Court emphasized the inconsistencies in testimony between the mother and her daughters, particularly regarding the original report of abuse.   Id. at 926.   Like C.R. and Angella's varying accounts of C.R.'s original report, the older daughter in McMitchell testified that she blurted out the abuse over the phone while the mother testified she was told of the abuse by the mother of the older daughter's boyfriend.   Id.   The McMitchell Court found that the inconsistencies in these key witnesses' stories merited reversal.   Id. ("Given the contradictory and inconsistent testimony of the prosecution's witnesses, we find that the evidence does not credibly support the defendant's conviction on any of the charges beyond a reasonable doubt.").   The evidence in this case, like that in McMitchell, weighed strongly in favor of acquittal.

31

A.     <u>Appellant's Physical Appearance is Markedly Different from What C.R. Described.</u>

C.R. was unable to describe appellant's basic physical appearance during her testimony though she claimed that she repeatedly saw him naked (C.R. 193, 210-211). Appellant's injuries from his service in Iraq left him with scars along his arms, discoloration on his chest, and almost no chest hair (Henry 509-510). Yet, when asked to describe his chest, C.R. gave a description that was completely unlike appellant's actual physical appearance:

> Q: Is there any detail you can give us and tell us to say yes, I've seen this man naked because he has this or he has this particular feature? Any detail you can give us?
>
> A: He has hair on his chest.
>
> Q: How much hair?
>
> A: Like, full of hair.
>
> Q: Like dark hair? Course [sic] hair?
>
> A: Yeah.
> . . .
>
> Q: Anything about the skin or marks on the skin, can you give us any detail?
>
> A: No (C.R. 292-293).

Though asked repeatedly if there was anything about appellant's body and chest that she could remember from the many times that they allegedly had sex, C.R. failed to

32

identify the skin discoloration or scarring.[7]   Even more strikingly, she stated that appellant's chest was covered with coarse, dark hair when appellant has almost no hair on his chest at all.   Id.   C.R. obviously had never seen appellant with his chest bare, despite her claim otherwise.

B.     C.R. was Highly Motivated to Accuse Appellant.

Pregnant at 13 and afraid of being sent back to her abusive father in Jamaica, C.R. had an undeniable and very compelling motive to accuse appellant and deflect blame away from herself.  C.R. was in a sexual relationship with a peer, who was likely the father of her fetus.  C.R. had told her teacher that she was afraid her mother would send her back to Jamaica, to an abusive father who was "always beating" her, and refuse to pay for food and school uniforms (Letter; 103-104).[8]   C.R. stated that her mother "hated" her and she had caused too many problems.  Id.  C.R. avoided talking to her mother and took every opportunity to escape her house (C.R. 283).

Remarkably, C.R. told no one of any purported sexual activity with appellant during the entire nine-month period that this activity was supposedly happening.  She did not tell her mother, her friends, or her sister with whom she was very close (C.R. 273).  Rather, C.R. identified appellant only when cornered and confronted with her pregnancy by her mother (C.R. 216, 299-300).  Only then, avoiding trouble for herself

---

[7] C.R. did not claim that appellant remained clothed during their encounters.  Rather, she testified that on multiple occasions appellant removed his clothes in front of her (C.R. 193, 210-211).

[8] C.R.'s letter to her teacher is attached under separate cover.

and for her 14-year-old boyfriend, did C.R. tell her mother that appellant was the father of her fetus, a claim proved false by DNA evidence (Gajewski 443-444). C.R.'s testimony that she failed to report having sex with appellant during the entire nine-month period because she was afraid of losing appellant's financial support is not credible.   During this same period C.R. informed her mother that appellant had another girlfriend and that this woman had verbally attacked her (C.R. 316-317). Had C.R. been truly afraid of appellant or of losing his support, she would not have risked telling her mother that he was involved with another woman.

C.R. was savvy: on August 16, 2012, when she found out she was two months pregnant, she alleged that appellant raped her two months before, on June 18, 2012 (C.R. 300-301).  This was, of course, the only specific date she claimed to remember when she originally spoke to police and prosecutors.  Id.  She was vague about the dates of all the other incidents which avoided the possibility that appellant would have an alibi for those dates.  But she had to specify the June 18, 2012 date because this supported her claim that appellant was the father.

C.    The People's Key Witnesses and Evidence Were Not Credible.

When C.R. allegedly told her mother that appellant had had sex with her, Angella did not immediately call the police (A.R. 113).  She did not tell medical personnel.  Id.  Rather, she set in motion a plan to extort thousands of dollars from appellant and then went to get her hair done (A.R. 56-57). Angella's scheme fell apart on cross-examination, however, because she and C.R. could not keep their stories

straight. Angella's description of appellant's supposed admission to raping her daughter varied every time she told it. C.R., likewise, could not consistently report when and how appellant supposedly confessed.

Angella and C.R.'s father threatened appellant in an attempt to extort money from him. And appellant, vulnerable to stressful situations after his time in Iraq, initially conceded to that pressure (Henry 501-502). When appellant refused Angella's subsequent demands to pay even more money, knowing that the DNA would exonerate him, Angella turned him into the police (likely to avoid getting into trouble herself should appellant report her extortion scheme) (Henry 504).

The only evidence against appellant aside from C.R.'s testimony (which she was highly motivated to fabricate), was the unauthenticated voice recording, the unauthenticated text messages, and the written contract that appellant signed under duress. First, the screenshots of the text messages supposedly sent by appellant were unreliable. Neither appellant's name nor his phone number appear anywhere in the screenshot. See People's Exhibits 4-5, 10. Angella supposedly took a picture of the messages and emailed them to Detective Kenny (Det. Kenny 384-385). Detective Kenny never verified that these messages actually came from appellant, either by looking at Angella's and C.R.'s phones or by obtaining a warrant and looking at appellant's phone (Det. Kenny 385-86). To be clear: these messages could have been sent by anyone from any phone number. Angella was once scorned by appellant when he left her for Nadine Hamilton and he foiled her extortion attempts when he

refused to agree to give her more money.  She was highly motivated to fabricate this evidence.  See Point IV(B), infra.

Second, the voice recording in which appellant supposedly agrees to Angella's accusations was equally unreliable.  Angella supposedly made the recording on her cell phone in the midst of her attempts to extort money from appellant (A.R. 65).  The recording was not a controlled call by law enforcement, but rather made by an extremely interested party who drove the conversation, demanding the answers that appellant gave.  Angella had ample time to edit or tamper with the recording on her cell phone in the days between when the recording was made and when she finally met with law enforcement to report her daughter's supposed rape.[9]  Indeed, appellant never verbalizes that he had sex with C.R. or impregnated her.  See generally People's Exhibit 3, 3A.  At best, appellant appears to sometimes affirm or respond to Angella's statements, leaving open the possibility that the recording has been tampered with. See Point IV(B), infra.

Finally, Angella's claim that appellant readily admitted to raping her 12-year-old daughter on paper contradicts her claim that he was concerned with going to prison. It is patently ridiculous that appellant would voluntarily put in writing that he raped a 12-year-old girl.  No rational person would do so unless threatened—which appellant

---

[9] The call logs were not probative of guilt. First, they were cherry-picked to show a period of heavy phone activity. Second, the vast majority of the calls lasted only seconds. Third, given that Angella used C.R.'s phone, it is unclear whether the calls were between appellant and C.R. or appellant and Angella.

was, repeatedly, by Angella and C.R.'s father.  Even C.R. admitted that, contrary to her mother's testimony, Angella threatened appellant to force him to sign the contract (C.R. 222-223).  The contract, signed under duress, simply is not substantial proof of appellant's guilt.

*     *     *

In sum, the verdict was against the weight of the evidence.  The complainant did not know what appellant's chest looked like, despite having supposedly seen him naked multiple times.  She had a strong motive to lie, and failed to consistently remember key details during her testimony.  The People's other key witness, Angella, plainly attempted to extort money from appellant—it is undisputed that he gave her money which she accepted.  Her actions—which include getting her hair done immediately after supposedly learning her daughter was raped and bringing her daughter to meet her rapist repeatedly—are not those of a concerned mother but rather of a motivated opportunist.  The only evidence that the People presented to bolster C.R.'s interested and incredible testimony—the screenshots, recording, and contract—were all created by, and exclusively within, Angella's control for several days before she brought them to law enforcement.  This supposed evidence was as unreliable and unbelievable as C.R. and Angella's testimony.  The People thus failed to prove appellant's guilt beyond a reasonable doubt and the verdict was against the weight of the evidence.  Jackson, 443 U.S. 307; Bleakley, 69 N.Y.2d 490.  Accordingly, appellant's convictions should be reversed and the indictment dismissed.

37

<u>POINT II</u>

THE COURT ABUSED ITS DISCRETION AND
DEPRIVED APPELLANT OF DUE PROCESS AND A
FAIR TRIAL WHEN IT PRECLUDED DEFENSE
COUNSEL FROM INQUIRING INTO PARENTAL
DISCIPLINE AND C.R.'S MOTIVE TO FABRICATE.

"The constitution guarantees a defendant 'a meaningful opportunity to present a complete defense.'" <u>Nevada v. Jackson</u>, 569 U.S. 505 (2013) (quoting <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973). The due process right to present a defense includes the right to "present the defendant's version of the facts," as contrasted with the prosecution's. <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967). Accordingly, a trial court's discretion in making evidentiary rulings "is circumscribed by . . . the defendant's constitutional right to present a defense." <u>People v. Carroll</u>, 95 N.Y.2d 375, 386 (2000); <u>Crane</u>, 476 U.S. at 690. The court's refusal to permit defense counsel to fully present a defense based on C.R.'s motive to fabricate was an abuse of discretion and deprived appellant of due process and a fair trial. U.S. Const., Amend. VI, XIV; N.Y. Const., Art. I, §6.

C.R.'s motive to fabricate allegations against appellant was driven by two interrelated factors: Her fear of her dictatorial mother and the corresponding consequences she would endure if her mother discovered she was having sex with her 14-year-old boyfriend. That discovery would have been inevitable once C.R.'s

38

pregnancy was exposed had she not immediately pointed the finger at appellant.  The court gutted appellant's principal defense when—over defense counsel's repeated objections—it prevented the jury from hearing comprehensive evidence of C.R.'s motive to fabricate.

A.    C.R.'s Fear of Her Parents was Relevant to Her Motive to Fabricate

Evidence that C.R. feared her mother and father and was motivated to protect herself and her boyfriend after her pregnancy was revealed was directly relevant to appellant's defense, but he was prevented from introducing it.  First, the court wrongly excluded a letter C.R. wrote to her teacher in which she discussed her abusive relationship with her parents.  The court excluded the letter on both relevance and hearsay grounds.  C.R.'s letter, even if it was hearsay, should have been admitted because it was critical to C.R.'s motive to fabricate and appellant's right to present a defense.  See, e.g., People v. Bradley, 99 A.D.3d 934, 937 (2d Dept. 2012) ("the right to present a defense may encompass the right to place before the trier of fact secondary forms of evidence, such as hearsay.") (internal quotations and brackets omitted).  Indeed, this Court has previously held that a complainant's out-of-court statements are admissible if they are relevant to a motive to fabricate.  See, e.g., People v. Grant, 60 A.D. 3d 865, 865 (2d Dept. 2009) (reversal warranted when court excluded out-of-court statements establishing a motive to fabricate and relevant to credibility).

39

fabricate. Id. In reaching its decision, the Grant Court emphasized that the evidence went "directly to the credibility of the complainant." Id. at 865; see also People v. Vo, 166 A.D.3d 1587, 1588 (4th Dept. 2009) (holding that the lower court improperly precluded defendant from presenting evidence that sexual abuse complainant had a reason to fabricate allegations against him because "complainant's motive to lie . . . is directly probative on the issue of credibility.").

Like Ocampo and Grant, this case hinged on the complainant's credibility, a fact noted by the court during a bench conference:

> . . . [C]learly there's issue of credibility which is uniquely suited for the jury. If they believe the defendant, no crime was committed. If they believe the complainant, he's a monster. That's pretty much what it is, so okay (541:11-14).

Despite this acknowledgement, the court prohibited inquiry into C.R.'s abusive relationship with her parents, even though that relationship was central to appellant's defense that C.R. lied because of it:

- The court sustained objections to defense counsel's inquiry into whether C.R.'s mother had threatened to send her back to Jamaica; to the reasons why C.R. did not want to engage in too much conversation with her mother; and to whether C.R.'s mother ever hit her (C.R., 242-243).

- During Angella's cross-examination, the court sustained the People's objections to questions about whether Angella had "problems with C.R.," whether

41

Angella had ever hit C.R., and whether C.R. had ever run away from home (A.R., 102).

- The court refused to allow defense counsel to question Angella concerning an Administration for Child Services ("ACS") report indicating that she had neglected C.R. (141-142).

The fact that the court permitted defense counsel a limited opportunity to explore C.R.'s relationship with her mother in general terms did not remedy the court's erroneous ruling preventing the questioning outlined above. See Carroll, 95 N.Y.2d at 386 (finding that court's allowance of limited questioning did not cure error in court's evidentiary ruling prohibiting other questioning).

Finally, C.R.'s letter was admissible as a prior inconsistent statement and defense counsel should have been permitted to impeach C.R. with it. The letter materially contradicted the testimony C.R. and her mother gave concerning their relationship. C.R. testified that she and her mother had an "okay relationship," kept disputes to "a minimum" and had only normal teenage daughter/mother tensions (C.R. 240-41). The court improperly hampered defense counsel's ability to impeach C.R. before her cross-examination by preventing him from using the letter as a prior inconsistent statement. (236). Although the court stated that parental discipline and C.R.'s relationship with her parents had "nothing to do" with the case, their relationship was directly relevant to her motive to fabricate and went to the heart of appellant's defense. The court was thus plainly incorrect when it found the issue to

42

be collateral because a defendant's ability to adequately present a defense based on a motive to fabricate is paramount, and transcends other evidentiary concerns: "Proof aimed at establishing a motive to fabricate is never collateral and may not be excluded on that ground." Grant, 60 A.D.3d at 865.

The relationship between C.R. and her mother as described in C.R.'s letter was also sufficiently inconsistent with the relationship C.R. described at trial to be used for impeachment. Indeed, a prior statement need not be directly inconsistent to be admissible for impeachment purposes during cross-examination. See, e.g., People v. Stavris, 75 A.D.2d 507, 507 (2d Dept. 1980) (finding that New York case law accords with the common-law rule that "a prior statement was admissible for impeachment purposes even though it did not directly contradict the witness' testimony") (internal quotations and citations omitted); see also People v. Bornholdt, 33 N.Y.2d 75, 88 (1973) ("the test of inconsistency, we have said, is not limited to outright contradictions between a witness' prior statements and his trial testimony"). Defense counsel should have been permitted to impeach C.R., the People's key witness, with her prior inconsistent written statement.[10]

The court prevented the jury from hearing comprehensive evidence of C.R.'s turbulent relationship with her parents and curtailed C.R.'s impeachment on the

---

[10] The court also prevented the letter from being used as an impeachment tool by preventing defense counsel from asking questions related to parental discipline that were directly referenced in the letter, such as whether C.R.'s mother had threatened to send her back to Jamaica (C.R. 242, 243). Had these questions been permitted and had C.R. lied in response, defense counsel could have used the letter to impeach her.

critical point that she was lying about her relationship with her mother. This was critical to the defense's theory of why C.R. fabricated her allegations against appellant. The jurors were "entitled to have the benefit of [this] defense theory before them so that they could make an informed judgment as to the weight to place on [the complainant's] testimony." Ocampo, 28 A.D.3d at 86, 813 N.Y.S.2d at 218.

B.  C.R.'s Intimate Relationship with Her Boyfriend Established a Motive to Fabricate

While the jury was permitted to hear that appellant was not the father of C.R.'s child and that she had a boyfriend, the court improperly ruled that the Rape Shield Law (CPL 60.42) precluded defense counsel from asking C.R. if she was sexually active with her boyfriend (C.R. 301). Similarly, the court barred defense counsel from introducing a Planned Parenthood record which showed that C.R. lied to Planned Parenthood personnel about whether she had had any sexual partners other than appellant and had identified appellant as the father of her fetus, which was false (H 26-27).

The Rape Shield Law was enacted "to bar harassment of victims and confusion of issues by raising matters relating to victims' sexual conduct that have no proper bearing upon defendant's guilt or innocence," such as the victim's chastity. N.Y. Crim. Proc. Law § 60.42 (McKinney). The Rape Shield Law is not, however, a blanket exclusion of all prior sexual conduct by the victim. Rather, in addition to the other enumerated exceptions, the statute provides an "interests of justice" exception "to

ensure that relevant evidence not otherwise admissible could be introduced." People v. Jovanovic, 263 A.D.2d 182, 195 (1st Dept. 1999).

In People v. Fisher, 104 A.D.3d 868 (2d Dept. 2013), for example, the lower court relied on the Rape Shield Law to exclude evidence that the complainant had told others that she had had sex with defendant's brother. This Court reversed, finding that the Rape Shield Law's "interests of justice" exception applied because the information was relevant to the defense's argument that it was defendant's brother, and not defendant, who had inappropriately texted the complainant. Id. at 873; see also People v. Loja, 305 A.D.2d 189, 193 (1st Dept. 2003)(finding that the Rape Shield Law did not bar evidence that complainant and defendant had sex previously because "the core of the defense is the assertion that they were maintaining an affair."); Jovanovic, 263 A.D.2d at 198 (finding that the "interests of justice" exception applied to victim's email messages concerning her sexual conduct because they showed a motive to fabricate the charges).

Like the complainant in Fisher, C.R. was motivated to fabricate the allegations. Once her pregnancy was discovered, C.R. knew she faced grave consequences were her mother to discover that she was sexually active with her 14-year-old boyfriend. C.R.'s rape accusation and her claim that appellant was the father of her fetus deflected those consequences, shifting attention from her own culpability with her boyfriend and onto her supposed attacker, appellant. By claiming to have been raped by a much older man, C.R. transformed herself from wrongdoer to blameless victim.

45

C.R.'s sexual relationship with her boyfriend was not introduced to impugn her chastity or to confuse the jury, but rather because it was relevant to her motive to fabricate and thus crucial to the defense. This evidence should have been admitted under the Rape Shield Law's "interests of justice" exception.

\*     \*     \*

In sum, the court's repeated refusal to allow defense counsel to present evidence of C.R.'s domestic situation and that she was sexually active with her boyfriend, which together created her motive to fabricate, violated appellant's due process right to a fair trial. This error was also not "harmless beyond a reasonable doubt." People v. Crimmins, 36 N.Y.2d 230, 237 (1975). As the court noted, and both the defense and prosecution repeatedly emphasized during their summations— the entire case hinged on credibility. C.R.'s motive to fabricate was thus appellant's most cogent defense. Accordingly, "there is at least a reasonable possibility that the deprivation of the [appellant's] constitutional right to present a defense might have contributed to [the appellant's] conviction." People v. Thompson, 111 A.D.3d 56,68 (2d Dept. 2013). This Court should, therefore, reverse appellant's conviction and grant him a new trial.

POINT III

APPELLANT WAS DEPRIVED OF DUE PROCESS,
NOTICE OF THE CHARGES AGAINST HIM, AND A
FAIR TRIAL DUE TO THE OVERLY BROAD TIME
PERIODS CHARGED IN THE INDICTMENT.

The People failed to exercise the requisite diligence and charge as specific a date as possible in the indictment. Their failure in this regard deprived appellant of the ability to present an adequate defense and to establish his alibi.[11]

The People are required to "state the date and time of the offense to the best of the People's knowledge, after a reasonably thorough investigation has been undertaken to ascertain such information." People v. Sedlock, 8 N.Y.3d 535, 539 (2007) (internal quotations omitted). To that end, the People must make "diligent efforts" to ascertain as specific a date as possible. Id. In considering whether the People have acted diligently, the court can consider, among other things: "(1) the age and intelligence of the victim and other witnesses; (2) the surrounding circumstances; and (3) the nature of the offense, including whether it is likely to occur at a specific time or is likely to be discovered immediately." Id. A significantly longer period charged merits "proportionately heightened scrutiny given to whether the People's

---

[11] The defense objected to this method of charging prior to the commencement of the trial (H 8-9). The court stated that the matter had already been ruled on (this was incorrect, the only issue ruled on was the unconstitutional multiplicity of the counts in the indictment) and told defense counsel "I don't want to hear that again" with regard to the argument that the time period charged was overly broad and "nebulous" (H 9).

inability to provide more precise times can be justified as against the important notice rights of the defendant." Id.

It is patently obvious that the People did not exercise the requisite diligence because C.R. was able to narrow the relevant period significantly at trial after only minimal questioning by defense counsel (C.R. 255-257, 275, 278, 290-91 294, 298). The failure by the People to immediately investigate when the supposed assaults at issue occurred is inexcusable given C.R.'s age and intelligence, and the corresponding likelihood that she could have identified specific dates. C.R. was not a small child when these events occurred—she turned 13 less than three months after she says she was first assaulted (C.R. 290). At 13, C.R. was intelligent and responsible—her mother trusted her to go to and from school on her own and take care of herself while her mother and sister worked (C.R. 252, 321). C.R. was cognizant of academic deadlines (C.R. 300). Most middle-schoolers are required to write the date on assignments at school—C.R. likely did the same. C.R. also testified that she was "certain" that the assaults always happened at the same time—around 3:00 p.m.—and had specific and distinct memories of the locations and circumstances surrounding the assaults (C.R. 257, 260-61).

Had the People diligently questioned C.R. when her memories were still very fresh, they likely could have narrowed the dates and times for the charged offenses significantly. C.R.'s trial cross-examination took place three years after she was supposedly assaulted. It is likely that C.R., a teenager cognizant of dates and times,

would have been able to pinpoint even narrower timeframes had the prosecution undertaken reasonable investigation in 2013 when it sought the indictment.

A "reasonably thorough investigation," however, required the People to do more than simply question C.R. Sedlock, 8 N.Y.3d at 539. The People should have, by way of example only, pulled C.R.'s school records to determine whether she was absent from school and what school holidays existed during the months charged (because she claimed that she was assaulted after school). Similarly, the People could have determined which days Angella and Valentina both worked (because C.R. testified that appellant came over when no one was at home and her mother and sister were usually at home if not at work) (C.R. 252-253). See People v. Bennett, 57 A.D.3d 688, 690 (2d Dept. 2008) (finding that, where the victim had testified that the assaults occurred when her mother was at the grocery store and when her mother took her brother to the doctor, "[t]he People should have inquired as to when the mother took the victim's brother to the doctor and/or should have sought to obtain the brother's medical records to narrow the time frame of the crimes as alleged").

To be sure, there is no evidence that the People undertook any investigation, much less a reasonably thorough investigation, to narrow the periods charged in the indictment. In some cases, according to C.R., the People even disregarded specific dates she provided them (C.R. 268, 290). The fact that C.R. eventually revealed these narrowed time frames during her cross-examination at trial does not cure this defect: Appellant was deprived of notice of the charges against him sufficiently far in advance

49

of the trial so that he could adequately prepare his defense.  See Bennett, 57 A.D.3d at 690 (reversing judgment even though at trial the relevant period was significantly narrowed when the victim "testified that the two incidents occurred about two weeks apart when she was in the middle of second grade").

The People's failure to adequately narrow the relevant time periods is particularly relevant and prejudicial because appellant has several potential alibis—he worked a consistent schedule at his job at JFK airport and helped a friend with construction two days a week regularly.  Had the time frame been significantly narrowed it is likely appellant could have presented compelling alibi evidence for some, if not all, the dates.  The court's refusal to dismiss the counts that were too broadly charged was thus not harmless error and Appellant's conviction should be reversed and the indictment dismissed.

## POINT IV

THE COURT DENIED APPELLANT A FAIR TRIAL WHEN, OVER OBJECTION, IT ALLOWED INADMISSIBLE HEARSAY AND UNRELIABLE EVIDENCE.

A.   The Court Improperly Admitted Unreliable Hearsay Evidence.

The court improperly admitted statements that C.R. made to her mother two months after the last supposed sexual assault on the basis that they were "outcry" statements (55).  New York courts recognize a "prompt outcry rule—an exception to

50

the inadmissibility of the prior consistent statements of an unimpeached witness"
which "permits evidence that a timely complaint was made," but does not allow
further testimony as to the "details of the incident." People v. Rosario, 17 N.Y.3d
501, 511 (2011) (declining to find that prompt outcry exception applied when 13-year-
old waited five months to make statement) (internal quotations omitted) (emphasis
added).

The "outcry" exception to the hearsay rule thus only applies to statements
made immediately, or very soon, after the alleged assault.  An outcry is "prompt"
when "made at the first suitable opportunity." People v. Evangelista, 155 A.D.3d 972,
972 (2d Dept. 2017), leave to appeal denied, 31 N.Y.3d 1013 (2018) (internal
quotations omitted).  While the courts have allowed significant delays in reporting
when the victim is a young child, "when the complainant is a teenager (or older), 'the
concept of promptness necessarily suggests an immediacy not ordinarily present when
months go by.'" People v. Ortiz, 135 A.D.3d 649, 650 (1st Dept. 2016) (quoting
People v. Rosario, 17 N.Y.3d 501, 513 (2011)).  A teenager's delay in reporting is
justified only if there are "legally sufficient circumstances that would excuse the
victim's delay, such as the victim being under the control or threats of the defendant
... or being among strangers and without others in whom [the victim] could confide."
Id. (Internal quotations omitted).

Here, C.R. was a teenager at the time of the events at issue but waited at least
two months to make her allegation, and did so only after her mother brought her to

the doctor and she discovered she was pregnant.  There were no legally sufficient circumstances to justify this delay.  C.R. did not live in the same home as her alleged abuser—she testified she rarely saw him—and she did not live among strangers. Indeed, her supposed outcry was prompted not by a desire to reveal that she had been raped but rather only in response to questioning by her mother after her pregnancy was discovered (A.R. 54).  C.R.'s attempts to appease her mother do not fall within the outcry exception and C.R.'s statement was not a prompt outcry: it was inadmissible hearsay.  The statement, which the court admitted over defense counsel's objection, was also extremely prejudicial to appellant because it presented an image to the jury that C.R., upset upon finding out that she was pregnant, immediately identified appellant as the father of her child (55).

B.    The Court, Over Objection, Improperly Allowed
       Unreliable Text Messages and Voice Recordings.

The court failed to require the People to demonstrate that the recorded call of appellant was accurate and had never been tampered with: "A party offering a recorded conversation must demonstrate the recording's accuracy or authenticity by clear and convincing proof establishing that it is genuine and has not been tampered with." People v. Tillman, 57 A.D.3d 1021, 1024 (2008).

At trial, defense counsel conducted a voi dire and, after the witness failed to properly authenticate the recording, defense counsel objected to the admission of the recording (66-67).  The court overruled defense counsel's objection despite the

People's failure to properly establish that the recording was credible.  Id.  The recording was not conducted by law enforcement or another similar entity with established recording procedures that might lend it some credibility.  Id.  Rather, the recording was created by a biased witness for the prosecution, Angella, on her cell phone.  Id.  Angella could have simply edited or tampered with the recording to eliminate parts of the conversation and make it appear as if the defendant was agreeing to having raped C.R., when in fact he was agreeing to something else entirely that had been deleted from the recording.  The jury requested additional copies of the recording transcript and played the recording again during their deliberations (632, 648-49).  The recording made it appear as though appellant admitted to having sex with C.R. and its inclusion was thus not harmless error.

The court also erroneously allowed the People to rely on screenshots of Detective Kenny's phone that depicted text messages allegedly sent by appellant to Angella and C.R., though no explanation was provided as to why the original messages were not preserved and produced (A.R. 90).  Secondary evidence of an unproduced original writing is only admissible if the trial court finds that the proponent "has sufficiently explained the unavailability of the primary evidence and has not procured its loss or destruction in bad faith."  Schozer v. William Penn Life Insurance Co., 84 N.Y.2d 639, 644 (1994) (citations omitted).  The "more important the document to the resolution of the ultimate issue in the case," the "stricter" this evidentiary burden becomes.  Id.  In all events, the failure to explain the

53

nonproduction of an original writing bars admission of secondary evidence to prove that writing's contents.  See Shanmugam v. SCI Eng'g, P.C., 122 A.D.3d 437, 438 (1st Dept. 2014).  Besides explaining the absence of original documents and establishing good faith, the proponent also bears the "heavy foundational burden" of demonstrating that the secondary evidence is "authentic" and "a reliable and accurate portrayal of the original." Schozer, 84 N.Y.2d at 645-46.

Notably, the content of the original text messages in the screenshot was plainly "in dispute and sought to be proven." Id. at 643.  The People did not produce, or even seek, the original text messages depicted in the screenshots.  The People were never required to explain why the witnesses' phones, or even the original messages and originating phone number, were not preserved.  What's more, no explanation was provided as to why the People could not have preserved the messages from appellant's phone (via a warrant) if he had in fact sent the messages.  This failure of explanation was particularly egregious because the original text messages could not have been "more important … to the resolution of the ultimate issue in the case." Schozer, 84 N.Y.2d at 644.  The People therefore needed to meet an even "stricter" evidentiary burden than usual. Id.

There was also no ability to objectively determine, from the screenshots, the original sender of the text messages shown. See People's Exhibits 4-5, 10, (Det. Kenny 385).  The court sustained objections to defense counsel's questions concerning how the screenshots were sent to the police and whether Angella still

possessed her phone (A.R. 92). To be sure, these questions were directly relevant to whether the screenshots were the best evidence of the text messages.

The People thus failed to satisfy each of the three requirements of the best evidence rule: they failed to adequately explain the absence of the original text messages, to demonstrate the absence of bad faith, and to show that the screenshots were a "reliable and accurate portrayal" of appellant's original messages. Schozer, 84 N.Y.2d at 644-46. Under these circumstances, it was error to admit the screenshots, all of which were susceptible to Angella's manipulation. The inclusion of the screenshots over defense counsel's objections was not harmless error—like the phone recording, the jury specifically requested copies of the screenshots during their deliberations. Accordingly, appellant's convictions should be reversed, on the law, and a new trial ordered.

<u>POINT V</u>

APPELLANT'S EXCESSIVE PRISON SENTENCE SHOULD BE REDUCED IN LIGHT OF HIS VETERAN STATUS, MINIMAL CRIMINAL RECORD, AND STABLE EMPLOYMENT HISTORY.

Appellant's sentence was more than the maximum permitted by law and, under the circumstances of this case, should be reduced in the interest of justice. First, the court's excessive 107-year sentence reflected the court's personal bias against appellant. During the trial, the court told counsel that appellant's testimony was "far-fetched," "implausible," and "fanciful" and that appellant was a "monster" if the

allegations were true (499-500, 541). The court acknowledged that its sentence was far more than the maximum of 50 years allowed by law (S 10). Undeterred by the statutory limit, the court imposed this draconian sentence to "send a message to any parole authority or any other authority when they have to make the determination of whether you should be released to society. . . ." Id.

Second, Appellant has led a productive and service-oriented life. His service to his country during the Iraqi War and resulting mental and physical injuries merit significant consideration. See People v. Hill, 34 A.D.3d 1130, 1132 (3d Dept. 2006) (considering defendant's veteran status in reducing sentence for sex crimes). So does the fact that, at age 58, this was his first conviction for a crime (his previous conviction was for a violation) (PSR 1). See People v. Melendez, 129 A.D.2d 449, 450 (2d Dept. 1987) (reducing sentence for manslaughter, citing fact defendant was "fifty years of age" with "no prior record"). Appellant was steadily employed by the New York City Department of Corrections for over 20 years and then worked at JFK airport until his arrest. See id. (citing "steady" history of employment); see also People v. Keith, 154 A.D.3d 877, 878-80 (2d Dept. 2017). Given his age, appellant will likely die in prison if his sentence is not reduced.

Especially where all these circumstances have converged, courts have granted sentence reductions, even in cases involving sexual abuse of a child. See Hill, 34 A.D.3d at 1132 (reducing sentence where "honorably discharged Vietnam veteran who had been steadily employed for 21 years in the same position" was convicted of

56

physically abusing two young girls); see also People v. Bhattacharjee, 51 A.D.3d 684,

684 (2d Dept. 2008) (reducing sentence for criminal sexual act and use of a child in a

sexual performance); People v. Masucci, 266 A.D.2d 579, 580-81 (3d Dept. 1999)

(reducing sentence for possessing child pornography).

For these reasons, appellant respectfully asks this Court to reduce his sentences

for counts one through four to 20 years in prison and for all of the sentences for

counts one through nine to run concurrently.

## CONCLUSION

FOR THE REASONS STATED IN POINTS I AND III,
APPELLANT'S CONVICTIONS SHOULD BE
REVERSED AND THE INDICTMENT DISMISSED.
ALTERNATIVELY, FOR THE REASONS STATED IN
POINTS II AND IV, THE CONVICTIONS SHOULD
BE REVERSED AND A NEW TRIAL GRANTED.
ALTERNATIVELY, FOR THE REASONS STATED IN
POINT V, APPELLANT'S SENTENCE SHOULD BE
REDUCED.

Respectfully Submitted,

PAUL SKIP LAISURE
*Attorney for the Defendant-Appellant*

HANNAH KON
*Of Counsel*
July 2019

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,          :
                                              :
                    Respondent,               :
                                              :
          - against -                         :
                                              :
BERTRAND HENRY,                               :
                                              :
                    Defendant-Appellant.      :
-----------------------------------------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.      The indictment number in the court below was 7388/13.

2.      The full names of the original parties were the People of the State of New York against Bertrand Henry.  There has been no change of parties on appeal.

3.      This action was commenced in Supreme Court, Kings County, with the filing of an indictment on September 19, 2013

4.      This appeal is from a March 21, 2016, judgment convicting appellant, upon a jury verdict, of rape in the first degree, rape in the second degree, and criminal sexual act.

5.      Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

PRINTING SPECIFICATIONS STATEMENT
Pursuant to 22 NYCRR § 1250.8(j)

The foregoing brief was prepared on a computer. A proportional typeface was used, as follows:

Name of typeface: Garamond
Point Size: 14
Line Spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 13,951.

Hannah Kon
Appellate Counsel

To be argued by:
DIANE R. EISNER
(15 minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                Respondent,

      -against-

BERTRAND HENRY,

          Defendant-Appellant.

Appellate Division
Docket Number
2016-03720

Kings County
Indictment Number
7388/2013

RESPONDENT'S BRIEF

**CONTAINS MATERIAL THAT IS CONFIDENTIAL**
**UNDER CIVIL RIGHTS LAW § 50-b**

LEONARD JOBLOVE
DIANE R. EISNER
Assistant District Attorneys
    of Counsel

Telephone: 718-250-2489
Email: Eisnerd@brooklynda.org

September 20, 2019

**ERIC GONZALEZ**
**DISTRICT ATTORNEY KINGS COUNTY**
RENAISSANCE PLAZA
350 JAY STREET
BROOKLYN, NEW YORK 11201-2908
(718) 250-2000

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................iii

PRELIMINARY STATEMENT ..........................................1

STATEMENT OF FACTS ............................................2
    Introduction ..............................................2
    The Trial ...............................................4
        The People's Case ...................................4
        The Defense Case ...................................21
        The Prompt Outcry Instruction to the Jury ..........30
    The Verdict .............................................30
    The Sentence ...........................................31


POINT I -


    THERE WAS LEGALLY SUFFICIENT EVIDENCE TO SUPPORT ALL OF
    DEFENDANT'S CONVICTIONS.   MOREOVER, THE VERDICTS WERE
    NOT AGAINST THE WEIGHT OF THE EVIDENCE ..................33


POINT II -


    DEFENDANT WAS NOT DENIED THE RIGHT TO PRESENT A DEFENSE
    BY THE COURT'S PRECLUSION OF EVIDENCE REGARDING A LETTER
    THAT C.R. WROTE TO A TEACHER AFTER HER FAMILY LEARNED OF
    HER PREGNANCY AND RELATIONSHIP WITH DEFENDANT, NOR WAS
    DEFENDANT DENIED A FAIR TRIAL BY THE COURT'S APPLICATION
    OF THE RAPE SHIELD LAW TO PRECLUDE DEFENDANT FROM
    EXPLICITLY QUESTIONING C.R. ABOUT SEXUAL RELATIONS WITH
    HER YOUNG BOYFRIEND .....................................43

i

TABLE OF CONTENTS (Cont'd)

Page

POINT III -

    DEFENDANT'S CLAIM THAT THE TIME PERIODS CHARGED IN THE INDICTMENT WERE OVERLY BROAD IS UNPRESERVED FOR APPELLATE REVIEW.  MOREOVER, DEFENDANT WAS NOT DEPRIVED OF FAIR NOTICE OF THE CHARGES AGAINST HIM ................ 51

POINT IV -

    DEFENDANT WAS NOT DENIED A FAIR TRIAL BY THE ADMISSION OF OUTCRY TESTIMONY, A RECORDED CALL, AND COPIES OF TEXT MESSAGES .................................................. 55

POINT V -

    DEFENDANT'S SENTENCE WAS NOT EXCESSIVE ................... 61

CONCLUSION -

    THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED IN ALL RESPECTS ................................................. 63

PRINTING SPECIFICATIONS STATEMENT ............................ 64

ii

## TABLE OF AUTHORITIES

Page

**Cases**

Jackson v. Virginia, 443 U.S. 307 (1979) ..................... 33

People v. Agudelo, 96 A.D.3d 611 (1st Dep't 2012) ............ 59

People v. Ahsan, 169 A.D.3d 815 (2d Dep't 2019) .............. 45

People v. Angona, 119 A.D.3d 1406 (4th Dep't 2014) ........... 53

People v. Benziger, 36 N.Y.2d 29 (1974) ...................... 33

People v. Bleakley, 69 N.Y.2d 490 (1987) ..................... 40

People v. Carr-El, 99 N.Y.2d 546 (2002) ...................... 33

People v. Contes, 60 N.Y.2d 620 (1983) ....................... 33

People v. Danielson, 9 N.Y.3d 342 (2007) ..................... 39

People v. Evangelista, 155 A.D.3d 972 (2d Dep't 2017) ........ 57

People v. Flower, 173 A.D.3d 1449 (3d Dep't 2019) ............ 62

People v. Francisco, 44 A.D.3d 870 (2d Dep't 2007) ........... 45

People v. Garcia, 47 A.D.3d 830 (2d Dep't 2008) .............. 45

People v. Gissendanner, 48 N.Y.2d 543 (1979) ................. 37

People v. Green, 108 A.D.3d 782 (3d Dep't 2013) .............. 57

People v. Green, 92 A.D.3d 894 (2d Dep't 2012) ............... 53

People v. Grose, 172 A.D.3d 1092 (2d Dep't 2019) ............. 44

People v. Gross, 26 N.Y.3d 689 (2016) ........................ 58

People v. Halter, 19 N.Y.3d 1046 (2012) ...................... 49

People v. Hernandez, 88 A.D.3d 907 (2d Dep't 2011) ........... 62

People v. Honghirun, 29 N.Y.3d 284 (2017) .................... 58

iii

People v. Horton, 173 A.D.3d 1338 (3d Dep't 2019) ..... 41, 58, 62

People v. Javier, 154 A.D.3d 445 (1st Dep't 2017) ............. 58

People v. Johnson, 24 A.D.3d 967 (3d Dep't 2005) ......... 42, 53

People v. Mandes, 168 A.D.3d 764 (2d Dep't 2019) ............. 58

People v. Mateo, 2 N.Y.3d 383, cert. denied
    542 U.S 946............................................. 39

People v. McDaniel, 81 N.Y.2d 10 (1993) .................... 55

People v. Mestres, 41 A.D.3d 618 (2d Dep't 2007) ............. 45

People v. Romero, 7 N.Y.3d 633 (2006) ...................... 40

People v. Shortell, 155 A.D.3d 1442 (3d Dep't 2017) .......... 59

People v. Simmons, 106 A.D.3d 1115 (2d Dep't 2013) ........... 50

People v. Skeen, 139 A.D.3d 1179 (3d Dep't 2016) ............. 42

People v. Spencer, 119 A.D.3d 1411 (4th Dep't 2014) .......... 53

People v. Suitte, 90 A.D.2d 80 (2d Dep't 1982) ............... 62

People v. Weber, 25 A.D.3d 919 (3d Dep't 2006) .............. 53

People v. Wilson, 283 A.D.2d 378 (1st Dep't 1991) ............ 45

Other Authorities

C.P.L § 60.42 ............................................. 46

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK,<br><br>                              Respondent,<br><br>              -against-<br><br>BERTRAND HENRY,<br><br>                    Defendant-Appellant. | Appellate Division<br>Docket Number<br>2016-03720<br><br>Kings County<br>Indictment Number<br>7388/2013 |

## RESPONDENT'S BRIEF

### PRELIMINARY STATEMENT

Defendant, Bertrand Henry, appeals from a judgment of the Supreme Court, Kings County, rendered March 21, 2016, convicting him, after a jury trial, of two counts of first-degree rape (P.L. § 130.35), five counts of second-degree rape (P.L. § 130.30), and two counts of first-degree criminal sexual act (P.L. § 130.50), and sentencing him to consecutive terms of imprisonment of twenty-five years for each first-degree rape/criminal sexual act conviction, and seven years for each second-degree rape conviction, for a total of one hundred and seven years' incarceration, which sentence, the court noted, was actually capped at fifty years.

<u>STATEMENT OF FACTS</u>

<u>Introduction</u>

Eleven-year-old C.R. and her older sister V.V. came to the United States from Jamaica in September 2011.[1]  They joined their mother, Angella R., who was living and working in Brooklyn. Defendant, Angella's fifty-five-year-old boyfriend, befriended the children and C.R. regarded him as a father figure.  Defendant also provided some financial support to the family.

At some point, Angella and defendant ceased being intimate, but they remained friends and defendant maintained contact with C.R., frequently picking her up from school even though Angella expressed discomfort with him seeing her while Angella was working.

Sometime in early September 2012, when then-twelve-year-old C.R. was home alone with defendant, defendant gave her rum, which caused C.R. to become inebriated and dizzy.  Defendant thereafter put his mouth on C.R.'s vagina and then penetrated her vagina with his penis.  After he was finished, defendant directed C.R. to wash herself and her underwear with antibacterial soap.  Defendant warned C.R. to keep the matter between them, telling her that nobody would believe her if she told, because he was a respected

---

[1] Because this case involves sexual crimes against a child, only the victim's initials will be used.  Her sister's initials and mother's last initial will also be used to preserve her privacy.

adult and she was a child.   Defendant also threatened to kill himself and C.R.'s mother if she told.

Prior to C.R.'s thirteenth birthday, in October of 2012, defendant took her to a local park.  After nightfall, he drove her to a secluded area, forced her to put his penis into her mouth, and thereafter penetrated her vagina with his penis.

On November 12, 2012, C.R.'s thirteenth birthday, defendant brought a cake and gifts.  He subsequently took C.R. to the park with him, and he later drove her to the secluded area where he had sexual intercourse with her in his car.

Defendant had sexual relations with C.R. on several other occasions between November 2012 and June 2013.  In August of 2013, C.R. got pregnant.  At that time, C.R. revealed to Angella having had sexual relations with defendant.

Angella confronted defendant and he admitted having sexual relations with C.R.   Defendant asked to keep the matter private and offered money to have C.R. sent to St. Vincent to be cared for there.  Defendant signed a writing regarding this agreement and, in a conversation that Angella secretly recorded, defendant admitted his sexual relationship with C.R.

On August 19, 2013, C.R. reported defendant's actions to the police, and Angella turned over the written agreement and recorded conversation she had obtained.  Defendant was arrested and charged by Kings County Indictment Number 7388/2013, with, among other

3

counts, two counts of first-degree rape (P.L. § 130.35), five counts of second-degree rape (P.L. § 130.30), and two counts of first-degree criminal sexual act (P.L. § 130.50).

The Trial

   The People's Case

   Angella R. came to the United States from Jamaica in 2004. Her two daughters, C.R. and V.V., remained in Jamaica. Angella met defendant and they developed an intimate relationship. Angella went back and forth before settling in the United States in 2009 (Angella R.: 43-47, 94-95, 97-98, 101).[2]

   In September 2011, V.V. and C.R. joined Angella, who introduced them to defendant. Defendant spent a lot of time with the family. He was a "second dad" who helped eleven-year-old C.R. with schoolwork and bought her gifts, and a phone. Defendant also helped the older V.V. with the college entry process and he helped the family with expenses and rent. V.V. did not initially like defendant, but she came to like him because he was generous and helpful and had a close father-daughter relationship with C.R. Despite some minimal mother/daughter disputes about grades and such, C.R. and Angella got along (Angella R.: 46-49, 51, 99, 101,

---

   [2] Numbers in parentheses refer to the pages of the trial transcript. Names preceding numbers refer to the witnesses whose testimony is being cited. Numbers preceded by "S." refer to the pages of the sentencing transcript.

104; C.R.: 181-85, 238-44, 248, 254, 261, 283-84, 319; V.V.: 349-52, 358-60).

Defendant lived in Queens and visited frequently but did not sleep over. At some point, defendant became involved with another woman and his intimate relationship with Angella ended. However, defendant remained a trusted family friend who continued to visit and provide some financial support. Angella regarded defendant as a kind person whose help she could accept, and she left defendant's number with C.R.'s school as an emergency contact. During the period that defendant visited the family, the family moved once (Angella R.: 46, 50-51, 95-97, 104-06, 110-11; C.R.: 213, 244, 320-21).

Defendant frequently visited when Angella was at work as a nursing assistant. Sometimes he would ask V.V. where C.R. was, and he would then go to pick C.R. up from school. C.R. went out with defendant frequently, and there were times when they did not return when V.V. had expected them, and V.V. would call and find out that they had gone all the way to Queens or somewhere else. V.V. advised Angella of defendant's visits and Angella was uncomfortable with them, because C.R.'s school was close to home and she did not need a ride. Angella told defendant several times that she was uncomfortable with him taking C.R. out without her knowledge, and at some point Angella confiscated C.R.'s phone

(Angella R.: 48-51, 105-09; C.R.: 250, 296; 283-84; V.V.: 353-55, 359-60).

From September 2012 through June 2013, V.V. and Angella both worked and were frequently out of the house at the same time (C.R.: 250-53; V.V.: 357, 363). While V.V. never saw inappropriate touching between defendant and C.R. during this period, she recalled one occasion when defendant opened the bathroom door after V.V. had just told him that C.R. was inside, and defendant then pretended that he had not known C.R. was in the bathroom (V.V.: 362).

V.V. recalled defendant bringing alcoholic beverages for Angella to have when she returned from work, and she recalled one occasion when C.R. got ready for an outing with defendant by putting on V.V.'s makeup and jewelry and a "sexy dress[]." V.V. found that "weird" because it seemed as if C.R. was going on a "date date" with defendant, and V.V. told C.R. to change. However, V.V. was not overly concerned because it seemed that C.R. was just playing dress-up. When V.V. started to call Angella that day to see if C.R. could go with defendant, defendant told her that Angella had already given permission. V.V. recalled another occasion when, after a barbecue, someone called Angella and said that C.R. and defendant looked inappropriate together (V.V.: 353, 355, 360-61).

C.R., sixteen years old at the time of trial, testified in detail about her relationship with defendant from September 2012 through June 2013, when she was twelve and thirteen years old. C.R. would see defendant after school, without the rest of her family present, about three or four times a week. Defendant picked her up and they would play board games, watch television, or go to the park. Defendant bought C.R. toys and clothing and she would speak to him almost every day. Defendant also bought C.R. a phone and paid for the monthly plan. C.R. spoke to defendant about things that were bothering her, including family and boyfriend matters. C.R. and defendant also sent text messages to each other. At some point, Angella took the phone away from C.R., but C.R. got another phone. Angella warned C.R. that she did not want her to be spending too much time with defendant (C.R.: 180, 182-85, 261).

At some point, defendant stopped keeping his distance. He touched C.R. more frequently and would kiss her goodbye. In early September 2012, close to the beginning of the month, before school had begun for the year, defendant came to C.R.'s house one afternoon when she was alone. Defendant brought rum and gave C.R. a full glass mixed with orange juice. Defendant also drank rum as they sat watching television. C.R. had never had an alcoholic drink and, after drinking it, she felt dizzy, and she had trouble standing up straight (C.R.: 186-92, 255-61, 270-71).

Defendant had to help C.R. to the bathroom and then back to the couch. Defendant then started kissing C.R. and touching her all over her body, including her breasts and private parts, both over and under her clothing. Defendant got undressed except for his socks, he undressed C.R. except for her bra, and he put his mouth on C.R.'s vagina before he thereafter got up off his knees and inserted his penis into her vagina. When defendant finished he got dressed. There was blood on the couch and C.R. had to go to the bathroom, steadying herself with her hand on the wall to get there. Defendant directed C.R. to wash herself and her underwear with Dettol, a disinfectant soap. C.R. also cleaned blood spots from the couch and floor leading from the bathroom to the living room. Defendant told C.R. that she could not tell anyone what happened because he would get in trouble. Defendant also warned C.R. that if she told, nobody would believe her because he was a respectable member of the community and a former corrections officer, and she was a child. Defendant said that if C.R. told, he would go to jail and he would kill himself and her mother. These threats frightened C.R. The next day, C.R. was sick with a terrible headache and vomiting, but she did not tell anyone what happened because, in addition to what defendant had threatened, defendant was contributing to the family's bills, he bought her things, and he was good to her family (C.R.: 192-96, 234, 261-64, 266, 271-73, 315-16).

Between October 1 and November 11 of 2012, before C.R. turned thirteen years old, defendant was again alone with C.R., watching television, and defendant began touching C.R.   On another day during that time period, defendant drove C.R. to nearby Lincoln Terrace Park, where defendant and C.R. sat around for several hours with defendant's friends, who were drinking and listening to music. When it was almost dark, defendant drove C.R. to a deserted area and turned off the ignition but left music playing.   Defendant directed C.R. to get into the back seat, where he joined her and began touching and kissing her.   Defendant undressed himself on the bottom, took off the lower portion of C.R.'s clothing, and asked C.R. to put his penis in her mouth.   When C.R. refused, defendant pushed her head down and put his penis into her mouth. Defendant then took off the rest of C.R.'s clothing, further lowered his underpants, and put his penis inside her vagina. Defendant then got dressed, directed C.R. to get dressed, and told her to get back into the front seat of the car.   Defendant then drove C.R. home (C.R.: 196-205, 274-75).

On her birthday on November 12, 2012, C.R. was living with Angella and V.V. on Strauss Street.   Defendant came over while everyone was still home and they shared a cake that defendant surprised C.R. with.   Defendant also gave C.R. a monetary gift (Angella R.: 51-53, 105; C.R.: 205-07, 278-79; V.V.: 356).

Shortly thereafter, Angella and V.V. left for work.  Defendant wanted C.R. to stay home but she had plans to meet friends in the park, and Angella had given her an excuse note for school, which C.R. dropped off (Angella R.: 52; C.R. 206-08, 280-81).

C.R. was playing hopscotch with some friends when, around 3:00 p.m., defendant texted that he was coming.  Defendant drove up and told C.R. to come with him.  C.R. did not want to leave her friends but they thought defendant was her father and C.R. did not want to create a fuss.  C.R. went with defendant and again spent hours with him and his friends.  At some point, defendant drove C.R. to the same place he had taken her previously.  C.R. "already knew the drill" and got into the back seat, where defendant kissed and touched her and inserted his penis into her vagina before taking her home prior to the arrival of V.V. and Angella (C.R. 208-10, 280-91, 321-22).

Between January 1 and February 28, 2013, probably around the week after New Year's, defendant again came to C.R.'s apartment around 3:00 p.m. and had sexual intercourse with her there (C.R.: 210-11, 292-95).

Between March 1 and April 30, 2013, the same thing happened.  Defendant engaged in foreplay to try to make C.R. "horny," and then had intercourse with her (C.R. 211, 296).

Between May 1 and May 31, 2013, on a day after school, the "usual" happened and C.R. and defendant had sexual intercourse (C.R. 212-13, 297-98).

On June 18, 2013, a date C.R. recalled because she had filled out forms for high school, defendant again came to the house and had sexual intercourse with her (C.R.: 212-13, 298-301).

Although Angella and defendant were broken up during these time periods, Angella thought that C.R. needed a father figure and she had not told defendant to stop coming around (C.R.: 296).

At trial, C.R. explained the factors in addition to defendant's initial threats that caused her to keep silent about what defendant was doing to her from September 2102 through June 2013:

> If you really look at it, I had a lot to lose because he was basically assisting with everything. We just – me and my sister just came up here. My mom couldn't really afford much, so his help was like a big part of our lives, basically and his support with the bills, and if that stopped, my mom couldn't pay the rent and I would probably have to go to a shelter or something

(C.R.: 213, 234, 315-16).

C.R. described two trips to Queens with defendant that also took place during this period, that did not involve sex acts. Once, defendant took C.R. to his apartment just to get his wallet. The next time, defendant left C.R. in his parked car with the windows open while he went to his apartment. A woman approached

and screamed at C.R. about being in her "baby father's car," and about defendant not answering her calls and "messing with somebody else." C.R., who could not close the windows, was frightened and retreated to the backseat. The woman appeared pregnant and C.R. did not want to argue with her. After the woman left, defendant returned, told C.R. to pay her no mind, and drove C.R. home. C.R. knew of a dispute involving another woman while defendant and Angella were involved and C.R. told Angella what happened at the car. Angella then cursed at defendant (C.R. 213-16, 244-45, 316-17).

In August of 2013, C.R. started feeling sick and vomiting. Angella took her to the doctor and the following week test results established that C.R. was pregnant. Angella and C.R. stepped out of the office, Angella asked who was responsible, and C.R. revealed her sexual relationship with defendant (Angella R.: 54-56, 110-15; C.R.: 216-17, 299-300, 305-07, 323; V.V.: 357).

C.R. said she was confused and scared and did not want to talk about it, because defendant had said if she did, his life was going to be destroyed and he was going to shoot her and himself. Angella did not immediately call the police because she wanted to find out if what C.R. had said was true (Angella R.: 113-14).

The precise timing of Angella's next step was somewhat confused by the time C.R. and Angella testified at defendant's March 2016 trial, over two and one-half years later. C.R. recalled

12

that defendant had driven them to the doctor's appointment and
that there was an immediate conversation about the pregnancy in
the car thereafter, but Angella initially recalled that it was
either later that day or the next that she first discussed the
pregnancy with defendant, after she had summoned him to meet her
at a hairdresser's salon, where she interrupted her appointment to
speak to him in his car.  Angella later recalled at trial, as C.R.
had, a conversation about the pregnancy in defendant's car right
after the doctor's appointment -- to which defendant had driven
them before they had knowledge of the pregnancy.   Angella
thereafter thought that she might have learned of C.R.'s sexual
relationship with defendant before she learned of the pregnancy,
when she was at her hairdresser's with C.R., but Angella then
recalled that in her first conversation with defendant about C.R.,
he offered money to deal with the pregnancy (Angela R.: 56-57,
115-19, 121, 130-35; C.R.: 217, 221, 305-08, 311-13).

     Both C.R. and Angella, however, clearly remembered defendant
coming to the hair salon and a conversation in his car about the
pregnancy, which took place while Angella was in the front seat
and C.R. was in back.  Defendant at first denied a relationship
with C.R., but subsequently admitted having sexual relations with
C.R. more than ten times.  Angella and defendant discussed abortion
clinics, and Angella discussed contacting the police, defendant
asked to keep the matter private, and he proposed sending C.R. to

live in St. Vincent and providing money for her care, without the money being traceable to him.   C.R. recalled this conversation frightening her, because she did not know anyone anywhere but in Brooklyn and Jamaica.   Defendant offered to pay one thousand dollars a month until he had paid twenty thousand dollars, and defendant asked Angella not to reveal his sexual relationship with C.R., because if that information "g[o]t in the wrong ears" he was "gone," his life was "over," and he was "done" (Angella R.: 58-63, 119, 121-24, 132-35, 149; C.R.: 217-20, 308-12, 323).

C.R. and Angella had differing recollections whether it was during this conversation or a subsequent conversation that occurred when defendant was driving Angella and C.R. to a doctor's appointment that defendant offered to put the agreement in writing, and whether it was during this conversation or a subsequent one that Angella secretly turned on the record function on her phone to record her conversation with defendant, which she did to obtain evidence to take to the police.   In the recorded conversation, Angella complained about defendant's lack of remorse and said he had destroyed a young child mentally, physically, and spiritually. Angella and defendant spoke English, but in a Jamaican Patois dialect.   They spoke of a "dumpling," which, Angella explained,

was a reference, in Patois, to money (Angella R.: 64-70, 73-74, 123-25, 129, 135-36, 146-49; C.R.: 222, 313).[3]

Angella and C.R. recalled defendant saying in a conversation in the car that because Angella did not trust him and he had let her down, he would make his word his bond and put the offer on paper. Defendant took a piece of paper from his glove compartment, wrote on it, and then signed it. Angella and C.R. also signed the paper. However, Angella thereafter wanted changes made. She wrote her changes, defendant agreed to her terms, and everyone signed again. Angella told defendant that she was not going to go to the police, but she testified that she said that so defendant would feel comfortable and reveal everything (Angella R.: 74-78, 88, 126-29, 135-36, 145-49; C.R. 222-24, 314-15, 322-23).[4]

The first statement, dated August 16, 2013, read: "I, Betrand Henry, having got [C.R.] who is pregnant and a minor hereby agree to give [Angella R.] one thousand dollars per month starting September 30, 2013 agreement to pay twenty thousand dollars." The revised statement, on the same piece of paper, read: "Bertrand

---

[3] A copy of that recording was admitted in evidence, along with a transcription/translation of the Patois dialect used by Angella and defendant (65-71). Defendant had no objection to the translation (Transcript dated March 7, 2016 at 22).

[4] The signed document, People's Exhibit 4, was admitted in evidence and shown to the jury (75-76, 84-86, 223).

Henry got [C.R.] pregnant.  She is 13 years old.  He has been
having sex with her from she is 12 years old.  Now she is pregnant.
He agree to settle with me, [Angella R.], twenty thousand dollars,
one thousand dollars every month until finish starting September
30, 2013.  And in addition, any medical bills arising from the
pregnancy.  If this money is not paid, I will take him to court
for the remaining balance to be paid in full. Sign, B. Henry.
Bertrand Henry; witness [Angella R.]; witness, [C.R. ]" (Angella
R.: 87-88, 138).

On August 19, 2013, Angella took C.R. to the 73rd Precinct,
and C.R. told Detective DANIELLE KENNY of the Special Victim's
Unit what happened.  Angella also provided the written document
and recorded conversation to Detective Kenny, and she showed
Detective Kenny certain text messages she had received from
defendant that morning, which read:  "You want me to say yes.
Again yes.  You want me to say yes.  Again yes.  I think one
thousand dollars a month is okay for now.  I really don't get that
amount each month.  I finish my life.  I finish.  My life is gone.
Are you still going to the clinic tomorrow.  I have the money for
you day" (Angella R.: 89-93, 151-52; C.R.: 225, 266-68; Kenny:
375, 379-83).

Another text admitted at trial, from C.R.'s phone, received
from defendant on August 19, 2013, at 10:27 p.m., read:  "I
deceived you and I want to amend.  I will do whatever it takes to

make you feel better.    I hurt you bad and I cannot apologize enough.    Just spare my life I beg you.    I am not hiding.    I will face the consequence" (C.R.: 229-34).

Detective Kenny either took photographs of the cell phones or C.R. and Angella sent her images of the text messages, which she printed out.    Those images showed C.R.'s and Angella's phone numbers, but not defendant's.    C.R. and Detective Kenny discussed when C.R. had sex with defendant, but the conversation was overwhelming to C.R., "because it's so many people just badgering you to give them specific dates and times and to remember every single time it happened," and it was hard for C.R., who was nervous, to remember specific dates (C.R.: 268-70, 276-77, 290-91, 321; Kenny: 384-90, 392).

C.R. did not talk about specific dates in September 2012, nor did she mention her birthday on November 12, 2012, but C.R. did recall a specific incident on June 18, 2013, and that there were a number of instances that occurred prior to that date (Kenny: 386-93).    C.R. and Angella thereafter had no further contact with defendant (Angella R.: 89, 93; C.R. 225-34, 266-69, 276-78, 321; Kenny: 391-93; People's Exhibit 10).[5]

---

[5] Copies of the text messages that Angella received from defendant and forwarded to the case detective were admitted in evidence (89-92).

On August 26, defendant was arrested.   He spoke to Detective Kenny and was cooperative, providing pedigree information indicating that he was fifty-five years old.  Defendant also provided his telephone number and a DNA sample (Kenny: 376-77, 379-84, 393-94).[6]

At trial, Angella explained that her confusion regarding the timing of the meetings she had with defendant after she learned of C.R.'s pregnancy was the result of the passage of time from the events until the March 2016 trial, and because there had been more than one trip to the doctor when she was in the car with defendant and C.R. (Angella R.: 120, 125, 155; C.R.: 322).

C.R. acknowledged at trial that when, upon learning that she pregnant, she said that she had only had an intimate relationship with one person, that was not true, and that, at that time, she had also had a fourteen year old boyfriend.  C.R. also agreed that she subsequently learned that defendant was not the father of the fetus she was carrying (C.R.: 225-26, 301, 303-04).

C.R. agreed that she had seen defendant without clothing, and she described him as "black as hell," but she did not notice any scars or deformities.  C.R. noted that whenever she had sex with

---

[6] The original signed agreement between defendant and Angella that had been provided to Detective Kenny was admitted in evidence as Defendant's Exhibit A. It was handwritten. On the reverse side was typewriting containing lab information regarding C.R. (Kenny: 381-82).

defendant in his car it was after dark, so that nobody could see them.  C.R. did notice that defendant had a very large "pregnant-ish" belly and hair on his chest.  During the time that defendant was in her life, C.R. did not know if he worked (C.R.: 252, 263, 289, 293, 295).

C.R. acknowledged conflicted feelings about her relationship with defendant, because he helped her family with bills and she also felt a little bit good about their relationship.  Before C.R.'s father came to the United States, her relationship with defendant was like none other in her life (C.R.: 234, 264, 272-73).

At some point before trial, C.R.'s father came to live in Brooklyn.  Angella wanted him there as a support because C.R. was "[torn] down" and "messed up" over what happened, and she required psychiatric help.  C.R.'s father and Angella wanted C.R. back the way she was before she was destroyed by this (Angella R.: 154; C.R.: 234, 318-19).

RONALD WITT, of T-Mobile Metro, identified cell phone records from defendant's phone.  Those records showed calls to subscriber C.R.  Records were only available from March 9, 2013 to June 30, 2013, for voice calls only, and they showed 260 calls from C.R.'s phone to defendant's phone, and 187 calls from defendant's phone to C.R.'s phone (Witt: 157-69).

Dr. ANNE MELTZER, a child psychologist who never met or spoke to C.R., testified as an expert witness in child victims of sexual abuse. Dr. Meltzer discussed some common characteristics of child victims, including that they are more likely to have been abused multiple times, and by someone they know, and to "accommodate" the abuse by refraining from immediately reporting it, particularly where the abuser is still around. Some wait years to report abuse because the abuser has authority over them or is more powerful, or because there are positive aspects to the relationship and the child does not want to get that person in trouble. Sometimes children have been warned not to report abuse and they fear being disbelieved or possibly being removed from the family, or they may feel embarrassed or guilty about what happened and/or fear punishment (Meltzer: 326-37, 341-45).

If disclosure occurs, it can be purposeful, where the child decides to tell, or "accidental," in that circumstances such as acquiring a sexually-transmitted disease or becoming pregnant suddenly require disclosure, or there can simply be a blurt-out when the child is angry or upset. It is typically difficult for children to be able to pinpoint exact dates when abuse occurred, particularly where there have been multiple incidents or a long interval between the events and disclosure (Meltzer: 338).

There is no one way that children react to sexual abuse and disclosure. Some express upset and always seem emotionally charged

20

when discussing it while others may appear calm and "disassociate[ed]" from the experience, because it is painful (Meltzer: 339-40).

False accusations of child abuse do occur, but generally in custody disputes, where a parent might coach a child to accuse the other parent, or as a means of seeking revenge against someone, or if the accuser is severely psychiatrically disturbed (Meltzer: 340-41, 345-46).

The Defense Case

The Office of the Chief Medical Examiner compared defendant's DNA to an N.Y.P.D. sample regarding C.R.'s pregnancy and it was determined that defendant was not the paternal contributor to C.R.'s sample (Criminalist CARL GAJEWSKI: 435-44).

AINSLEY CUMMINGS, a retired police officer, tax consultant, and friend of defendant's, who had also met Angella, met C.R. once when defendant brought her to Cummings' house to play with Cummings' daughters. Defendant appeared to have a father/daughter relationship with C.R. on that occasion (Cummings: 447-49, 452-53).

During the years of 2011 and 2012, defendant would come to Cummings' house for barbecues and to help with some renovations. Defendant was a "workaholic" who came on his days off work, which Cummings thought were "Mondays and stuff," or may be "Monday and Tuesday." Cummings could not fully recall when defendant came or

how long defendant stayed each time, testifying that defendant would stay for "two, three, four hours sometimes depending you know." Others also came to Cummings' house to help with the renovation. Cummings believed there were some days in 2011 or 2012 where defendant spent the whole day doing construction with him. Cummings never saw C.R. with defendant when defendant came on his days off (Cummings: 450-57). It was possible that there were days between September 2012 and June 2013 that Cummings did not see defendant. Cummings did not spend time with defendant at Lincoln Terrace Park (Cummings: 456).

ZEPHANIAH FARQUHARSON would see defendant at Cummings' house during the years 2011 through 2013, with the group helping with Cummings' basement renovation. Farquharson did not go there on Sundays, but thought he saw defendant there most weekdays. Farquharson never saw defendant outside of Cummings' house and had no recollection of specific days that he saw defendant. Farquharson did not know C.R. and never saw defendant in the company of a young girl (Farquharson: 460-65).

Defendant, fifty-eight-year-old BERTRAND HENRY, testified that he had no criminal record and was a United States citizen, originally from Grenada. Defendant was a veteran who served in Iraq, and a retired Corrections Officer who thereafter worked security at Kennedy airport until his arrest (Henry: 467-69).

22

Defendant described meeting Angella in 2004, developing an intimate relationship with her, and how he did not see Angella after 2007, until she contacted him again in 2011. Angella had brought her daughters from Jamaica at that time -- C.R., who was almost twelve, and V.V., who was about nineteen -- and Angella introduced them to defendant. Defendant visited the family in Brooklyn, helped them with rent money and, up through June of 2012, had a close relationship with them. Defendant bought them things, including a cake for C.R.'s twelfth birthday, and C.R. often said she wished defendant was her father. Defendant was listed as an emergency contact with C.R.'s school, and he sometimes picked C.R. up after school if she called him. Defendant would drop by and visit the family on nights when he was going to work at Ainsley Cummings's house, and on some weekends he took C.R. to watch netball games at Lincoln Terrace Park. Defendant also sometimes took C.R. to Cummings' house to play with Cummings' twin daughters. Defendant also bought C.R. a phone, he helped her with homework, and he helped V.V. prepare for her SATs (Henry: 472-77, 516-19).

In June of 2012 defendant's relationship with the family changed. He had a fight with Angella and he had a new girlfriend. Angella was unhappy because she had wanted defendant to marry her so that she could get a green card, despite Angella being married to a man in Jamaica (Henry: 477-79).

At the end of the summer of 2012, defendant returned to the workforce, getting a security job at JFK airport. Defendant worked Wednesdays through Sundays, from 3:30 p.m. until 12:00 a.m., although it was possible there were weeks he worked less than forty hours, including the week ending November 11, 2012, and some weeks in October 2012 he only worked twenty-four hours (Henry: (479-81, 519, 521-23).

Defendant claimed his relationship with Angella's family fell apart after he started his job, because he worked late and then went to his Queens home.  On his off days, defendant worked renovating Ainsley Cummings' basement.  Angella complained during this period that defendant was not coming around and that C.R. wanted him to visit.  C.R. would also call, sometimes to ask for a Metrocard or lunch money.  Defendant had a baby in September of 2012 (Henry: 481-83, 522).

Defendant denied any sexual contact with C.R. at any time. He denied seeing C.R. on her birthday in 2012, claiming he worked that day, and defendant denied ever driving C.R. to a location near Lincoln Terrace Park, although he agreed they had watched netball games in that park before he returned to work.  Defendant denied ever taking C.R. out when she was dressed in a sexy outfit (Henry: 483-86).

Defendant could not say that he worked every Wednesday through Sunday from September 2012 through June 2013, and he agreed that

24

his time sheets sometimes showed less than eight-hour days. Defendant acknowledged not working Mondays, and that November 12, 2012, C.R.'s thirteenth birthday, was a Monday. Defendant also acknowledged that between March 2013 and June 2013, he spoke to C.R. almost every day (Henry: 518, 523-26).

In August of 2013, defendant got a call from Angella telling him that C.R. was pregnant. Defendant was "devastated" because C.R. was only thirteen years old. Angella said nothing about defendant being the father. In a subsequent call, Angella said that defendant was the father. Defendant was shocked at this false accusation and felt as though he was back in Iraq. Defendant stayed home from work and met Angella at a hairdresser's salon, as she requested (Henry: 486-88, 526-27).

Defendant met Angella because he wanted to find out what was going on. Angella came out with her hair not completed and she sat in the front seat of defendant's car while C.R. sat in the back. Defendant was traumatized at that point because an allegation had been made that could damage his whole life and that was not good for his medical condition. Defendant denied taking Angella and C.R. to a doctor's appointment, but agreed he drove with them to a location away from the hairdresser's. Once parked, defendant saw that Angella was holding two phones. Angella said that C.R. had said that defendant got her pregnant, and Angella told defendant she needed twenty thousand dollars or she was going

to go to the police.  Defendant was so shocked that this was coming from people he had helped.  His heart felt like it was coming out of his chest, he was traumatized by the accusation and request for money, and he asked Angella why she was doing this.  Defendant could see that C.R., in the back seat, was trying to tell him something but when he asked what was going on, C.R. did not say anything.  C.R. was pointing to her chest and shaking her hand back and forth and defendant believed that C.R. was trying to say she had nothing to do with this.  Meanwhile, defendant could hear a voice on one of Angella's phones that C.R. said was her father, and Angella put the phone on speaker.  The man said that if defendant did not comply with Angella's demands, defendant's son in Jamaica and his family there would be dead (Henry: 488-91, 527-28).

Defendant was in his car with Angella and C.R. for about one-half hour.  He was so shaken by the threat to his ten-month-old son that he felt like he was back in Iraq.  Defendant was sweating, his heart was racing, and because it was a matter of life and death to his son, defendant decided to go along with Angella's demands, even though he had not had sex with C.R.  Defendant made the statements that Angella secretly recorded under duress because of the threat to his son.  Defendant wrote out the top portion of People's Exhibit 4 and he signed the top of that document, and he again signed the bottom portion of the document after Angella said

that she was dissatisfied with what he wrote, and she wrote
something else. It was Angella's idea to have a written document
and defendant wrote what Angella told him to on the back of a form
that Angela had gotten from the clinic. Defendant signed the
document because Angella said that she would not go to the police
if he did, and defendant decided it was better to give her the
money and go on with his life than go through the system, and
defendant was also worried about his child's safety. Defendant
also signed the document because he did not really know what he
was doing. Defendant drove Angella and C.R. to a Chase Bank, where
defendant withdrew money and gave it to Angella. Angella told
defendant if he went for a DNA test, he was going to get locked up
(Henry: 491-502, 528, 531, 534-37, 539)

The next day, on August 17, 2013, defendant got another call
from Angella with her husband on the line. Defendant could not
recall if Angella secretly taped the conversation with him on
August 16 or 17. Defendant acknowledged that he told Angella that
she could not go to the police or she and he would be gone.
Defendant also said that Angella should not tell anyone else about
C.R.'s pregnancy and should keep it between the three of them to
decide what to do. Defendant also acknowledged saying that it
would be hard for C.R. to heal, it would be a scar for life, and
that he admitted having sex with C.R. for the first time in his
car, and said he should not have had sex with her. Defendant

27

testified that those statements were made under stress and he insisted that he never had sex with C.R., and that C.R. had told him to say that they had sex in the car (Henry: 497, 528-31, 533).

Defendant never reported any threat to his son to Jamaican authorities.  Defendant knew C.R.'s father moved to New York a year before trial but defendant never met him.  Defendant admitted he was never threatened again (Henry: 533, 537).

Defendant introduced into evidence a photograph of a cell phone text message to his phone from Angella's phone that was sent on August 17, 2013.  The text read, "I'm not satisfied with the agreement we come to.  I want six thousand dollars now, and I meet with Nadine and tell her."  Defendant testified that he thereafter refused to continue to pay Angella, told her she was not getting another dime, and said he did not care what she did.  Angella went to the police with her allegations and defendant was arrested. Defendant did not report Angella's extortion threat because at the time his mind was "so clouded" that he "wasn't even thinking about filing a report."  Defendant could not explain refusing to pay money to Angella only one day after agreeing to pay out of fear for his son's life.  That son, three years old at the time of trial, was never harmed (Henry: 502-05, 536-39).

Defendant eventually gave a DNA sample (Henry: 506).

Photographs of defendant's chest -- taken the night before his March 17, 2016 testimony, were admitted in evidence.  Defendant

claimed that they accurately showed his body as it appeared in 2011 through 2013, and defendant pointed out what he said were areas of lighter pigment on his dark skin caused by an accident in Iraq. Defendant asserted that the photographs showed no chest hair, and that he had no chest hair in 2012-13. Defendant also described scars on his arm, elbow, and ankle (Henry: 507-11).

Defendant testified that the calls between his phone and C.R.'s phone in 2012, after he returned to work, were C.R. asking why defendant was no longer visiting, which calls were brief, and that some calls were from Angella, using C.R.'s phone (Henry: 511-12, 515-16).

C.R. called defendant on August 24, 2013 but he did not speak to her (Henry: 514).

During redirect examination, defendant was asked by his attorney to reviewing the document defendant signed for Angella, and their recorded conversation, and to say whether what was in the document and conversation was the truth. Defendant replied: "Well, it's the truth in a sense, but you know it's very difficult at the time for me. I didn't even know what to do. I was - I was, like, in a daze. I really didn't know. I was very scared" (Henry: 539).

The Prompt Outcry Instruction to the Jury

As the court promised when it permitted Angella to testify that C.R. told Angella that she and defendant had sex (54-55), the court instructed the jury:

> You may consider whether [C.R.] complained of the crime properly or within a reasonable doubt [sic] period of time after its alleged commission.  If you find the complaint was made promptly within a reasonable time, then you may consider whether and to what extent, if any, that fact has the support, the believability of the witness's testimony.

> Now if you find that the complaint was unreasonably delayed, you may consider whether and to what extent, if any, that fact has not support the believability of the witness's testimony.  So when you determine whether a complaint was made within a reasonable period of time, you may consider such circumstances as what's the complainant's age, what are her past experiences, what was her mental state, whether or not the complainant feared for her own safety, or the safety of others, whether or not the complainant had an opportunity to make a complaint, or any other circumstance that operated to prevent or delay disclosure within a reasonable period of time.

(611-12).

The Verdict

Defendant was convicted of two counts of first-degree rape for having sexual intercourse with C.R. between September 1-29, 2012, and October 1-November 11, 2012 (both times before she was thirteen years old), five counts of second-degree rape for having sexual intercourse with C.R. between November 12-15, 2012, and for acts of sexual intercourse that took place in 2013, between January 1-February 28, March 1-April 30, May 1-31,

and on June 18.  Defendant was also convicted of two counts of first-degree criminal sexual act for putting his mouth to C.R.'s vagina between September 1-29, 2012, and for forcing his penis into C.R.'s mouth between October 1-November 11, 2012 (both acts occurring before C.R. was thirteen years old) (617-23, 653-54).

The Sentence

At the sentencing proceeding on March 21, 2016, the prosecutor read a letter from Angella, asking that defendant receive the maximum sentence and recounting how defendant's actions had devastated C.R., physically and mentally (S. 3-4).  Defense counsel requested leniency and a minimum sentence because defendant had also been generous and helpful to C.R.'s family, defendant was an Iraq war veteran and former corrections officer, and because defendant suffered medical problems (S. 4-5).  Defendant asserted his complete innocence and said that lies had been told (S. 7-8).

The court found overwhelming evidence of guilt and that defendant "outright lie[d]" at trial.  For his crimes, and to serve as a deterrent to others, the court imposed maximum sentences of twenty-five years for each of the first-degree rape/sexual act convictions, with twenty-five years of post-release supervision, and seven-year terms for all of the second-degree rape convictions, with three-year terms of post-release supervision, all sentences to run consecutively (S. 8-10).

The court acknowledged a legislative cap of fifty years on the sentence defendant would actually serve, but noted it was sending a message to any authority that might someday consider releasing defendant (S. 10).

POINT I

THERE WAS LEGALLY SUFFICIENT EVIDENCE TO SUPPORT ALL OF
DEFENDANT'S CONVICTIONS.   MOREOVER, THE VERDICTS WERE
NOT AGAINST THE WEIGHT OF THE EVIDENCE.

When a defendant challenges his conviction, claiming that
guilt was not proven beyond a reasonable doubt, the conviction
must be upheld if "any rational trier of fact could have found the
essential elements of the crime charged beyond a reasonable doubt."
Jackson v. Virginia, 443 U.S. 307, 319 (1979).   Accord People v.
Contes, 60 N.Y.2d 620, 621 (1983).   Once the trier of facts has
found against a defendant, the People are entitled to the most
permissible inferences in their favor.   See People v. Carr-El, 99
N.Y.2d 546, 548 (2002); People v. Benziger, 36 N.Y.2d 29, 32
(1974).   Applying these standards to this case, the People proved
beyond a reasonable doubt that defendant was guilty of two counts
of first-degree rape, five counts of second-degree rape, and two
counts of first-degree criminal sexual act for his seven acts of
sexual intercourse with C.R., two of which occurred before C.R.
was thirteen years old and all of which occurred when she was less
than fourteen years old, and for his acts of oral sexual conduct
with C.R. on two occasions when she was under thirteen years old.

C.R. testified to all of the charged sex acts and although,
but for one act, she could not recall the specific dates when they
occurred, a reasonable jury could have found C.R. credible.   C.R.
described in graphic detail how defendant got her drunk before the

33

first rape, and how he first took off her clothes, put his mouth on her vagina, and then got off his knees and put his penis into her vagina. Despite being affected by the alcohol, C.R. remembered defendant undressing himself and her, how she afterwards had blood on her underwear, and defendant directing her to clean herself and her clothing with disinfectant soap. C.R. recalled how she needed to use the wall to steady herself to get to the bathroom, how she also saw blood on the couch and floor that she cleaned, and how sick she felt the next day from the rum defendant had given her. C.R. also recalled threats by defendant regarding killing himself and her mother that mirrored defendant's recorded statement to Angella that if she told the police what he had done, he was "gone" and she was "gone."

C.R. described in some detail defendant putting his penis in her mouth and vaginal rape in his car after she and defendant had spent hours in the park with defendant's friends. C.R. recalled the drive to a secluded area and how defendant turned off the ignition but left music playing, which were recollections that a reasonable jury could find had the ring of truth. C.R. also had fairly detailed recollections of her thirteenth birthday, when defendant brought her a cake and gift, left the house, but then came and found her playing in the park with friends, took her with him to sit for hours with adults watching a netball game, after which he again had sexual intercourse with her in his car.

Although, as would be expected, there were no witnesses to any of the sexual acts, C.R.'s testimony was corroborated to the extent that Angella and V.V. testified that defendant had a penchant for visiting C.R. on occasions when they worked, and V.V. recalled an occasion where C.R. sexualized her appearance for an outing with defendant that struck V.V. as weird and inappropriate. V.V. also saw defendant once open the bathroom door when he knew C.R. was inside, but then pretend that he did not know.

C.R. also provided credible explanations for not reporting defendant before she became pregnant. C.R. recounted defendant's warning that her word would not be believed over his, and that defendant uttered threats of harm to Angella and himself. C.R. also explained that she had a lot to lose by telling, because defendant was a financial help to her family, and she worried about becoming homeless if he withdrew his support. Angella corroborated that defendant helped with money for rent and C.R. obviously knew of defendant's financial assistance. Moreover, C.R. was candid in admitting that she got some pleasure from her relationship with defendant, who was in some ways like a father to her and who bought her food and clothing, and who gave her a birthday cake and monetary gifts. That a twelve/thirteen-year-old would opt to keep silent under all of these circumstances could certainly have been understandable to a reasonable jury, particularly in light of Dr. Meltzer's testimony describing how common it is for child sex abuse

victims to delay reporting, especially where there is a continuing relationship with the abuser and the child likes or possibly fears the abuser.

Here, C.R. clearly did not want to report defendant for the reasons she explained, but felt forced to acknowledge the sexual relationship once she was revealed to be pregnant. The fact that C.R. had another sexual partner who was apparently responsible for her pregnancy did not mandate a reasonable jury concluding that she lied about sexual contacts with defendant.

While defendant suggested at trial that Angella accused defendant of these crimes to extort money from him, the jury knew that C.R. named defendant as her sexual partner before Angella confronted defendant about C.R.'s pregnancy, and no reasonable juror could have believed that thirteen-year-old C.R. instantaneously concocted an extortion plot and falsely named defendant as her sexual partner upon learning that she was pregnant so that she and her mother could collude to get money from defendant. Moreover, the jury had good reason to conclude that Angella never wanted any money from defendant, and only pretended to have a plan to accept payments from him in order to obtain evidence against him. Angella explained that her motive in discussing defendant's guilt and payments for C.R.'s care was to obtain evidence to bring to the police and her actions supported the truthfulness of her testimony (135-36). Rather than take money

from defendant pursuant to the contract they signed, Angella took the document to the police as proof of defendant's guilt (77, 136). Angella clearly understood -- just as defendant had warned C.R. after the first rape -- that C.R. might not be believed if she made a rape allegation against a respectable member of society, and that something more than C.R.'s word might be necessary to bring defendant to justice.

While there were some inconsistencies in Angella's and C.R.'s recollections, particularly regarding whether defendant was first confronted with the news of C.R.'s pregnancy in defendant's car outside the doctor's office on the day C.R. and Angella first learned of the pregnancy, or in his car after Angella interrupted an appointment at her hairdresser's later that day or the next (C.R.: 217, 221, 307-13; Angella R.: 56-57, 62-63, 115-16, 131-33), a reasonable jury could have concluded that these inconsistencies did not undermine the truthfulness of their accounts and were simply confusions explainable by the passage of time from August 2013 to defendant's trial in March 2016. See People v. Gissendanner, 48 N.Y.2d 543, 550 (1979) (what defendant characterized as a "diametrically opposed" version of events, "need not have been perceived as indicative of anything worse than the kind of discrepancy that differing faculties of concentration and memory will commonly produce in the most honest of witnesses").

Both C.R. and Angella recalled Angella leaving her hairdresser's in the middle of an appointment to discuss the matter of C.R.'s pregnancy with defendant in his car, and whether that discussion occurred the day Angella learned of C.R.'s pregnancy or the next could certainly have been found by a reasonable jury to be of no great consequence regarding Angella's overall credibility.

Indeed, defendant admittedly confessed to Angella having had sex with C.R. and his excuse at trial, that he did so because he was shocked and had a flashback to being in Iraq, could certainly have been found by a reasonable jury to be patently incredible.

Defendant attacks C.R.'s credibility by arguing that she did not correctly describe defendant's body despite claiming to have seen him naked on a number of occasions. But C.R. did describe defendant as "black as hell," and as having chest hair and a large belly, and the accuracy those descriptions were for the jury to determine, based upon its ability to observe defendant. To the extent that defendant contends that C.R. did not accurately describe his chest because defendant allegedly lacked chest hair and had skin discolorations, the jury knew that defendant's evidence of his skin and lack of chest hair was based on a photograph taken during the 2016 trial and admitted in evidence. A photograph taken over three years after the alleged abuse, some of which acts took place in a dark car backseat, certainly did not

establish that C.R. was lying.  It was possible that defendant's chest hair diminished with age or that he removed it prior to having the photograph taken and/or that the hair that he had at the time of his encounters with C.R. obscured his skin tone variations.  It was also possible that C.R. did not pay particular attention to defendant's chest, especially in light of her perception that he had a very large protruding belly, and because he was sexually abusing her when he was naked, and his activities might have more strongly occupied her mind.

Because C.R.'s and Angella's testimony was reasonable and corroborated by defendant's signed and recorded admissions, and because that testimony could certainly have been credited as truthful by a rational jury, there was legally sufficient evidence of defendant's guilt of all of the crimes of which he was convicted.

Nor was the verdict against the weight of the evidence.  In deciding whether the jury was justified in finding defendant guilty beyond a reasonable doubt, this Court must weigh the conflicting testimony, review any rational inferences that may be drawn from the evidence, and evaluate the strength of such conclusions, while according great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor.  See People v. Danielson, 9 N.Y.3d 342, 348 (2007); People v. Mateo, 2 N.Y.3d

383, 410, cert. denied 542 U.S. 946; People v. Romero, 7 N.Y.3d 633, 644-45 (2006); People v. Bleakley, 69 N.Y.2d 490, 495 (1987).

Here, the jury heard preposterous testimony from defendant that he never touched C.R. sexually but almost immediately confessed to sexual conduct and offered to pay thousands of dollars for C.R.'s care because he was shocked by the accusation and felt like he was back in Iraq -- this, from a man who, apparently successfully, handled the stressful job of Corrections Officer at Rikers Island for years after his discharge from the Army. The jury also heard defendant implausibly explain making the monetary offer allegedly because his infant son's life was threatened, but then deciding the very next day to refuse to pay, his fear for his son apparently gone. The jury knew that defendant's claim that his contact with C.R. and her family significantly diminished after he got his security job at Kennedy airport was belied by the cell phone records showing hundreds of contacts between defendant and C.R. during just part of time they were sexually involved, and the jury heard defendant essentially admit, during redirect examination, that what he had told Angella and written in the document that she gave to the police was true.

Defendant's attempt to establish an alibi based on his work schedule and renovation work at Ainsley Cummings' house fell short, because defendant could not establish that he could not have been with C.R. as she alleged. Cummings could not say when and for how

long defendant stayed when defendant did work there, and defendant's work timesheets showed that he did not work every day and that his workdays were not always eight hours long.

Defendant's claim that C.R. had a motive to falsely accuse him of sex crimes to deflect blame from herself for a pregnancy apparently resulting from a sexual relationship with a young boyfriend -- because C.R. was allegedly afraid of her mother and frightened that her mother would send her back to her allegedly abusive father in Jamaica (Defendant's Brief at 33) -- is based solely upon a letter that was found inadmissible by the court (see POINT II, infra) and defendant's argument in this regard must be disregarded as completely unsupported by the evidence. In fact, there was no evidence that C.R. had a bad relationship with Angella, or that her father was abusive, or that her pregnancy caused her to fear being sent back to Jamaica, and no evidence to support a suggestion that C.R. believed that a false accusation against defendant would avoid any dire consequences to her.

For all of these reasons, the verdicts were not against the weight of the evidence. See People v. Horton, 173 A.D.3d 1338, 1340 (3d Dep't 2019) (notwithstanding child victim's inability to specify precisely when [predatory assault] conduct occurred, jury could properly have credited victim's testimony and found all charges proven; victim's delayed disclosure, learning disabilities, and mental health issues, were explored at trial;

41

deference accorded to jury's credibility determinations); <u>People</u> <u>v. Flower</u>, 173 A.D.3d 1449, 1452 (3d Dep't 2019) (legally sufficient evidence of first-degree rapes and verdicts not against weight of the evidence where complainant and defendant gave competing testimony about whether defendant forced complainant to have sex when she was fifteen years old or they had a consensual relationship that began when complainant was seventeen); <u>People v.</u> <u>Skeen</u>, 139 A.D.3d 1179 (3d Dep't 2016) (regarding minor inconsistencies in victim's testimony regarding time line and frequency of sexual assaults, "we note that '[j]ury resolution of credibility issues, particularly those involving sex-related conduct with a victim of tender years who may have difficulty recalling precise dates and times of the acts, will not be disturbed absent manifest error'"; jury had opportunity to view victim's testimony and assess her credibility as well as her ability to recall specific details and time frames of particular sex crimes and verdict was in accordance with the weight of the evidence); <u>People v. Johnson</u>, 24 A.D.3d 967, 968 (3d Dep't 2005) (same).

POINT II

DEFENDANT WAS NOT DENIED THE RIGHT TO PRESENT A DEFENSE
BY THE COURT'S PRECLUSION OF EVIDENCE REGARDING A LETTER
THAT C.R. WROTE TO A TEACHER AFTER HER FAMILY LEARNED OF
HER PREGNANCY AND RELATIONSHIP WITH DEFENDANT, NOR WAS
DEFENDANT DENIED A FAIR TRIAL BY THE COURT'S APPLICATION
OF THE RAPE SHIELD LAW TO PRECLUDE DEFENDANT FROM
EXPLICITLY QUESTIONING C.R. ABOUT SEXUAL RELATIONS WITH
HER YOUNG BOYFRIEND.

Defendant contends that that he was denied a fair trial by
the court's refusal to allow him to admit in evidence and/or
question C.R. and Angella about a letter that C.R. wrote to a
teacher (apparently in response to C.R. being warned that she might
have to repeat the eighth grade), in which C.R. explained that her
schoolwork was slipping because of her strained relationship with
her mother, her concerns about the upcoming trial at which she
would have to answer embarrassing questions, and her concern about
her mother's threats to send her back to her father in Jamaica,
who, C.R. indicated in the letter, would hit her.  According to
defendant, that letter showed that C.R. had a motive to fabricate
her accusations against him (103-04, 144 [letter marked as court
exhibit]).   Defendant also claims that the court improperly
precluded him from questioning Angella about a neglect inquiry by
the Administration for Children's services (that was apparently
instigated by the teacher who received C.R.'s letter [141, 144]),
and that the court erred in disallowing more explicitly questioning
of C.R. about her sexual relations with the boyfriend who likely

43

impregnated her.   Defendant's claims are meritless.   The court properly found the letter, written well after C.R.'s relationship with defendant was revealed, to be irrelevant to the issues at trial because C.R.'s complaints about her parents' post-pregnancy response to her situation did not did not establish a motive to falsely accuse defendant of a sexual relationship, and the court properly applied the rape shield law to preclude a more explicit inquiry about C.R.'s sexual relationship with a boyfriend.

(1)

The court properly denied defendant's request to question C.R. and Angella about C.R.'s letter to her teacher, written well after C.R. made her accusations against defendant, because the fact that some turmoil apparently occurred in C.R.'s family after the revelation of her pregnancy and relationship with defendant had no reasonable bearing on a motive for C.R. to have falsely accused defendant of the charged crimes.   Defendant's theory that C.R. falsely accused defendant to deflect parental anger over her consensual relationship with a young boyfriend was entirely speculative and provided no basis to permit questioning regarding the family's situation after the family learned of the pregnancy and sexual activity (102-04, 141-44, 236-37).   See People v. Grose, 172 A.D.3d 1092, 1093 (2d Dep't 2019) (extrinsic proof tending to establish motive to fabricate never collateral, but when evidence

too remote or speculative of a motive to fabricate, court may, in its discretion, exclude such proof; proposed line of inquiry by defense counsel too remote and speculative to infer a motive to fabricate); People v. Ahsan, 169 A.D.3d 815, 815-16 (2d Dep't 2019) (right to confront witnesses not unfettered; court has broad discretion to limit cross-examination regarding irrelevant, only marginally relevant, or collateral issues); People v. Francisco, 44 A.D.3d 870 (2d Dep't 2007) (same); People v. Garcia, 47 A.D.3d 830, 831 (2d Dep't 2008) (same); People v. Mestres, 41 A.D.3d 618 (2d Dep't 2007) (same); People v. Wilson, 283 A.D.2d 378 (1st Dep't 1991) (reasonable limits on cross-examination properly imposed; defendant afforded sufficient latitude to present his defense and challenge complainant's credibility).

The same is true regarding the neglect inquiry, that apparently resulted from the teacher's report after receiving C.R.'s letter, and which the court correctly found was irrelevant to the relationship between C.R. and her mother at the time C.R. first learned of her pregnancy and named defendant as her sexual partner (140-44).

In fact, the court permitted defense counsel to cross-examine C.R. about the domestic relationship in her family at the time of the charged crimes (142, 237). Counsel did so and elicited that Angella had left C.R. in Jamaica for five years while Angella was living in the United States, that there had been some disputes

45

between the two after C.R. came to live with Angella, and that the two did not have "open communication" before September 2012 (240-43). Counsel argued in summation that C.R. was scared and shocked when she learned she was pregnant, and that her bad relationship with Angella caused her to point the finger of blame at defendant (550, 559). Thus, defendant had sufficient evidence to make the argument he wanted to make and he was not prejudiced by the preclusion of questioning regarding a letter written well after C.R.'s accusation of defendant had been made. Moreover, even if, arguendo, the court should have permitted questioning about the letter, any error was harmless, given the questioning that was allowed and the overwhelming evidence of guilt.

(2)

The court also properly applied the rape shield law, C.P.L § 60.42, to preclude explicit questioning of C.R. regarding a sexual relationship she had with a fourteen-year-old boyfriend at the time C.R. learned that she was pregnant. The court avoided any prejudice to defendant by allowing him to establish that DNA evidence excluded him as the father of the child C.R. was found to be carrying in August of 2013, and to elicit that at the time she became pregnant, C.R. had a boyfriend whom she failed to mention as a sexual partner. In fact, C.R. responded affirmatively to defense counsel's questions: "And by the way, you later learned

46

that Mr. Henry was not a father of that child," "In fact, you found — you revealed that you had a boyfriend," and, "I think you said a fourteen-year-old?" before the court cut off the question, "And you were sexually active with that fourteen-year-old?" (301). The court thereafter asked counsel, "She admitted that the client — that your client was not the father and so that apparently somebody else has to be the father. So what's your point of going into this" (302).

Moreover, the court thereafter allowed the following exchange:

> [Defense counsel]: And the doctors had asked you about being pregnant?
>
> C..R.: Yes.
>
> Defense counsel]: And they asked you if you had been sexually active, right?
>
> C.R.: Yes, yes.
>
> [Defense counsel]: And you told them that you had not been sexually active with anybody but the person that you say had raped you.
>
> C.R.: Yes.
>
> [Defense counsel]: And that was not true?
>
> C.R.: No.

(304).

Defendant was thus permitted to establish that C.R. had been dishonest when she claimed, upon learning of her pregnancy, that she had only had sexual relations with defendant, and defendant

established that he was not the father of C.R.'s unborn child. Defendant had no entitlement to further explicitly question C.R. about her sexual relations with her boyfriend, as the court correctly ruled prior to trial (3/7/16: 25-29).

Moreover, all of the questioning that the court permitted during C.R.'s cross-examination was redundant, given that C.R. had already admitted in her direct testimony that she lied about only having had sexual relations with one person when she learned that she was pregnant, and that C.R. had a fourteen-year-old boyfriend at the time (C.R. 225-26). In fact, in the prosecutor's opening statement, the jury was informed that after defendant acknowledged his sexual relationship with C.R., it was later discovered that he was not the cause of C.R.'s pregnancy (32). Thus, the jury knew from the outset that C.R. had been sexually active with someone other than defendant.[7]

Defendant's claim that he was prejudiced by the court's limitation on his questioning of C.R. regarding her sexual relations with her boyfriend, and about whether C.R. also lied to Planned Parenthood about having more than one sexual partner is meritless (Defendant's Brief at 44-45). While defendant claims that C.R.'s relationship with her boyfriend provided a motive for

---

[7] Prior to trial, the prosecutor acknowledged that the People were going to breach the rape shield law to elicit testimony about C.R. having had a boyfriend, and that they were doing so after consultation with C.R. and Angella (3/7/16 at 23-25).

her to fabricate her accusations against defendant in order to shift attention from her relationship with her boyfriend onto an older man whom she accused of being her attacker – allegedly, so that C.R. could portray herself as a blameless victim instead of a wrongdoer -- the testimony at trial was certainly sufficient for defendant to make his argument.  It was clear from the questioning that took place that C.R. had engaged in sexual relations with someone other than defendant, and that she had, in fact, been impregnated by someone other than defendant, and that she had lied about having no sexual involvements other than with defendant. More inquiry regarding the specifics of C.R.'s sexual activity with her boyfriend was unnecessary to aid in defendant's defense and the court properly applied the rape shield law to preclude such questioning.  See People v. Halter, 19 N.Y.3d 1046, 1049 (2012) (court properly precluded evidence of defendant's daughter's purportedly sexual relationship with teenage boy; court allowed evidence that daughter stayed out all night, was found at boy's house in bedroom with him the next day, and that she was angry at defendant for sending police after her; also not error to preclude evidence of daughter's MySpace page and regarding clothing she wore; sufficient evidence was admitted to establish that defendant's unhappiness over his daughter's postings and clothing choices caused considerable friction between them, which evidence defendant used in support of his position that his

daughter had a motive to escape his control by fabricating charges of sexual abuse); People v. Simmons, 106 A.D.3d 1115, 1116 (2d Dep't 2013) (court properly limited inquiry into complainant's sexual history; right to present defense and confront witnesses not unduly curtailed by Rape Shield Law; defendant permitted to develop evidence of prior sexual encounter between complainant and teenaged boy, and that this allegedly provided motive to fabricate her accusations).

<u>POINT III</u>

<u>DEFENDANT'S CLAIM THAT THE TIME PERIODS CHARGED IN THE
INDICTMENT WERE OVERLY BROAD IS UNPRESERVED FOR
APPELLATE REVIEW. MOREOVER, DEFENDANT WAS NOT DEPRIVED
OF FAIR NOTICE OF THE CHARGES AGAINST HIM.</u>

Prior to trial, defendant successfully moved to dismiss certain of the charges in the indictment as multiplicitous (Decision and Order of Gubbay, J., dated February 4, 2014). Defendant thereafter moved to reargue his motion to dismiss the indictment, arguing that certain other counts encompassed more than one offense and were duplicitous under C.P.L. § 200.30(1). The motion was denied by Decision and Order dated September 17, 2014 (Chun, J.). Defendant did not claim that the time periods charged the separate counts of the indictment were overly broad.

Before jury selection, in the course of arguing that the People should not be allowed to elicit defendant's bad act of giving C.R. an alcoholic drink on the date of the first charged rape, defense counsel asked to add "one other point, which was that "there is no real specified date or time when anything occurred," and counsel argued "I don't think, especially for a Molineux application where they're trying to bring out an uncharged crime to specify that something like this occurred is a bad act and it happened in a range of time" ((Transcript dated March 7, 2016 [hereinafter 3/7/16] at 8). Counsel argued that the People were trying to dovetail another incident to the charges, and that

51

it would be hard to defend, particularly where "there is a nebulous exact time or date that anything happened" (3/7/16: 8).  When the court noted that it would not relitigate anything that had already been litigated with respect to the time periods in the indictment that had already been decided by Judges Gubbay and Chun, counsel reiterated that he was only talking about the Molineux ruling regarding giving alcohol to C.R., which the court thereafter found admissible as inextricably intertwined with the alleged sexual event (3/7/16: 8-11).

Because defendant's current claim that the time periods charged in several of the counts were overly broad is raised for the first time on appeal, defendant's claim is unpreserved for appellate reviews.  See People v. Simmons, 106 A.D.3d 1115, 1116-17 (2d Dep't 2013) (contention certain rape and sexual act charges failed to provide fair notice of dates of charged crimes unpreserved for appellate review; considering age of complainant at time of charged crimes, repetitive nature of the sexual abuse, and that time was not a material element of any of the crimes, the 30-day time periods set forth in the subject counts provided adequate notice).

Moreover, defendant's claim that he was deprived of fair notice of the charges against him by the allegedly overly broad time periods charged in the indictment is meritless.  Given C.R.'s relatively tender years and the repetitive nature of the abuse,

the time periods charged in the indictment were not excessive and they did not deprive defendant of the opportunity to mount a defense.[8] See People v. Green, 92 A.D.3d 894 (2d Dep't 2012) (time periods alleged were not so lengthy as to require dismissal, considering age of victims at times of commission of crimes, nature of crimes, and People's efforts to narrow the time frames); see also People v. Angona, 119 A.D.3d 1406 (4th Dep't 2014) (time frame in indictment -- "during the months of September or October 2001" -- sufficiently specific given nature of the offenses and age of victim at the time of acts); People v. Spencer, 119 A.D.3d 1411, 1413 (4th Dep't 2014) (time periods specified for certain counts not too broad to permit defendant to prepare a defense; where period of time not essential element of charged crime, reasonable approximation sufficiently complies with statute, "especially where the crime was committed against a young victim, and was not immediately reported; use of a three-month "seasonal" period sufficiently specific); People v. Weber, 25 A.D.3d 919 (3d Dep't 2006) (where victim eight years old and time not essential element of crime, allegation abuse occurred on or about summer of 1996 reasonably specific as to the time period for commission of act); People v. Johnson, 24 A.D.3d 967, 968 (3d Dep't 2005) (specificity

---

[8] Furthermore, prior to voir dire and one week before opening statements, the People narrowed the time period regarding one count (3/7/16 at 18-19).

requirements of C.P.L. § 200.50 -- designed to give defendants fair notice of dates upon which alleged crimes occurred in order to prepare a defense -- "are relaxed where, as here, the charge involves a 'continuing crime.' Moreover, the inability of the victim to give specific dates and times regarding the alleged sexual conduct was adequately established and we observe no prejudice to defendant's ability to defend arising from the lack of specificity in the indictment" [citations omitted]).

POINT IV

<u>DEFENDANT WAS NOT DENIED A FAIR TRIAL BY THE ADMISSION
OF OUTCRY TESTIMONY, A RECORDED CALL, AND COPIES OF TEXT
MESSAGES.</u>

Defendant asserts that the court erred in admitting outcry testimony that was allegedly not made promptly enough to come within the exception to the hearsay rule, and in admitting a recording made by Angella and copies of text messages that allegedly violated the best evidence rule. All of this evidence was properly admitted and defendant's contentions are meritless.

With respect to the outcry, Angella's testimony contained no details of the crimes, but simply set forth C.R.'s statement that she had had sex with defendant (54-56). This testimony was permissible under all of the circumstances of this case, including C.R.'s age, her continuing contacts with defendant, defendant's threats regarding disclosure, and C.R.'s family's dependence on defendant. See People v. McDaniel, 81 N.Y.2d 10, 17 (1993) (promptness is a relative concept dependent on the facts; what might qualify as prompt in one case might not in another).

C.R. was only twelve years old when defendant first raped her. She was relatively new to this country and had very little family support here except for her sister and her mother. Defendant was also C.R.'s mother's on-again, off-again boyfriend, and he was kind to the family, providing financial support for critical needs such as rent, utilities, and food. C.R. explained

that she had a lot to lose by revealing the sexual abuse because of these factors (195-96, 213).   C.R. provided an additional explanation for her failure to come forward before she learned that she was pregnant.   C.R. revealed that as of their first encounter, defendant threatened that nobody would believe her over him, and defendant further threatened that he would harm himself or her mother if she told (195, 234, 315-16).[9]

C.R. was also very candid about having conflicted feelings about the relationship because defendant was good to her, in some ways like a father to her, and because he apparently attempted to make the sexual encounters pleasurable (211, 234, 264, 272-73). Indeed, C.R.'s sister, V.V. confirmed that C.R. seemed to enjoy playing dress up on that occasion when it looked to V.V. that C.R. was getting ready to go on a "date date" with defendant (355).

Furthermore, the relationship with defendant was ongoing. Seven acts of sexual intercourse took place between early September of 2012 and June of 2013, and there was a continuing relationship between defendant and C.R.'s family.  In fact, cell phone records showed extensive contacts between C.R. and defendant up until she learned that she was pregnant, and defendant may have driven C.R. and her mother to a doctor's appointment prior to them learning

_____

[9] On the day she found out that she was pregnant, C.R. told Angella that defendant had threatened her that if she ever spoke about their sexual encounters his life would be destroyed and he would shoot her and shoot himself (Angella R.: 114)

that C.R. was pregnant (C.R.: 305-06; Angella R.: 116-19, 130), which showed the family's continued dependence on defendant and that the relationship had not terminated with the last act of sexual intercourse in June of 2013. Under all of these circumstances, the court properly permitted the outcry testimony. See People v. Evangelista, 155 A.D.3d 972 (2d Dep't 2017) (no iron rule on when outcry is considered prompt; court properly allowed testimony of victim's first outcry to her parents approximately 4½ years after abuse ended where victim was about seven years old at time of crime, there was an ongoing familial relationship between victim and defendant, defendant warned victim not to tell anyone, and victim was afraid of making the complaint sooner).

Moreover, the court gave appropriate limiting instructions that allowed the jury to find that a delay in outcry could affect their assessment of C.R.'s credibility (612). See People v. Green, 108 A.D.3d 782, 785 (3d Dep't 2013) (prompt outcry charge provided additional safeguards to defendant by cautioning jury to consider victims' delayed disclosures in evaluating their credibility; prompt outcry charge is usually a limiting instruction that is favorable to and requested by a defendant).

Finally, even if the court had not admitted the outcry when it did, during Angella's testimony describing first learning of C.R.'s pregnancy, the outcry would have been admissible as part of the narrative when Angella described coming up with a plan to

57

obtain admissions from defendant to bring to the police (122-24).
See People v. Honghirun, 29 N.Y.3d 284, 290 (2017) (New York courts
have routinely recognized that nonspecific testimony about a
child-victim's reports of sexual abuse does not constitute
improper bolstering when offered for relevant, nonhearsay purpose
of explaining the investigative process); People v. Gross, 26
N.Y.3d 689, 695 (2016) (same); People v. Mandes, 168 A.D.3d 764,
765 (2d Dep't 2019) (challenged testimony properly admitted for
purpose of completing the narrative and explaining the
investigation); People v. Horton, 173 A.D.3d 1338, 1341 (3d Dep't
2019) (same).

With regard to the recording, it was authenticated by Angela
as an accurate copy of the full conversation she had with defendant
(66), and the text messages were authenticated by Angella and C.R.
as accurate copies of messages they had received on their phones
from defendant's phone number (90-93; 229-34), and by Detective
Kenny who testified to copying them as they appeared on the screens
of those phones (383-85).  Nobody testified from memory regarding
the content of the message and there was no violation of the best
evidence rule.  See People v. Javier, 154 A.D.3d 445, 445-46 (1st
Dep't 2017) (court properly permitted as evidence of text message
conversation between undercover officer and defendant email
created by undercover officer who copied text message
conversation, pasted it into an email, which officer sent to his

personal account and then printed out; messages were properly
authenticated by officer's testimony that he copied and pasted
entirety of text message conversation and the copies did not
violate best evidence rule; officer adequately explained the
unavailability of original in that it was his routine practice to
erase original text messages from his phone, particularly since
those messages would be automatically deleted once the memory
became full [and, in any event, there was no genuine dispute about
the contents of text messages]); People v. Agudelo, 96 A.D.3d 611
(1st Dep't 2012) (victim's testimony sufficient to authenticate
set of cell phone instant messages exchanged between victim and
defendant, which detective viewed on victim's phone before reading
printouts of the messages that victim had cut and pasted into a
single document that was admitted in evidence; credibility of
authenticating witness and any motive she may have had to alter
the evidence go to the weight of the evidence and not its
admissibility); see also People v. Shortell, 155 A.D.3d 1442, 1444
(3d Dep't 2017) (same).

     To the extent that defendant claims on appeal that Angella
could have tampered with the recording, it should be noted that
defendant testified at trial and admitted making the statements
that were recorded, although he claimed that he was not thinking
straight at the time he spoke and that he was speaking while under
duress and while having a flashback to Iraq (497-98, 529-31, 539).

Defendant also admitted a photograph of his own cell phone, depicting a message he said came from Angella, although her number did not appear on the screen (503-05).

POINT V

DEFENDANT'S SENTENCE WAS NOT EXCESSIVE.

Although the court imposed consecutive sentences totaling over one hundred years in prison, the court knew that the maximum sentence that defendant would serve was fifty years. Given the circumstances of this case, including repeated rapes of a child and no remorse whatsoever, that sentence was not excessive.

The evidence established that the then-fifty-five-year-old defendant preyed on a child new to this country by initially cultivating a supportive father/daughter friendship with her, buying her things and being there for her during hours when her mother and sister worked, but that defendant thereafter turned the relationship sexual and kept it secret by threats of physical harm to himself or to C.R.'s mother, and by C.R.'s knowledge that her family depended on defendant's financial assistance for essentials like rent and food. The evidence further established that defendant callously gave C.R. enough alcohol to make her feel very sick the day after he first raped her, apparently to minimize resistance, and that defendant thereafter trained C.R. to know "the drill" for having sex with him in his car in a deserted area. The evidence further established that, after C.R.'s pregnancy was revealed, defendant was willing to have her sent, alone and terrified, to live in a foreign land among strangers in order to conceal what defendant then thought was his role in impregnating

her, and Angella's testimony established that defendant significantly physically and psychologically harmed C.R. Moreover, the record supported the court's determination that defendant baldly perjured himself when he denied having sex with C.R. and blamed his confession to Angella on a flashback to his days in Iraq. Defendant also falsely accused C.R. of lying at trial, which was an additional violation she endured at his hands.

Given the significant damage defendant inflicted, his complete lack of remorse, his perjury, and his false public accusations against C.R., the sentence imposed was not excessive. See People v. Suitte, 90 A.D.2d 80, 83 (2d Dep't 1982) (sentencing committed to exercise of court's discretion); People v. Hernandez, 88 A.D.3d 907 (2d Dep't 2011) (sentencing court properly considered lack of remorse and unwillingness to accept responsibility for crimes); see also People v. Flower, 173 A.D.3d 1449, 1458 (3d Dep't 2019) (declining to reduce concurrent twenty-five-year sentences for three rapes of fifteen-year-old given seriousness of offenses, predatory nature of defendant's behavior, and refusal to accept responsibility); People v. Horton, 173 A.D.3d 1338, 1342 (3d Dep't 2019) (declining to reduce sentence where there were "notably exploitative circumstances surrounding the crimes here and * * * complete lack of remorse").

CONCLUSION

THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED
IN ALL RESPECTS.

Dated:      September 20, 2019
            Brooklyn, New York


                                    Respectfully submitted,


                                    ERIC GONZALEZ
                                    District Attorney
                                    Kings County
                                    Attorney for Respondent


LEONARD JOBLOVE
DIANE R. EISNER
Assistant District Attorneys
      of Counsel

## PRINTING SPECIFICATIONS STATEMENT

Certificate of Compliance
Pursuant to 22 NYCRR § 1250.8(j)

This brief was prepared on a computer.  A monospaced typeface was used, as follows:

Name of typeface:  Courier New
Point size:  12
Line spacing:  Double

According to the word count of the word processing system used to prepare the brief, the total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of authorities, proof of service, certificate of compliance, or any authorized addendum containing decisions, statutes, rules, regulations, etc., is 13,862.

Diane R. Eisner
Assistant District Attorney

64

*To be argued by*
HANNAH KON
*(15 minutes)*

# New York Supreme Court

## APPELLATE DIVISION -- SECOND DEPARTMENT

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*– against –*

BERTRAND HENRY,

*Defendant-Appellant.*

*TO BE HEARD ON
THE ORIGINAL
RECORD*

Kings County
Ind. No. 7388/13

A.D. No. 2016-03720

## REPLY BRIEF

PAUL SKIP LAISURE
Attorney for Defendant-
Appellant
111 John Street, 9th Floor
New York, N.Y. 10038
(212) 693-0085 x. 251

HANNAH KON
*Of Counsel*
hkon@appad.org

OCTOBER 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT .......................................................... 1

POINT I

BECAUSE THE PEOPLE FAIL TO PERSUASIVELY ADDRESS
THEIR WITNESSES' LACK OF CREDIBILITY, THE
COMPLAINANT'S STRONG MOTIVE TO FABRICATE, AND
THE COMPLAINANT'S INABILITY TO DESCRIBE
APPELLANT'S CHEST ACCURATELY THEY HAVE NOT
DEMONSTRATED APPELLANT'S GUILT BEYOND A
REASONABLE DOUBT ...................................................................... 1

POINT II

THIS COURT SHOULD REJECT THE PEOPLE'S ATTEMPTS TO
MINIMIZE THE IMPORTANCE OF THE EXCLUDED
EVIDENCE OF C.R.'S POWERFUL MOTIVE TO FABRICATE ............... 7

    A. C.R.'s Letter and Related Testimony were Probative of Her
    Long-Standing Fear of Her Parents ................................................ 9

    B. The Testimony Defense Counsel Tried to Elicit Concerning
    C.R.'s Sexual Relationship with Her Boyfriend Falls Squarely
    Within the Fifth Exception to the Rape Shield Law .......................... 11

POINT III

OBJECTION TO THE OVERLY BROAD TIME RANGE IN THE
INDICTMENT WAS PRESERVED, AND EVEN IF NOT, THE
COURT SHOULD REACH THIS FUNDAMENTAL DUE
PROCESS ISSUE IN THE INTEREST OF JUSTICE ............................. 14

CONCLUSION ............................................................................... 16

PRINTING SPECIFICATIONS STATEMENT

# TABLE OF AUTHORITIES

## CASES

People v. Davis, 69 A.D.3d 647 (2d Dept. 2010) ...................................................15

People v. Halter, 19 N.Y.3d 1046 (2012).................................................................12

People v. Mezon, 80 N.Y.2d 155 (1992)..................................................................15

People v. Nash, 77 A.D.3d 687 (2nd Dept. 2010)..........................................11, 12

People v. Ocampo, 28 A.D.3d 684 (2d Dept. 2006) .............................................11

People v. Simmons, 106 A.D.3d 1115 (2nd Dept. 2013) ....................................12

People v. Thompson, 111 A.D.3d 56 (2nd Dept. 2013)...........................8, 13, 14

## STATUTES

C.P.L. § 60.42 ..............................................................................................................13

C.P.L. § 470.15 ............................................................................................................16

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,      :

                  Respondent,          :

        -against-           :

                         :

BERTRAND HENRY,

                         :

            Defendant-Appellant.
-------------------------------------------------------------------X


## PRELIMINARY STATEMENT

This brief is submitted in reply to respondent's brief.  Appellant's time to serve and file this reply brief has been enlarged to October 15, 2015.

## POINT I

BECAUSE THE PEOPLE FAIL TO PERSUASIVELY ADDRESS THEIR WITNESSES' LACK OF CREDIBILITY, THE COMPLAINANT'S STRONG MOTIVE TO FABRICATE, AND THE COMPLAINANT'S INABILITY TO DESCRIBE APPELLANT'S CHEST ACCURATELY, THEY HAVE NOT DEMONSTRATED APPELLANT'S GUILT BEYOND A REASONABLE DOUBT.

In his opening brief, appellant argues that the verdict was against the weight of the evidence and the People failed to establish appellant's guilt beyond a reasonable doubt, because appellant's physical appearance was

1

markedly different from what complainant described; the complainant was highly motivated to accuse appellant; and the People's witnesses were inconsistent and unreliable (Appellant's Brief at 30-37). The People respond that the inconsistencies were not material and that the complainant remembered the assaults in detail at trial (Respondent's Brief at 33-34, 37). The People also speculate as to why the complainant inaccurately described appellant's chest and dismiss the complainant's motive to fabricate as unsupported by the evidence (Respondent's Brief at 41).

The People provide no credible rationale for why C.R.'s description of appellant's chest was wildly inaccurate despite her claim that she saw him naked on multiple occasions (Respondent's Brief at 39-40). The People's argument that C.R. may have forgotten what appellant's chest looked like or had not focused on it during the assaults ignores C.R.'s testimony specifically describing it (id.). C.R. did not testify that she did not remember what appellant's chest looked like or had not paid particular attention to it. Instead, she gave definitive testimony that appellant had "full" dark hair covering his chest and had no scars or discoloration (C.R. 292-293). The People's explanations as to why the pictures of appellant's chest—clearly showing discoloration and no hair—could be inaccurate are mere speculation (Respondent's Brief at 38-39). Similarly, their theory that C.R. was distracted by appellant's protruding

stomach, and the implication that she found it unattractive, would explain a lack of recall; it does not explain a completely different description.

The People do not even attempt to reconcile the improbable testimony C.R. gave concerning the events of her birthday. C.R. originally testified that she went to the park with friends after a small birthday party with appellant, which occurred at around 11:00 a.m. on a Monday (C.R. 206-208, 279). When pressed about this timeline during cross-examination, C.R. first claimed she went to school after the impromptu birthday party with appellant (C.R. 280). When she realized that her attendance at school would be inconsistent with the timeline she had provided on direct examination, she testified, incredibly, that she only went to school to drop off a note excusing her from school (C.R. 281). C.R. then said that her friends skipped school to spend time with her in the park, but that she left them as soon as appellant arrived (C.R. 208-09; 280-283).

C.R.'s claim that she left her friends—who had skipped school to be with her—in order to spend four hours in the park watching appellant and his friends is simply not believable. What is believable is that C.R. manufactured this story to close the significant gap between when she said appellant picked her up in the park (early afternoon) and when she alleged that they had sex (after dark to avoid the risk of being seen) (C.R. 280-81, 289). This fabrication

3

colors C.R.'s entire testimony. C.R. did not tell the truth about the events of her birthday because she is untrustworthy, and her accusations against appellant are similarly untrustworthy.

The People label the variations in C.R.'s and A.R.'s narratives as insignificant "confusions" (Respondent's Brief at 37), but C.R. and A.R. gave inconsistent testimony about the most memorable aspects of their story (Respondent's Brief at 37). Where A.R. was, and what she was doing, when her 13-year-old daughter told her that she had been repeatedly raped are not facts that A.R. would confuse or forget (Respondent's Brief at 37). Yet C.R. and her mother told four different narratives, each with a different account of when C.R. told her mother she had been raped, the events that followed, and when they confronted appellant (A.R. 54-58, 114-115, 119, 131-32; C.R. 216-219, 308-313).

C.R.'s and A.R.'s narratives were inconsistent both with their own prior accounts and with each other's accounts. C.R. originally said that she told her mother appellant had assaulted her in the doctor's office. Contradicting that testimony, A.R. gave at least three inconsistent versions of C.R.'s first accusation, which included that C.R. told her about the supposed assaults in the car on the way to the doctor; that C.R. told her about the supposed assaults at the hairdresser's; and that C.R. told her about the supposed assaults in the car

on the way to the hairdresser's (C.R. 216-217; A.R. 114-15, 131-33). A.R. and C.R. gave materially different testimony concerning how and when appellant was first confronted, when and where appellant supposedly confessed to them, and when and where appellant signed the written agreement (C.R. 313, 221-23; A.R. 65-66, 114). Similarly, C.R. and A.R. gave conflicting accounts as to whose idea the contract was. A.R. testified at trial that the contract was appellant's idea, a claim that contradicts both C.R.'s testimony and A.R.'s own testimony that she made him sign the contract so she would have "proof" to bring to the police (A.R. 74, 126, 128).

The People mischaracterize appellant's argument as accusing C.R. and A.R. of colluding to extort money from appellant (Respondent's Brief at 36). Appellant's actual argument is that C.R. accused appellant of rape to avoid getting into trouble and that her mother capitalized on the accusation to extort money from appellant (Appellant's Brief at 37). All C.R. had to say to deflect blame when confronted outside the doctor's office by her mother was that appellant raped her. She was not pressed to provide particulars of the supposed assaults until days later when she spoke with police, after she had plenty of time to fabricate them. Even then, however, she gave scant details. The detective assigned to the case testified that when she spoke to C.R. in August 2013, C.R. "didn't really remember a lot" (Kenny 392). The detective

5

added "[s]he's just one of those victims that doesn't remember a lot at that time" (Kenny 392).[1]

At trial, however, C.R. purportedly recovered her memory such that she could give "fairly detailed" accounts of each supposed assault (Respondent's Brief at 33-34). She remembered every aspect of the first supposed assault in "graphic detail," despite consuming so much alcohol that she could not walk to the bathroom without holding the wall and was sick the next day (Respondent's Brief at 33).[2] But then she was unable to give consistent testimony about material aspects of her story when cross-examined. While such inconsistencies might be explainable in other contexts, the horror of these events, if actually experienced and not entirely invented, are unlikely to be forgotten or confused to such an extent.

Finally, the People's attempts to discredit appellant's testimony that he panicked when he was accused of raping a child ignores a key fact: appellant

---

[1] While the People make much of V.V's testimony, it was not indicative of guilt. At most, V.V. thought her sister looked too dressed up when she went out with appellant and there was an incident where she believed appellant heard her say C.R. was in the bathroom and he went in anyway (Respondent's Brief at 35; V.V. 355). That C.R. decided to dress up when going up with appellant indicated nothing of appellant's actions and his entering the bathroom was just as easily an honest mistake.

[2] It is highly suspect that the only specific date on which C.R. claimed to remember she was assaulted was two months prior to when she discovered she was two months pregnant (C.R. 2165, 299-301). Page 34 of Appellant's Brief incorrectly cites the date of this discovery as August, 2012 (Appellant's Brief at 34). C.R.'s pregnancy was discovered in August, 2013.

knew he would be exonerated by the DNA evidence showing he was not the father of C.R.'s baby (Henry 505). It made sense for him, given the threats by A.R. and C.R.'s father, to agree at the time to pay for the child's support and prove himself innocent later (Henry 492, 505).

For all of these reasons, this Court should reverse appellant's convictions and dismiss the indictment.

POINT II

> THIS COURT SHOULD REJECT THE PEOPLE'S ATTEMPTS TO MINIMIZE THE IMPORTANCE OF THE EXCLUDED EVIDENCE OF C.R.'S POWERFUL MOTIVE TO FABRICATE.

Appellant was denied a fair trial by the court's exclusion of evidence tending to show that C.R. had a strong motive to fabricate the allegations against him (Appellant's Brief at 38-39). Specifically, the court refused to allow a letter, neglect report, testimony concerning C.R.'s relationship with her parents, and testimony that C.R. was in a sexual relationship with a peer (Appellant's Brief at 39-46). The People's contention that the letter and neglect report were irrelevant because they were written after the allegations at issue ignores that these documents, which discussed C.R.'s relationship with her parents generally, provided a good faith basis for questions about C.R.'s relationship with her parents at the time of the alleged abuse (Respondent's

7

Brief at 45-46).   The People also fail to acknowledge that C.R.'s false representations to Planned Parenthood about her sexual activity were relevant not only to her motive to fabricate but also to her credibility in general, which was already highly suspect.

The People attempt to minimize the harm caused by the exclusion of this evidence by arguing that appellant was allowed to put in enough evidence to "make his argument" (Respondent's Brief at 46, 48-49).   But the right to present a defense is a constitutional one, and a "constitutional error can be harmless only if the evidence of guilt, without reference to the error, is overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant's conviction, such that it is harmless beyond a reasonable doubt." People v. Thompson, 111 A.D.3d 56, 67 (2nd Dept. 2013). Indeed, this is "perhaps the most demanding test yet formulated" by the courts and "places a heavy burden on the prosecution." Id.

The People do not come close to meeting this high burden given the amount of evidence indicating innocence.   The jury did not hand in a quick verdict—they deliberated over the course of two days, during which time they asked the court to reinstruct them on the definition of reasonable doubt (See Jury Notes).   This was a close credibility case, and one where even a small amount of additional evidence supporting the defense could have tipped the

8

scales in favor of acquittal. The court's refusal to allow appellant to comprehensively establish C.R.'s strong motive to fabricate her allegations deprived him of his constitutional right to a fair trial.

A.   C.R.'s Letter and Related Testimony were Probative of Her Long-Standing Fear of Her Parents.

The People's narrow focus on the date of C.R.'s letter ignores that C.R.'s fear of being sent back to Jamaica preexisted the discovery of her pregnancy and was part of the basis for her motive to fabricate (Respondent's Brief at 44-45). The letter she wrote to her teacher, though written after her pregnancy was discovered, provided information about the relationship C.R. had with her parents prior to these events (Respondent's Brief at 44). Specifically, C.R. told her teacher in the letter that her mother had threatened to send her back to Jamaica, a place she feared because her father, who remained there, was abusive (103-04). C.R. lived with her abusive father in Jamaica <u>before</u> the assaults at issue allegedly took place and her pregnancy was discovered (C.R. 181).

Similarly, the letter's description of A.R.'s harsh treatment of C.R. shed light on the nature of their relationship—at a minimum it provided a good faith basis to ask questions about A.R.'s treatment of C.R. prior to the discovery of her pregnancy. Even though this information was plainly relevant, the trial court refused to allow defense counsel to ask whether A.R. had ever threatened

to send C.R. back to Jamaica or whether C.R.'s mother ever hit her (C.R. 242-43; A.R. 102).

The letter and testimony that the trial court barred defense counsel from eliciting was strong evidence of a motive to fabricate. It showed that C.R. risked mistreatment from her mother and father if her sexual relationship with her boyfriend were discovered. The mere fact that the letter was written after the accusation was made does not render it irrelevant to C.R.'s motive to fabricate (Respondent's Brief at 45). It is hardly remote or speculative to theorize that a young girl impregnated by a peer and terrified of her parents might fabricate an allegation when found pregnant (Respondent's Brief at 44-45). The People likewise ignore that, even if inadmissible, the letter and report provided a good faith basis for questions about C.R.'s mistreatment at the hands of her parents (Respondent's Brief at 44-46).

The relevant timeline supports the defense's theory that C.R. was afraid of her parents and motivated to lie. C.R. had initially avoided blame when her pregnancy was discovered in August 2013 by claiming that appellant had raped her. But in December 2013, the DNA test proved that she was sexually active with someone other than appellant (Gajewski 444). C.R. then wrote the letter to her teacher in February 2014 (as evidenced by the ACS report, which was created as a result of the letter), describing her mother's mistreatment. The

letter thus confirms that C.R. had every reason to fabricate her allegations: Once the truth about her pregnancy was discovered she was faced with the consequences that she had tried to avoid with her false accusation (Respondent's Brief at 44-45). Appellant was barred from introducing this critical, exonerating evidence at trial and, accordingly, reversal is necessary. See People v. Ocampo 28 A.D.3d 684 (2d Dept. 2006) (finding that proof aimed at establishing a motive to fabricate is "never collateral" and not speculative when relevant to the credibility of the accuser).

B.  The Testimony Defense Counsel Tried to Elicit Concerning C.R.'s Sexual Relationship with Her Boyfriend Falls Squarely Within the Fifth Exception to the Rape Shield Law

The People note that defense counsel was allowed to elicit some information indicating that appellant did not impregnate C.R. and that she had a boyfriend, and any further information was unnecessary and protected by the Rape Shield Law (Respondent's Brief at 49). But evidence that someone other than appellant had impregnated C.R. was not enough information, standing alone, for appellant to adequately defend himself (Respondent's Brief at 46-47). The court did not allow defense counsel to elicit testimony from C.R. that she was sexually active with her 14-year-old boyfriend, who likely impregnated her (177, 217, 301, 304). That she was impregnated by a minor peer, and not an adult, was critically important to establish C.R.'s motive to fabricate.

11

This court's decision in <u>People v. Nash</u>, 77 A.D.3d 687 (2nd Dept. 2010) illustrates why the trial court's suppression of this evidence was in error. <u>Nash</u> presented the reverse scenario: there, the defendant wanted the victim's pregnancy and abortion excluded at trial on the grounds that it was more prejudicial than probative. <u>Id.</u> at 687. The <u>Nash</u> court rejected the defendant's claim, noting that the 13-year-old victim's pregnancy, though not definitive proof that appellant raped her, "constituted proof that a crime had been committed by someone." <u>Id.</u> That is, when a 13-year-old is found to be pregnant, the assumption is that an adult has committed a crime, and does not suggest a motive to fabricate. But, conversely, sex with a peer provides a strong motive to fabricate an allegation against an adult because it deflects blame: the irresponsible, precocious child becomes the victim of sexual abuse. The jury should have been permitted to hear that C.R. was sexually active with a peer and then lied repeatedly to medical personnel and others to avoid getting into trouble.

The People's reliance on <u>People v. Halter</u>, 19 N.Y.3d 1046 (2012) and <u>People v. Simmons</u>, 106 A.D.3d 1115 (2nd Dept. 2013) is misplaced (Respondent's Brief at 49-50). The discovery of C.R.'s pregnancy provided an increased likelihood of fabrication absent in those cases. In neither <u>Halter</u> nor <u>Simmons</u> did the complainant accuse the defendant of impregnating her when,

12

in fact, DNA evidence proved that to be false.  <u>See generally</u> <u>Halter</u>, 19 N.Y.3d 1046; <u>Simmons</u>, 106 A.D.3d 1115.  Rather, in both <u>Halter</u> and <u>Simmons</u> the supposed motive to fabricate was supported by nothing other than a bare allegation.

Here, the allegation that C.R. was lying to protect herself and her boyfriend was buttressed by the discovery of C.R.'s pregnancy and the subsequent DNA evidence eliminating appellant as the father.  The discovery of C.R.'s pregnancy created an urgent imperative for her to falsely accuse appellant: Either she removed the blame from herself and her boyfriend by claiming she was raped by a much older man, or she risked the possibility of being sent back to Jamaica.  The court erred in not allowing this evidence to be admitted.  N.Y. Crim. Proc. Law § 60.42 (McKinney) ("evidence of a victim's sexual conduct" is admissible if found by the court "to be relevant and admissible in the interests of justice.").

The People contend that the exclusion of this evidence was harmless because C.R. had already testified to lying about her sexual activity during the People's direct case, and defense counsel was permitted to elicit testimony that C.R. had lied to the doctors she originally saw and that she had a 14-year-old boyfriend (Respondent's Brief at 47-48).  This court's holding in <u>People v. Thompson</u>, 111 A.D.3d 56 (2nd Dept. 2013), renders that argument

13

unsupportable.  In <u>Thomas</u>, the prosecution elicited testimony that the victim had once identified a different perpetrator, but the trial court prevented the defendant from offering evidence that the victim had identified another perpetrator multiple times.  <u>Id.</u> at 65.  The court reversed the conviction:

> The People's carefully controlled and abbreviated presentation of the defense theory of this case did not render the evidence proffered by the defendant repetitive, and the People's version of the defendant's theory did not serve to satisfy his right to present his own defense.

<u>Id.</u>  Here, the fact that the People elicited from C.R. that she was impregnated by someone other than appellant and had lied to medical personnel did not render the additional evidence that C.R. lied on multiple occasions and was sexually active with a peer repetitive (Respondent's Brief at 47-48).  Appellant had the constitutional right to fully present his defense and was deprived of that right by the trial court.

POINT III

OBJECTION TO THE OVERLY BROAD TIME RANGE IN THE INDICTMENT WAS PRESERVED, AND EVEN IF NOT, THE COURT SHOULD REACH THIS FUNDAMENTAL DUE PROCESS ISSUE IN THE INTEREST OF JUSTICE

Defense counsel's objection to the broad time periods charged in the indictment was not originally limited to his objection to the introduction of

14

Molineux material and, in any event, the trial court itself reached the broader issue. Specifically, defense counsel told the court that "[o]ne of the issues here is that there is no real specified specific date or time when anything occurred. This application also goes to that issue where at some point in September 2012 . . . this whole case is certainly a situation where there is a nebulous exact time or date that anything happened, so now here's another incident that they're trying to dovetail to the real charges here . . . ." (H 8) (emphasis added). While this statement was made during a discussion of the admissibility of Molineux material, counsel was "also" objecting to the larger problem of the "nebulous" periods charged (H 8). What's more, the court itself reached the broader issue:

> Judge Chun indicated your argument for again requesting dismissal of charges because it was vague, and you alleging due process violation.
>
> Criminal Appeals has ruled already in these types of cases on or about and between a set time period, which is in this case 30 days, is well within the accepted parameters, so I'm denying your argument. I don't want to hear that again . . . .(H 9)(emphasis added).

See also People v. Davis, 69 A.D.3d 647, 648-49 (2d Dept. 2010) (court's "specific finding" of issue even though not specifically raised by defendant preserved it for review). The court's warning to defense counsel not to raise the issue again chilled any attempt by defense counsel to later raise his broader objection to the time periods charged in the indictment. People v.

15

<u>Mezon</u>, 80 N.Y.2d 155, 160-61 (1992) ("The law does not require litigants to make repeated pointless protests after the court has made its position clear").

Finally, even if the issue was unpreserved, the lower court's actions, which denied appellant due process, militate in favor of this Court exercising its interest of justice jurisdiction. *See* C.P.L. § 470.15(6)(a) (court may reverse order in the interest of justice based on unpreserved claim that deprived the defendant of a fair trial).

<u>CONCLUSION</u>

FOR THE REASONS STATED IN POINT I, APPELLANT'S CONVICTIONS SHOULD BE REVERSED AND DISMISSED. FOR THE REASONS STATED IN POINTS II-III, APPPELLANT'S CONVICTION SHOULD BE REVERSED AND A NEW TRIAL ORDERED.

Respectfully Submitted,

PAUL SKIP LAISURE
*Attorney for the Defendant-Appellant*

HANNAH KON
*Of Counsel*
October 2019

*To be argued by*
HANNAH KON
*(15 minutes)*

# New York Supreme Court

## APPELLATE DIVISION -- SECOND DEPARTMENT

**PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

*– against –*

**BERTRAND HENRY,**

*Defendant-Appellant.*

*TO BE HEARD ON
THE ORIGINAL
RECORD*

Kings County
Ind. No. 7388/13

A.D. No. 2016-03720

## REPLY BRIEF

PAUL SKIP LAISURE
Attorney for Defendant-
Appellant
111 John Street, 9th Floor
New York, N.Y. 10038
(212) 693-0085 x. 251

HANNAH KON
*Of Counsel*
hkon@appad.org

OCTOBER 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................ii

PRELIMINARY STATEMENT .......................................................................... 1

POINT I

BECAUSE THE PEOPLE FAIL TO PERSUASIVELY ADDRESS
THEIR WITNESSES' LACK OF CREDIBILITY, THE
COMPLAINANT'S STRONG MOTIVE TO FABRICATE, AND
THE COMPLAINANT'S INABILITY TO DESCRIBE
APPELLANT'S CHEST ACCURATELY THEY HAVE NOT
DEMONSTRATED APPELLANT'S GUILT BEYOND A
REASONABLE DOUBT ....................................................................................... 1

POINT II

THIS COURT SHOULD REJECT THE PEOPLE'S ATTEMPTS TO
MINIMIZE THE IMPORTANCE OF THE EXCLUDED
EVIDENCE OF C.R.'S POWERFUL MOTIVE TO FABRICATE ............................. 7

    A. C.R.'s Letter and Related Testimony were Probative of Her
    Long-Standing Fear of Her Parents ..................................................................... 9

    B. The Testimony Defense Counsel Tried to Elicit Concerning
    C.R.'s Sexual Relationship with Her Boyfriend Falls Squarely
    Within the Fifth Exception to the Rape Shield Law ............................................. 11

POINT III

OBJECTION TO THE OVERLY BROAD TIME RANGE IN THE
INDICTMENT WAS PRESERVED, AND EVEN IF NOT, THE
COURT SHOULD REACH THIS FUNDAMENTAL DUE
PROCESS ISSUE IN THE INTEREST OF JUSTICE ....................................... 14

CONCLUSION ..................................................................................................... 16

PRINTING SPECIFICATIONS STATEMENT

# TABLE OF AUTHORITIES

## CASES

People v. Davis, 69 A.D.3d 647 (2d Dept. 2010) ................................................15

People v. Halter, 19 N.Y.3d 1046 (2012)................................................................12

People v. Mezon, 80 N.Y.2d 155 (1992)................................................................15

People v. Nash, 77 A.D.3d 687 (2nd Dept. 2010)........................................ 11, 12

People v. Ocampo, 28 A.D.3d 684 (2d Dept. 2006) .............................................11

People v. Simmons, 106 A.D.3d 1115 (2nd Dept. 2013) .................................12

People v. Thompson, 111 A.D.3d 56 (2nd Dept. 2013)........................... 8, 13, 14

## STATUTES

C.P.L. § 60.42 ................................................................................................13

C.P.L. § 470.15 ..............................................................................................16

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,          :

                     Respondent,          :

          -against-          :

                            :

BERTRAND HENRY,

                     :

               Defendant-Appellant.
------------------------------------------------------------------------X

## PRELIMINARY STATEMENT

This brief is submitted in reply to respondent's brief.  Appellant's time
to serve and file this reply brief has been enlarged to October 15, 2015.

## POINT I

BECAUSE THE PEOPLE FAIL TO
PERSUASIVELY ADDRESS THEIR
WITNESSES' LACK OF CREDIBILITY, THE
COMPLAINANT'S STRONG MOTIVE TO
FABRICATE, AND THE COMPLAINANT'S
INABILITY TO DESCRIBE APPELLANT'S
CHEST ACCURATELY, THEY HAVE NOT
DEMONSTRATED APPELLANT'S GUILT
BEYOND A REASONABLE DOUBT.

In his opening brief, appellant argues that the verdict was against the

weight of the evidence and the People failed to establish appellant's guilt

beyond a reasonable doubt, because appellant's physical appearance was

1

markedly different from what complainant described; the complainant was highly motivated to accuse appellant; and the People's witnesses were inconsistent and unreliable (Appellant's Brief at 30-37). The People respond that the inconsistencies were not material and that the complainant remembered the assaults in detail at trial (Respondent's Brief at 33-34, 37). The People also speculate as to why the complainant inaccurately described appellant's chest and dismiss the complainant's motive to fabricate as unsupported by the evidence (Respondent's Brief at 41).

The People provide no credible rationale for why C.R.'s description of appellant's chest was wildly inaccurate despite her claim that she saw him naked on multiple occasions (Respondent's Brief at 39-40). The People's argument that C.R. may have forgotten what appellant's chest looked like or had not focused on it during the assaults ignores C.R.'s testimony specifically describing it (id.). C.R. did not testify that she did not remember what appellant's chest looked like or had not paid particular attention to it. Instead, she gave definitive testimony that appellant had "full" dark hair covering his chest and had no scars or discoloration (C.R. 292-293). The People's explanations as to why the pictures of appellant's chest—clearly showing discoloration and no hair—could be inaccurate are mere speculation (Respondent's Brief at 38-39). Similarly, their theory that C.R. was distracted by appellant's protruding

2

stomach, and the implication that she found it unattractive, would explain a lack of recall; it does not explain a completely different description.

The People do not even attempt to reconcile the improbable testimony C.R. gave concerning the events of her birthday. C.R. originally testified that she went to the park with friends after a small birthday party with appellant, which occurred at around 11:00 a.m. on a Monday (C.R. 206-208, 279). When pressed about this timeline during cross-examination, C.R. first claimed she went to school after the impromptu birthday party with appellant (C.R. 280). When she realized that her attendance at school would be inconsistent with the timeline she had provided on direct examination, she testified, incredibly, that she only went to school to drop off a note excusing her from school (C.R. 281). C.R. then said that her friends skipped school to spend time with her in the park, but that she left them as soon as appellant arrived (C.R. 208-09; 280-283).

C.R.'s claim that she left her friends—who had skipped school to be with her—in order to spend four hours in the park watching appellant and his friends is simply not believable. What is believable is that C.R. manufactured this story to close the significant gap between when she said appellant picked her up in the park (early afternoon) and when she alleged that they had sex (after dark to avoid the risk of being seen) (C.R. 280-81, 289). This fabrication

3

colors C.R.'s entire testimony. C.R. did not tell the truth about the events of her birthday because she is untrustworthy, and her accusations against appellant are similarly untrustworthy.

The People label the variations in C.R.'s and A.R.'s narratives as insignificant "confusions" (Respondent's Brief at 37), but C.R. and A.R. gave inconsistent testimony about the most memorable aspects of their story (Respondent's Brief at 37). Where A.R. was, and what she was doing, when her 13-year-old daughter told her that she had been repeatedly raped are not facts that A.R. would confuse or forget (Respondent's Brief at 37). Yet C.R. and her mother told four different narratives, each with a different account of when C.R. told her mother she had been raped, the events that followed, and when they confronted appellant (A.R. 54-58, 114-115, 119, 131-32; C.R. 216-219, 308-313).

C.R.'s and A.R.'s narratives were inconsistent both with their own prior accounts and with each other's accounts. C.R. originally said that she told her mother appellant had assaulted her in the doctor's office. Contradicting that testimony, A.R. gave at least three inconsistent versions of C.R.'s first accusation, which included that C.R. told her about the supposed assaults in the car on the way to the doctor; that C.R. told her about the supposed assaults at the hairdresser's; and that C.R. told her about the supposed assaults in the car

4

on the way to the hairdresser's (C.R. 216-217; A.R. 114-15, 131-33). A.R. and C.R. gave materially different testimony concerning how and when appellant was first confronted, when and where appellant supposedly confessed to them, and when and where appellant signed the written agreement (C.R. 313, 221-23; A.R. 65-66, 114). Similarly, C.R. and A.R. gave conflicting accounts as to whose idea the contract was. A.R. testified at trial that the contract was appellant's idea, a claim that contradicts both C.R.'s testimony and A.R.'s own testimony that she made him sign the contract so she would have "proof" to bring to the police (A.R. 74, 126, 128).

The People mischaracterize appellant's argument as accusing C.R. and A.R. of colluding to extort money from appellant (Respondent's Brief at 36). Appellant's actual argument is that C.R. accused appellant of rape to avoid getting into trouble and that her mother capitalized on the accusation to extort money from appellant (Appellant's Brief at 37). All C.R. had to say to deflect blame when confronted outside the doctor's office by her mother was that appellant raped her. She was not pressed to provide particulars of the supposed assaults until days later when she spoke with police, after she had plenty of time to fabricate them. Even then, however, she gave scant details. The detective assigned to the case testified that when she spoke to C.R. in August 2013, C.R. "didn't really remember a lot" (Kenny 392). The detective

added "[s]he's just one of those victims that doesn't remember a lot at that time" (Kenny 392).[1]

At trial, however, C.R. purportedly recovered her memory such that she could give "fairly detailed" accounts of each supposed assault (Respondent's Brief at 33-34). She remembered every aspect of the first supposed assault in "graphic detail," despite consuming so much alcohol that she could not walk to the bathroom without holding the wall and was sick the next day (Respondent's Brief at 33).[2] But then she was unable to give consistent testimony about material aspects of her story when cross-examined. While such inconsistencies might be explainable in other contexts, the horror of these events, if actually experienced and not entirely invented, are unlikely to be forgotten or confused to such an extent.

Finally, the People's attempts to discredit appellant's testimony that he panicked when he was accused of raping a child ignores a key fact: appellant

---

[1] While the People make much of V.V's testimony, it was not indicative of guilt. At most, V.V. thought her sister looked too dressed up when she went out with appellant and there was an incident where she believed appellant heard her say C.R. was in the bathroom and he went in anyway (Respondent's Brief at 35; V.V. 355). That C.R. decided to dress up when going up with appellant indicated nothing of appellant's actions and his entering the bathroom was just as easily an honest mistake.

[2] It is highly suspect that the only specific date on which C.R. claimed to remember she was assaulted was two months prior to when she discovered she was two months pregnant (C.R. 2165, 299-301). Page 34 of Appellant's Brief incorrectly cites the date of this discovery as August, 2012 (Appellant's Brief at 34). C.R.'s pregnancy was discovered in August, 2013.

knew he would be exonerated by the DNA evidence showing he was not the father of C.R.'s baby (Henry 505). It made sense for him, given the threats by A.R. and C.R.'s father, to agree at the time to pay for the child's support and prove himself innocent later (Henry 492, 505).

For all of these reasons, this Court should reverse appellant's convictions and dismiss the indictment.

<u>POINT II</u>

THIS COURT SHOULD REJECT THE PEOPLE'S ATTEMPTS TO MINIMIZE THE IMPORTANCE OF THE EXCLUDED EVIDENCE OF C.R.'S POWERFUL MOTIVE TO FABRICATE.

Appellant was denied a fair trial by the court's exclusion of evidence tending to show that C.R. had a strong motive to fabricate the allegations against him (Appellant's Brief at 38-39). Specifically, the court refused to allow a letter, neglect report, testimony concerning C.R.'s relationship with her parents, and testimony that C.R. was in a sexual relationship with a peer (Appellant's Brief at 39-46). The People's contention that the letter and neglect report were irrelevant because they were written after the allegations at issue ignores that these documents, which discussed C.R.'s relationship with her parents generally, provided a good faith basis for questions about C.R.'s relationship with her parents at the time of the alleged abuse (Respondent's

7

Brief at 45-46).   The People also fail to acknowledge that C.R.'s false representations to Planned Parenthood about her sexual activity were relevant not only to her motive to fabricate but also to her credibility in general, which was already highly suspect.

The People attempt to minimize the harm caused by the exclusion of this evidence by arguing that appellant was allowed to put in enough evidence to "make his argument" (Respondent's Brief at 46, 48-49).   But the right to present a defense is a constitutional one, and a "constitutional error can be harmless only if the evidence of guilt, without reference to the error, is overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant's conviction, such that it is harmless beyond a reasonable doubt." People v. Thompson, 111 A.D.3d 56, 67 (2nd Dept. 2013). Indeed, this is "perhaps the most demanding test yet formulated" by the courts and "places a heavy burden on the prosecution." Id.

The People do not come close to meeting this high burden given the amount of evidence indicating innocence.   The jury did not hand in a quick verdict—they deliberated over the course of two days, during which time they asked the court to reinstruct them on the definition of reasonable doubt (See Jury Notes).   This was a close credibility case, and one where even a small amount of additional evidence supporting the defense could have tipped the

8

scales in favor of acquittal. The court's refusal to allow appellant to comprehensively establish C.R.'s strong motive to fabricate her allegations deprived him of his constitutional right to a fair trial.

A.  C.R.'s Letter and Related Testimony were Probative of Her Long-Standing Fear of Her Parents.

The People's narrow focus on the date of C.R.'s letter ignores that C.R.'s fear of being sent back to Jamaica preexisted the discovery of her pregnancy and was part of the basis for her motive to fabricate (Respondent's Brief at 44-45).  The letter she wrote to her teacher, though written after her pregnancy was discovered, provided information about the relationship C.R. had with her parents prior to these events (Respondent's Brief at 44).  Specifically, C.R. told her teacher in the letter that her mother had threatened to send her back to Jamaica, a place she feared because her father, who remained there, was abusive (103-04).  C.R. lived with her abusive father in Jamaica before the assaults at issue allegedly took place and her pregnancy was discovered (C.R. 181).

Similarly, the letter's description of A.R.'s harsh treatment of C.R. shed light on the nature of their relationship—at a minimum it provided a good faith basis to ask questions about A.R.'s treatment of C.R. prior to the discovery of her pregnancy.  Even though this information was plainly relevant, the trial court refused to allow defense counsel to ask whether A.R. had ever threatened

9

to send C.R. back to Jamaica or whether C.R.'s mother ever hit her (C.R. 242-43; A.R. 102).

The letter and testimony that the trial court barred defense counsel from eliciting was strong evidence of a motive to fabricate. It showed that C.R. risked mistreatment from her mother and father if her sexual relationship with her boyfriend were discovered. The mere fact that the letter was written after the accusation was made does not render it irrelevant to C.R.'s motive to fabricate (Respondent's Brief at 45). It is hardly remote or speculative to theorize that a young girl impregnated by a peer and terrified of her parents might fabricate an allegation when found pregnant (Respondent's Brief at 44-45). The People likewise ignore that, even if inadmissible, the letter and report provided a good faith basis for questions about C.R.'s mistreatment at the hands of her parents (Respondent's Brief at 44-46).

The relevant timeline supports the defense's theory that C.R. was afraid of her parents and motivated to lie. C.R. had initially avoided blame when her pregnancy was discovered in August 2013 by claiming that appellant had raped her. But in December 2013, the DNA test proved that she was sexually active with someone other than appellant (Gajewski 444). C.R. then wrote the letter to her teacher in February 2014 (as evidenced by the ACS report, which was created as a result of the letter), describing her mother's mistreatment. The

letter thus confirms that C.R. had every reason to fabricate her allegations: Once the truth about her pregnancy was discovered she was faced with the consequences that she had tried to avoid with her false accusation (Respondent's Brief at 44-45).    Appellant was barred from introducing this critical, exonerating evidence at trial and, accordingly, reversal is necessary.  See People v. Ocampo 28 A.D.3d 684 (2d Dept. 2006) (finding that proof aimed at establishing a motive to fabricate is "never collateral" and not speculative when relevant to the credibility of the accuser).

B.    The Testimony Defense Counsel Tried to Elicit Concerning C.R.'s Sexual Relationship with Her Boyfriend Falls Squarely Within the Fifth Exception to the Rape Shield Law

The People note that defense counsel was allowed to elicit some information indicating that appellant did not impregnate C.R. and that she had a boyfriend, and any further information was unnecessary and protected by the Rape Shield Law (Respondent's Brief at 49).  But evidence that someone other than appellant had impregnated C.R. was not enough information, standing alone, for appellant to adequately defend himself (Respondent's Brief at 46-47). The court did not allow defense counsel to elicit testimony from C.R. that she was sexually active with her 14-year-old boyfriend, who likely impregnated her (177, 217, 301, 304).  That she was impregnated by a minor peer, and not an adult, was critically important to establish C.R.'s motive to fabricate.

11

This court's decision in <u>People v. Nash</u>, 77 A.D.3d 687 (2nd Dept. 2010) illustrates why the trial court's suppression of this evidence was in error. <u>Nash</u> presented the reverse scenario: there, the defendant wanted the victim's pregnancy and abortion excluded at trial on the grounds that it was more prejudicial than probative. <u>Id.</u> at 687. The <u>Nash</u> court rejected the defendant's claim, noting that the 13-year-old victim's pregnancy, though not definitive proof that appellant raped her, "constituted proof that a crime had been committed by someone." <u>Id.</u> That is, when a 13-year-old is found to be pregnant, the assumption is that an adult has committed a crime, and does not suggest a motive to fabricate. But, conversely, sex with a peer provides a strong motive to fabricate an allegation against an adult because it deflects blame: the irresponsible, precocious child becomes the victim of sexual abuse. The jury should have been permitted to hear that C.R. was sexually active with a peer and then lied repeatedly to medical personnel and others to avoid getting into trouble.

The People's reliance on <u>People v. Halter</u>, 19 N.Y.3d 1046 (2012) and <u>People v. Simmons</u>, 106 A.D.3d 1115 (2nd Dept. 2013) is misplaced (Respondent's Brief at 49-50). The discovery of C.R.'s pregnancy provided an increased likelihood of fabrication absent in those cases. In neither <u>Halter</u> nor <u>Simmons</u> did the complainant accuse the defendant of impregnating her when,

12

in fact, DNA evidence proved that to be false.  See generally Halter, 19 N.Y.3d 1046; Simmons, 106 A.D.3d 1115.  Rather, in both Halter and Simmons the supposed motive to fabricate was supported by nothing other than a bare allegation.

Here, the allegation that C.R. was lying to protect herself and her boyfriend was buttressed by the discovery of C.R.'s pregnancy and the subsequent DNA evidence eliminating appellant as the father.  The discovery of C.R.'s pregnancy created an urgent imperative for her to falsely accuse appellant: Either she removed the blame from herself and her boyfriend by claiming she was raped by a much older man, or she risked the possibility of being sent back to Jamaica.   The court erred in not allowing this evidence to be admitted.  N.Y. Crim. Proc. Law § 60.42 (McKinney) ("evidence of a victim's sexual conduct" is admissible if found by the court "to be relevant and admissible in the interests of justice.").

The People contend that the exclusion of this evidence was harmless because C.R. had already testified to lying about her sexual activity during the People's direct case, and defense counsel was permitted to elicit testimony that C.R. had lied to the doctors she originally saw and that she had a 14-year-old boyfriend (Respondent's Brief at 47-48).   This court's holding in People v. Thompson, 111 A.D.3d 56 (2nd Dept. 2013), renders that argument

unsupportable. In <u>Thomas</u>, the prosecution elicited testimony that the victim had once identified a different perpetrator, but the trial court prevented the defendant from offering evidence that the victim had identified another perpetrator multiple times. <u>Id.</u> at 65. The court reversed the conviction:

> The People's carefully controlled and abbreviated presentation of the defense theory of this case did not render the evidence proffered by the defendant repetitive, and the People's version of the defendant's theory did not serve to satisfy his right to present his own defense.

<u>Id.</u> Here, the fact that the People elicited from C.R. that she was impregnated by someone other than appellant and had lied to medical personnel did not render the additional evidence that C.R. lied on multiple occasions and was sexually active with a peer repetitive (Respondent's Brief at 47-48). Appellant had the constitutional right to fully present his defense and was deprived of that right by the trial court.

POINT III

OBJECTION TO THE OVERLY BROAD TIME RANGE IN THE INDICTMENT WAS PRESERVED, AND EVEN IF NOT, THE COURT SHOULD REACH THIS FUNDAMENTAL DUE PROCESS ISSUE IN THE INTEREST OF JUSTICE

Defense counsel's objection to the broad time periods charged in the indictment was not originally limited to his objection to the introduction of

14

Molineux material and, in any event, the trial court itself reached the broader issue. Specifically, defense counsel told the court that "[o]ne of the issues here is that there is no real specified specific date or time when anything occurred. This application also goes to that issue where at some point in September 2012 . . . this whole case is certainly a situation where there is a nebulous exact time or date that anything happened, so now here's another incident that they're trying to dovetail to the real charges here . . . ." (H 8) (emphasis added). While this statement was made during a discussion of the admissibility of Molineux material, counsel was "also" objecting to the larger problem of the "nebulous" periods charged (H 8). What's more, the court itself reached the broader issue:

> Judge Chun indicated your argument for again requesting dismissal of charges because it was vague, and you alleging due process violation.
>
> Criminal Appeals has ruled already in these types of cases on or about and between a set time period, which is in this case 30 days, is well within the accepted parameters, so I'm denying your argument. I don't want to hear that again . . . .(H 9)(emphasis added).

See also People v. Davis, 69 A.D.3d 647, 648-49 (2d Dept. 2010) (court's "specific finding" of issue even though not specifically raised by defendant preserved it for review). The court's warning to defense counsel not to raise the issue again chilled any attempt by defense counsel to later raise his broader objection to the time periods charged in the indictment. People v.

15

Mezon, 80 N.Y.2d 155, 160-61 (1992) ("The law does not require litigants to make repeated pointless protests after the court has made its position clear").

Finally, even if the issue was unpreserved, the lower court's actions, which denied appellant due process, militate in favor of this Court exercising its interest of justice jurisdiction. *See* C.P.L. § 470.15(6)(a) (court may reverse order in the interest of justice based on unpreserved claim that deprived the defendant of a fair trial).

<u>CONCLUSION</u>

FOR THE REASONS STATED IN POINT I, APPELLANT'S CONVICTIONS SHOULD BE REVERSED AND DISMISSED. FOR THE REASONS STATED IN POINTS II-III, APPPELLANT'S CONVICTION SHOULD BE REVERSED AND A NEW TRIAL ORDERED.

Respectfully Submitted,

PAUL SKIP LAISURE
*Attorney for the Defendant-Appellant*

HANNAH KON
*Of Counsel*
October 2019

16