UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
BERTRAND HENRY,

                                    Plaintiff,

                                                                    **MEMORANDUM**
                    -against-                                       **AND ORDER**
                                                                    21 CV 6016 (CLP)
DONITA MCINTOSH, *et al.*,

                                    Defendants.
--------------------------------------------------------X
**POLLAK**, Chief United States Magistrate Judge:

On October 29, 2021, petitioner Bertrand Henry, through counsel, filed this Petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Pet.[1]).  Petitioner claims that his state

criminal conviction was obtained in violation of his constitutional right to confront the witnesses

against him and in direct conflict with clearly established United States Supreme Court

precedent.  On December 22, 2021, the parties consented to the jurisdiction of the Magistrate

Judge, and, on December 24, 2021, the case was reassigned to the undersigned for all further

proceedings.

For the reasons set forth below, the Court denies the Petition in its entirety.

<u>FACTUAL BACKGROUND</u>

The People of the State of New York accused petitioner, by felony indictment, of having

repeated sexual contact with a child between September 2012 and June 2013.  On March 21,

2016, petitioner was convicted by a jury after a trial in the Supreme Court of the State of New

York, Kings County, of two counts of first-degree rape (N.Y. Penal Law § 130.35), five counts

---

[1] Citations to "Pet." refer to the Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, filed on October 29, 2021, ECF No. 1.

of second-degree rape (N.Y. Penal Law § 130.30), and two counts of the commission of a criminal sexual act (N.Y. Penal Law § 130.50).

A. The People's Case

According to the evidence introduced at trial, C.R., the alleged victim in the State's criminal case, was born in Jamaica in November 1999.  (Tr.[2] at 43:9, 101:5-14, 180:17-18).  In 2009, C.R.'s mother, Angella Reid, moved to the United States from Jamaica, leaving C.R. and her older sister, V.V., in Jamaica.  (Id. at 45:16-19).

In 2011, C.R. and V.V. moved to the United States to live with Angella in Brooklyn.  (Id. at 45:12-13, 181:1-17).  When the children arrived in New York City, Angella was involved in an intimate relationship with petitioner.  (Id. at 46:14-16, 47:2-18).  According to Angella and C.R., who was 12 years old at the time, petitioner would spend "quality time" with Angella and her children and was "very supportive" of the children.  (Id. at 47-48:8, 182-183:7).  C.R. described petitioner and Angella's relationship as "off and on."  (Id. at 244:2-15).  Nevertheless, petitioner consistently visited Angella and her children until his arrest.  (Id. at 254, 352).

From September 2012 through June 2013, C.R. attended school and, when she was not in school, she spent much of her time at home.  (Id. at 250:18-251:10, 252:5-9).  During this period, V.V. and Angella both worked, and V.V. attended university; thus, both were frequently absent from the home at the same time, leaving C.R. home alone.  (Id. at 250-53, 356:19-357:10).  C.R. testified that, during this period, petitioner would visit her three or four times during the week while she was at home alone and would avoid visiting if he knew that Angella would be present. (Id. at 183:8-14, 250-53).  Petitioner would also frequently take C.R. from her home without

_____

[2] Citations to "Tr." refer to the transcript of the trial that occurred before the Supreme Court of the State of New York, Kings County under the indictment number 7388/2013. ECF Nos. 10-1, 10-2, and 10-3.

being accompanied by Angella or another adult.  (Id. at 354:10-23).  Angella testified that this made her uncomfortable.  (Id. at 48:9-21, 105:22-23).

According to C.R., at some point, her relationship with petitioner began to change.  (Id. at 186:1-2).  She testified that petitioner "stopped keeping his distance from me[.] . . . He stopped keeping his distance and started getting closer. . . . Like, the touches were more frequent, the kisses good-bye were more frequent, stuff like that."  (Id. at 186:4-9).

In September 2012, when C.R. was 12 years old, petitioner brought rum to C.R.'s home while she was there alone.  (Id. at 186: 10-16, 189:5-10).  During the visit, petitioner gave C.R. a full glass of rum mixed with orange juice.  (Id. at 189:5-10).  C.R. drank the mixture and became inebriated.  (Id. at 191:13-192:16).  According to C.R., petitioner then began kissing her and touching her breasts and genitals both over and under her clothing.  (Id. at 192:19-193:2).  C.R. testified that petitioner then undressed C.R. and himself, performed oral sex on C.R., and vaginally penetrated her with his penis while she was lying on a couch.  (Id. at 193:4-194:1).  The alleged intercourse left blood on the couch and on the floor.  (Id. at 194:3-5, 195:1-5).  Petitioner instructed C.R. to wash herself, her underwear, and the couch with a disinfectant soap, which C.R. did.  (Id. at 194:3-23).  C.R. also cleaned the blood from the floor.  (Id. at 195:1-11).

According to C.R., petitioner warned her not to tell anyone what had transpired, and that, if she did, no one would believe her because she was a child and petitioner was a "respectable person in the community" and had worked as a correctional officer.  (Id. at 195:11-16).  Petitioner also threatened that if C.R. reported the incident, he would kill himself and Angella.  (Id. at 234:13-15).  C.R. did not immediately report the incident, explaining that petitioner contributed to her family's finances and was "good" to her and her family.  (Id. at 195:17-196:4).

Between October 1 and November 11, 2012, before C.R. turned 13 years old, petitioner again visited C.R. while she was alone in her home and "touch[ed]" her.  (Id. at 196:12-197:19).

On a separate occasion during that period, petitioner drove C.R. to a nearby park, where, in the backseat of his car, C.R. claimed that he forced her to engage in oral sex and again vaginally penetrated her with his penis.  (Id. at 198:11-201:11, 203:14-204:22).

C.R. testified that, after she turned 13 in November 2012, petitioner again picked her up from her home while she was alone, drove her to the same place in the park that he had driven her to before, and again groped and vaginally penetrated her in the backseat of his car.  (Id. at 207:23-209:23).  Between January 1 and June 18, 2013, petitioner returned to C.R.'s home four more times while C.R. was alone and had intercourse with her.  (Id. at 210:6-11:25, 212:1-213:5).  C.R. explained that she did not immediately report these incidents because "she had a lot to lose[.]"  (Id. at 213:12).  According to C.R., petitioner assisted C.R. and her family "with everything[,]" and if petitioner stopped financially supporting C.R. and her family, Angella would likely not be able to afford their rent.  (Id. at 213:12-18).

In August of 2013, Angella took C.R. to a doctor because she felt ill and the doctor performed tests establishing that C.R. was pregnant.  (Id. at 216:8-25, 357:14-18).  After learning that C.R. was pregnant, Angella asked C.R. who had impregnated her; C.R. told Angella that it was petitioner.  (Id. at 54:1-14, 217:3-6).  C.R. also claimed at that point that she had only had sexual relations with petitioner and no other person, which C.R. later admitted was a lie.  (Id. at 225:11-21).  Angella testified that C.R. appeared "confused" during this conversation, and that C.R. told her that she was "scared" and did not want to talk because petitioner had told her that, if she reported his conduct, his life would be destroyed, and he would "shoot her and shoot himself."  (Id. at 113:13-114:7).

Angella testified that she did not immediately call the police because she wanted to "get to the bottom of it" and see if C.R.'s claims were "true or a lie."  (Id. at 114:15-17).  Angella

and C.R. gave differing accounts regarding how and when Angella confronted petitioner with C.R.'s allegations.  However, both Angella and C.R. testified that, during their conversations with petitioner that began in August 2013 and were about the alleged sexual assault, he admitted to having had intercourse with C.R., and C.R. claimed that he admitted to having had intercourse with her "more than ten times[.]" (Id. at 54:1-58:8, 119:19-25, 121:3-6, 216:8-217:17, 218:3-8).

Angella testified that, a few days after her first conversation with petitioner during which he admitted to having had intercourse with C. R., Angella, C.R. and the petitioner had another conversation during which Angella clandestinely used her phone to record petitioner. (Id. at 63:6-12, 64:25-65:3).  During this conversation, petitioner again admitted to having had intercourse with C.R.  (Id.)  Angella claimed to have recorded the conversation so that she would have evidence to present to the police.  (Id. at 123:2-13).

Petitioner also wrote out a confession in which he promised to make payments to Angella in exchange for her promise that she would not report his conduct.  (Id. at 74:16-75:18, 122:18-21).  The confession, which was introduced at trial, stated:  "I, Bertrand Henry, having got [C.R.] who is pregnant [sic] and is a minor hereby agree to give Angella Reid one thousand dollars per month starting September 30, 2013 agreement [sic] to pay twenty thousand dollars." (Id. at 87:11-16).  Angella also wrote the following statement on the same document:

> Bertrand Henry got [C.R.] pregnant. She is 13 years old. He has been having sex with her from [sic] she is 12 years old . . . . He agree [sic] to settle with me, Angella F. Reid, twenty thousand dollars, one thousand dollars every month until finish [sic] starting September 30, 2013.  And in addition, any medical bill[s] . . . [a]rising from the pregnancy.  If this money is not paid, I will take him to court for the remaining balance and to be paid [sic] in full.

5

(<u>Id.</u> at 87:20-88:7).  Petitioner, Angella, and C.R. all signed the document.  (<u>Id.</u> at 75:14-18, 87:11-88:7).[3]

Angella testified that petitioner explained that she "mustn't go and tell nobody" [sic] about petitioner's having had "sex" with C.R., "because if it get in [sic] the wrong ears, he's gone, his life is over and he's gone."  (<u>Id.</u> at 122:18-21).  According to Angella, petitioner proposed sending C.R. to live with his family in St. Vincent "to have the child."  (<u>Id.</u> at 122:8-16, 219:12-17).  C.R. testified that petitioner also proposed that C.R. have the child aborted at a clinic that would not ask how C.R. became pregnant.  (<u>Id.</u> at 218:11-13, 219:23-220:4).

On August 19, 2013, Angella reported petitioner's alleged conduct to the police.  (<u>Id.</u> at 375:4-23).  On August 26, 2013, police officers arrested petitioner.  (<u>Id.</u> at 376:14-377:11).

After petitioner was taken into custody, the Office of the Chief Medical Examiner collected a DNA sample from petitioner to compare with DNA taken from C.R.'s unborn child.  (<u>Id.</u> at 443:7-21).  The DNA testing excluded the petitioner as a parent of the fetus.  (<u>Id.</u>)  At the trial, C.R. testified that she had also had sexual relations with a 14-year-old boyfriend, although there is no indication in the record that law enforcement matched that person's DNA to the fetus.  (<u>Id.</u> at 225:11-226:6).

B.  <u>The Trial Court Precluded Defense Counsel From Questioning into Familial Abuse</u>

Petitioner's primary defense at trial was that C.R. had fabricated the alleged sexual assault.  In defense counsel's opening statement, counsel stated that "[t]his case is about truth and lies.  Truth: [C.R.] was abused . . . but not the way the prosecutor describes to you."  (<u>Id.</u> at 34:12-14).  According to the defense's opening statement, C.R. lived "in constant fear of her mother, Angella Reid. This was a woman who physically abused her; psychologically abused

---

[3] Both the recording and the written confession were admitted into evidence at petitioner's criminal trial.

her, threatened her to the point where this child had run away" and "didn't even want to stay at the house.  And the truth is that [C.R.] was constantly threatened because of her behavior with being sent back to . . . Jamaica, to live with her biological father who also abused her."  (Id. at 34:15-24).  Defense counsel's theory, as expressed to the jury during his opening statement, was that CR. falsely blamed petitioner for her pregnancy "to cast blame on the one person that would protect her from her mother" and spare her from her mother's abuse.  (Id. at 35: 1-12).

During defense counsel's cross-examination of Angella, counsel attempted to ask Angella how she would "describe" her "relationship" with C.R., whether she "had problems" with C.R., whether she told C.R. that C.R. "had no respect[,]" and whether she hit C.R. in 2012.  (Id. at 101:22-102:19).  The trial court sustained objections to these questions and called the parties to a sidebar.  (Id.)  At the sidebar, the court questioned what "parental discipline" had to do with the case, and defense counsel explained that it was the defense's theory that C.R. was "terrified" of Angella and therefore fabricated the alleged sexual assault, and that counsel had a good-faith basis for asking the objected-to questions.  (Id. at 102:23-103:3).

Defense counsel then produced a letter written by C.R. to one of her teachers in February of 2014,[4] claiming that the letter supplied the basis for the objected-to questions about the relationship between Angella and C.R.  (Id. at 103:11-13) (ECF No. 1-8).  The letter reads as follows:

> This might seem inappropriate to tell a teacher, but I trust you.  The reason I have been acting a little weird is because my mother hates me and is going to send me back to Jamaica because I told her that her boyfriend basically had sex with me against my will.  I can't keep up with my studies or grades because I'm stressed out.  Lawyers are asking me embarrassing questions, I have to get counseling, and I have to go to court to tell a jury and judge (in detail) what happened.  My mom says it's my fault and that I have no respect for her.  [Redacted] put me on promotion in [illegible]

---

[4] Petitioner attached a copy of the letter to the Petition as Exhibit F.

because I am failing math, I'm trying to pass her class but in the end I have nothing to lose because I'm going back to Jamaica to live with my abusive father, who's always beating me.  She says she is done with me when she sends me back.  She's not going to send money for me to go to school, to buy uniforms, or even to eat.  My sister is begging for me but I don't stand a chance.  She won't even press my clothes, comb my hair, or let me sleep in her room anymore.  So forgive me if I say that repeating the eighth grade is the least of my problems.

(ECF No. 1-8).

After reviewing the letter, the court rejected defense counsel's argument and precluded him from pursuing any line of questioning based on the document, explaining that Angella's described behavior was a "reaction" to C.R.'s allegations against petitioner and occurred after the alleged abuse, and was thus "not a good faith basis" to question Angella about abusing C.R. prior to the sexual assault.  (Tr. at 103:21-104:17).  Moreover, the court observed that C.R. did not claim in the letter that Angella had abused her.  (Id. at 141:22-142:4).

Later, during defense counsel's cross-examination of Angella, counsel asked Angella whether she had been contacted by the New York City Administration for Children's Services ("ACS"); the court again precluded this line of questioning and called a sidebar.  (Id. at 140:22-23).  At the sidebar, defense counsel explained that ACS had contacted Angella after C.R. had written the letter in February of 2014.  (Id. at 141:2-9).  The court responded that the letter was "written by the child after the event[,]" and thus had "no relevance or probative value that there was some type of domestic incident in the home where this child would fabricate" claims of sexual abuse.  (Id. at 141:13-16).  According to the court, the letter did not refer to any abuse prior to the alleged sexual assaults or indicate that C.R. had lied, and thus counsel was essentially attempting to impeach Angella using "an alleged prior bad act that she didn't do." (Id. at

8

141:22-144:10).  The court encouraged counsel to "bring out . . . the domestic relationship within the family" through C.R. when she testified.  (Id. at 142:8-11).

Defense counsel attempted to cross examine C.R. regarding whether she had been "abused or threatened by her mom" and again cited for the court the letter that C.R. had written to her teacher as a basis for asking those questions.  (Id. at 236:4-12).  The court precluded defense counsel from "going into any content of th[e] letter[,]" explaining that, while the content of the letter was inadmissible, the court would afford defense counsel "ample opportunity to cross-examine" C.R. "as to the domestic . . . environment of the family with her and the defendant and her mother for the times that are relevant[.]"  (Id. at 236:13-37:1).

Defense counsel questioned C.R. regarding whether she ever had "disputes" or "arguments" with her mother, and whether she had ever run away from home.  (Id. at 240-43).  C.R. testified that she had disputes with her mother, but that they "kept it at a minimum[,]" that her disagreements with her mother were "mostly about school[,]" and that she had once walked out of her home after an argument with Angella and stood on a corner until her mother retrieved her.  (Id. at 240-42).  When defense counsel asked C.R. whether her mother had "ever threaten[ed]" her "before September of 2012[,]" C.R. replied "[n]o."  (Id. at 242:10-12).  The court precluded inquiry into whether Angella had ever threatened to send C.R. back to Jamaica, whether Angella was upset when she learned that C.R. was pregnant, whether C.R. avoided conversations with her mother for any "particular reason[,]" and whether Angella ever hit C.R. prior to September 2012.  (Id. at 242-43).

C.  Petitioner's Case

Petitioner took the stand during his defense and denied C.R.'s allegations.  (Id. at 483:7-
486:4).  He claimed to have been working on many of the dates and times that C.R. claimed that
she was sexually assaulted.  (Id.)

In attempting to explain away his own recorded and written confessions, petitioner—who
served in the United States military in Iraq and was wounded while deployed—claimed that he
admitted to sexually assaulting C.R. because, when Angella and C.R. confronted him with the
accusations, it was "like being back in Iraq again."  (Id. at 467:25-468:19, 472:11-23, 487:10-14,
488:9-15).  Petitioner explained that the situation reminded him of his deployment as follows:
"My whole demeanor, my thinking, my thoughts were like, what is going on?  I mean, how she's
[sic] gonna accuse me of something that, you know, I never done, [sic] you know?  Why would
she do that?"  (Id. at 487:15-19).  Petitioner also testified that, at some point during a
conversation with Angella about the alleged sexual assault, C.R.'s father spoke to him through
Angella's phone and threatened to kill him and one of his children, who, at the time, was an
infant living in Jamaica.  (Id. at 490:23-491:6).

According to petitioner, under the threat of his own and his infant child's deaths, he
decided to "go along" with the accusations, and thus verbally confessed to sexually assaulting
C.R., which Angella recorded.  (Id. at 492).  He further conceded that he signed the written
admission in which he promised to pay Angella in exchange for her silence.  (Id. at 492:6-
495:16, 501:21-502:2, 528:20-529:24, 530:24-531:1).  Petitioner testified that Angella was
motivated to extort him because he would not marry her so that she could obtain a green card and
because he had a girlfriend, which upset her.  (Id. at 477:13-479:20).  Petitioner also claimed that

Angella complained when he started a new job and spent less time with her and her family.  (Id. at 480:9-482:14).

On cross-examination, petitioner admitted that he never reported to the police that Angella was trying to extort him.  (Id. at 537:16-20, 538:21-25).  He also never reported the alleged threat to his infant son to law enforcement in Jamaica, explaining that he was "not a [sic] kind of person who do [sic] things like that."  (Id. at 532:5-14, 536:24-537:10).  Petitioner did acknowledge, however, that in the recorded conversation admitted into evidence during the trial, he threatened that both he and Angella "would be gone" if she reported the alleged sexual assault to the police.  (Id. 529:25-531:15).

<u>PROCEDURAL BACKGROUND</u>

On March 21, 2016, the jury returned a verdict convicting petitioner of every count in the indictment against him.  (Id. at 653:1-654:2).

Petitioner filed a direct appeal to the New York Supreme Court Appellate Division, Second Department ("Second Department").  On appeal, petitioner argued that the trial court had abused its discretion and violated his constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution by precluding defense counsel's inquiry into parental discipline, fear of which, according to petitioner, led C.R. to fabricate the sexual assault allegations.  (Petr's Br.[5] at 38-46).  Petitioner also argued in his briefing that the prosecution had failed to prove its case against him beyond a reasonable doubt and that his conviction was against the weight of the evidence presented during his trial.  (Id. at 30-34).  Petitioner also challenged the indictment against him as overly broad, challenged the court's admission of certain testimony as hearsay, and argued that his sentence was excessive.  (Id. at 47-57).

---

[5] Citations to Petr's Br." refer to petitioner's brief filed in the Second Department on direct appeal from his criminal conviction, filed with this Court on October 29, 2021, ECF No. 1-6.

On May 6, 2020, the Second Department modified petitioner's sentence but otherwise denied his other bases for appeal and affirmed his convictions.  (ECF No. 1-3).  With respect to petitioner's argument relating to error caused by the preclusion of defense counsel's inquiry into parental discipline, the Second Department opined simply that the claim was "without merit." (Id.)

On May 14, 2020, petitioner sought leave to appeal to the New York State Court of Appeals.  In his submission to that court, petitioner again argued that the trial court had erroneously prevented defense counsel from introducing evidence showing C.R.'s motive to fabricate her allegations against him, citing to Pennsylvania v. Ritchie, 480 U.S. 39 (1987). (ECF No. 1-7).  On September 8, 2020, the Court of Appeals denied petitioner's application.  (ECF No. 1-4).  Petitioner then moved for reconsideration, and on November 5, 2020, the court denied that motion as well.  (ECF No. 1-5).

On October 29, 2021, petitioner moved for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court.

DISCUSSION

A. Timeliness

Before turning to the procedural hurdles that petitioner must clear in order for this Court to consider the merits of his claim and before considering the merits of petitioner's claim, this Court must first determine whether petitioner's claim is timely under the governing limitations period.

This petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides that a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the

judgment of a State court." Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of Title 28 of the United States Code), 28 U.S.C. § 2244(d)(l).  In this case, that period began to run on the date that petitioner's case became final by the "conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(l)(A). Under AEDPA, a petitioner's case has become final when that person is denied *certiorari* by the United States Supreme Court or the petitioner's time to seek *certiorari* has expired.  Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).  A petition for a writ of *certiorari* is timely if it is filed within 90 days after entry of the judgment of the state court of last resort.  Sup. Ct. R. 13.

Here, petitioner's one-year period to file his petition began to run 90 days after the New York Court of Appeals denied his motion for reconsideration of its decision denying his application for leave to appeal.  Paulino v. Griffin, No. 16 CV 3839, 2019 WL 9362540, at *7 (S.D.N.Y. Aug. 26, 2019), report and recommendation adopted, No. 16 CV 3839, 2020 WL 1673248 (S.D.N.Y. Apr. 6, 2020).  Since the Court of Appeals denied Petitioner's motion for reconsideration of its denial of his application for leave to appeal on November 5, 2020, petitioner's time to file his habeas corpus petition began to run on February 3, 2021—90 days after the expiration of his time to seek a writ of *certiorari*.  Petitioner therefore had until February 3, 2022 to file the instant petition.  Petitioner filed his petition on October 29, 2021; his petition is therefore timely.

B.  AEDPA Standards

Under 28 U.S.C. § 2254(d), as amended by AEDPA, federal courts may only grant a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court where the state court reached a merits adjudication that:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Greene v. Fisher, 565 U.S. 34, 37 (2011).

In Williams v. Taylor, the Supreme Court held that the "contrary to" and "unreasonable application" clauses of Section 2254(d)(l) have independent meanings.  529 U.S. 362, 404-05 (2000).  A state court's decision is considered to be "contrary to" clearly established federal law where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or where the state court "confronts a set of facts that are materially indistinguishable" from those considered by the Supreme Court, but "nevertheless arrives at a result different from [Supreme Court] precedent."  Id. at 405-06; accord Evans v. Fischer, 712 F.3d 125, 132-33 (2d Cir. 2013); King v. Greiner, 453 F. App'x 88, 89 (2d Cir. 2011).

Under the "unreasonable application" prong of Section 2254(d)(l), a state court decision will be set aside if it involves an "unreasonable application" of the correct governing legal rule, as stated by the United States Supreme Court, to the particular facts of the case, see Williams v. Taylor, 529 U.S. at 407, 409; King v. Greiner, 453 F. App'x at 89; Evans v. Fischer, 712 F.3d at 133, or if the decision "refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern."  Emmons v. Artus, 494 F. App'x 127, 128 (2d Cir. 2012) (quoting Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006)).  "Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable[,]" not merely if it was incorrect or erroneous.  Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) (citing Williams v. Taylor, 529 U.S. at 410); see also Fuentes v. T. Griffin, 829 F.3d 233, 245 (2d Cir. 2016).

14

The standard for what constitutes a holding that is "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet[.]"  Greene v. Fisher, 565 U.S. at 38 (quoting Harrington v. Richter, 562 U.S. 86, 102–103 (2011)); see also Contreras v. Artus, 778 F.3d 97, 110 (2d Cir. 2015) (quoting Williams v. Taylor, 529 U.S. at 412) (noting that courts evaluating whether a state court's decision is contrary to clearly established federal law do not consider dicta in state courts' decisions when arriving at their determinations).

Moreover, review under Section 2254(d) is "extremely narrow."  Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003); Anderson v. Lee, 453 F. Supp. 3d 574, 580 (E.D.N.Y. 2020).  This flows from the fact that "the purpose of AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction."  Greene v. Fisher, 565 U.S. at 38 (quoting Harrington v. Richter, 562 U.S. at 102–103).  The reviewing court must first determine the theories that formed the basis for the state court's decision, then ask whether "fair-minded jurists could disagree" that those theories were inconsistent with a prior Supreme Court decision.  Harrington v. Richter, 562 U.S. at 101.  Thus, the habeas petitioner must show that the state court's ruling was "so lacking in justification" that there was an error in existing law that is "beyond any possibility for fair-minded disagreement."  Id. at 103. This standard is intentionally difficult to meet.  Id. at 102.  Indeed, "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings."  Id.

C.  Procedural Requirements

Before reaching the merits of petitioner's claim and applying the exacting standard articulated above, this Court must first determine whether petitioner has (1) exhausted his

remedies in state court; or (2) procedurally defaulted on his claim.  Coleman v. Thompson,  501 U.S. 722, 731-32 (1991).

      1.   Exhaustion of Petitioner's Claim

A federal court may not grant a petition for a writ of habeas corpus unless a petitioner has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(l)(A); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 201 (2d Cir. 2010).  This rule, based on principles of comity between state and federal courts, requires that the state courts have "the first opportunity to address and correct alleged violations of state prisoner's federal rights."  Coleman v. Thompson, 501 U.S. at 731; see also Picard v. Connor, 404 U.S. at 275-76.  As the United States Supreme Court has explained, it would be "unseemly" in our dual system of government for a federal district court to upset state court convictions without providing the state courts with an opportunity to correct constitutional violations that arise in state court proceedings.  Picard v. Connor, 404 U.S. at 275 (quoting Darr v. Burford, 339 U.S. 200, 204 (1950)).

"To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'"  Bassett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (quoting Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990)), cert. denied, 115 S. Ct. 1436 (1995)).  "In order to have fairly presented his federal claim to the state courts[,] the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court."  Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).  A habeas petitioner satisfies the exhaustion requirement if the petitioner has presented his claim to the appropriate state courts in accordance with state procedural requirements, and has thereby "afford[ed] the state courts a meaningful opportunity to

consider [the] allegations of legal error[.]"  Vasquez v. Hillery, 474 U.S. 254, 257 (1986) (citing Rose v. Lundy, 455 U.S. 509, 515 (1982)).

Although some courts have insisted upon citation in the state pleadings to a specific clause of the Federal Constitution that is alleged to have been violated, courts in this Circuit have held that a claim may be "fairly present[ed] to the state courts . . . without citing chapter and verse of the Constitution" if there is: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis [in factually similar circumstances], (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation."  Daye v. Attorney Gen. of State of New York, 696 F.2d at 194; Carvajal v. Artus, 663 F.3d 95, 104 (2d Cir.), cert. denied, 132 S. Ct. 265 (2011); Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir. 1993) (holding that petitioner had fully presented her claim to the state court where, "[a]lthough she did not cite specific constitutional provisions in her" state court brief, "she explicitly asserted her constitutional right to present a defense" and "cited a leading Supreme Court case in this area"), cert. denied, 510 U.S. 1120 (1994).

The legal claims raised in the state courts must also be the "substantial equivalent" of the claims raised in the federal petition.  See Picard v. Connor, 404 U.S. at 278; accord Jones v. Murphy, 694 F.3d 225, 247 (2d Cir. 2012); see also Waterhouse v. Rodriguez, 848 F.2d 375, 381 (2d Cir. 1988) (noting that the "legal theory relied upon in the federal court need not . . . be identical to the legal theory presented to the state courts, provided that the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts").  Once a federal claim has been properly presented to the state courts, the

claim is considered exhausted even if the state court did not address the claim on the merits and instead rejected it on a state procedural ground or did not rule on the claim on either substantive or procedural grounds, but nonetheless had a fair opportunity to address the claim. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (holding that petitioners must exhaust the right to seek discretionary review from a state high court, though they need not have obtained a review of their claims merits in the state high court); accord Galdamez v. Keane, 394 F.3d 68, 76 (2d Cir. 2005) (holding that where the New York Court of Appeals denied petitioner leave to appeal, petitioner exhausted his state court remedies by seeking leave to appeal).

In this case, petitioner raises a single claim before this Court. According to petitioner, the state trial court's limitation on defense counsel's cross-examination into parental abuse "violated clearly established Supreme Court precedent[.] . . ." (Petr's Mem.[6] at 13). "New York's courts thus deprived petitioner of his constitutionally guaranteed right to present a defense and confront the prosecution's witnesses," in violation of the Sixth and Fourteenth Amendments to the United States Constitution. (Id.)

Petitioner raised this specific claim on his direct appeal to the Second Department. (Petr's Br. at 38-46; see also Petr's Reply Br.[7] at 7-11). In addition to claiming that the trial court erred under New York State law by precluding defense counsel from cross examining C.R. about familial abuse, petitioner also cited to Nevada v. Jackson, 569 U.S. 505 (2013); Crane v. Kentucky, 476 U.S. 683 (1986); Chambers v. Mississippi, 410 U.S. 284 (1973); and Washington v. Texas, 388 U.S. 14, 19 (1967), for the principle that, under the Sixth Amendment and the due process clause of the Fourteenth Amendment, defendants are entitled to a meaningful

---

[6] Citations to "Petr's Mem.' refer to petitioner's Memorandum of Law in Support of a Petition for Writ of Habeas Corpus by a Person in State Custody, filed on October 29, 2021, ECF No. 1-2.
[7] Citations to "Petr's Reply Br." refer to petitioner's Reply Brief filed in the Second Department and filed with this Court on October 29, 2021, ECF No. 1-6.

opportunity to present a complete defense.  (Petr's Br. at 38).  Petitioner also cited directly to the Sixth and Fourteenth Amendments to the United States Constitution.  (Id.)  Petitioner again raised these arguments in his application for leave to appeal to the New York State Court of Appeals.  (Leave Ltr.[8] at 4 (citing Pennsylvania v. Ritchie, 480 U.S. 39, 51–52 (1987))).

At each stage of state review, petitioner has diligently raised the claim upon which he now seeks habeas relief.  Accordingly, the Court finds that petitioner has exhausted his state remedies under 28 U.S.C. § 2254(b)(l)(A).

2.  Procedural Default

"A defendant whose claim is rejected in state court for failure to comply with a state procedural rule may be precluded from raising that claim on habeas review in federal court." Petronio v. Walsh, 736 F. Supp. 2d 640, 652 (E.D.N.Y. 2010) (citing Coleman v. Thompson, 501 U.S. at 729-30; Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999)).  Thus, even if a petitioner raises a colorable federal claim, habeas review is barred if the claim was rejected in the state courts on a procedural ground that is both "'independent' of the merits of the federal claim" and provides an "'adequate' basis for the court's decision." Id. (quoting Fernandez v. Smith, 558 F. Supp. 2d 480,489 (S.D.N.Y. 2008)).

Here, the Second Department reached the merits of petitioner's claim, finding that the claim was "without merit."  Thus, petitioner has not procedurally defaulted.

D.  The Parties' Arguments

Petitioner argues that his conviction was secured in violation of his right to present a complete defense through cross-examination of the prosecution's witnesses.  (Petr's Mem. at 13-

---

[8] Citations to "Leave Ltr." refer to the letter that petitioner submitted to the New York State Court of Appeals to supplement his application for leave to appeal to that Court, dated June 8, 2020, and filed with this Court on October 29, 2021, ECF No. 1-7.

15).  Specifically, petitioner argues that in precluding defense counsel from questioning Angella and C.R. about parental discipline, the trial court effectively prevented defendant from presenting the jury with the theory that C.R. had a motive to lie about petitioner's abuse because of her fear of her mother's reaction to the revelation that C.R. was sexually active with a peer and became pregnant.  According to petitioner, the trial court's ruling was directly contrary to, and represented an unreasonable application of the holdings in Olden v. Kentucky, 488 U.S. 227 (1988) and Davis v. Alaska, 415 U.S. 308 (1974).  (Petr's Mem. at 15-16).  Thus, petitioner claims that he is entitled to habeas corpus relief under 28 U.S.C. § 2254(d)(1).  (Id. at 22).

Both Olden and Davis dealt with violations of defendants' rights under the Sixth and Fourteenth Amendments to cross-examine witnesses in order to reveal those witnesses' motives to fabricate.  (Id. at 17, 18).  Petitioner thus contends that in these two cases, the United States Supreme Court was confronted with what petitioner characterizes as the "exact issue" presented in this case.  (Id. at 15-16)

Respondent argues that petitioner's claim here is "patently illogical," noting that Angella's reaction, as described in C.R.'s February 2014 letter, came months after petitioners' confession and thus after Angella had learned about the alleged sexual assault.  (Rep.'s Mem.[9] at 4-5).  Moreover, in respondent's view, C.R.'s letter provided only a "speculative" ground from which to infer that C.R. had been subjected to abuse by her mother prior to C.R.'s allegations of sexual assault by petitioner.  (Id. at 13-16).  Respondent argues that "[b]ecause the letter did not demonstrate a motive to fabricate on C.R.'s part," the state court's preclusion of the contested line of questioning was proper.  (Id. at 5-20).  Respondent buttresses this argument by claiming that, in fact, petitioner was able to present sufficient evidence at trial to argue in summation that

---

[9] Citations to "Resp.'s Mem" refer to respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, filed on February 4, 2022, ECF No. 10.

C.R. had a "motive to falsely accuse defendant to avoid being blamed for a sexual relationship with a peer." (Id. at 6-7).

Respondent fails to specifically address petitioner's argument that the instant case is similar or identical to the circumstances in Olden and Davis. (Reply[10] at 3). Instead, respondent cites to Padilla v. Artuz, No. 07 CV 5957, 2010 WL 8971502 (S.D.N.Y. Nov. 18, 2010), report and recommendation adopted sub nom. Padilla v. LaBalley, No. 07 CV 5957, 2012 WL 4473958 (S.D.N.Y. Sept. 28, 2012). (Resp. Mem. at 15-16). In Padilla, the state court precluded defense counsel's attempt to cross-examine a witness regarding a sealed arrest record, the content of which was unknown to defense counsel. Padilla v. Artuz, 2010 WL 8971502, at *6. The district court for the Southern District of New York denied the subsequent petition for a writ of habeas corpus, distinguishing the case from Davis and Olden. Id. at *8.

The district court in Padilla reasoned that Davis and Olden dealt exclusively with limiting cross-examination into a witness's motive to fabricate. Since the precluded line of questioning before the Padilla court dealt with a witness's general credibility, the court held that it remained an open question whether "Davis and its progeny may be broad enough to justify granting habeas relief where a trial court has *not* curtailed cross-examination regarding a witness's bias or motive to lie[.]" Id. (emphasis in the original). "In any event," the court continued, "the existence of any basis for impeachment" stemming from the sealed arrest record "was speculative at best[.]" Id. Thus, it concluded that the trial court was "well within the 'wide latitude' afforded trial judges to reasonably limit crossexamination [sic] of a prosecution witness." Id. Respondent argues that, as in Padilla, the trial court in this case determined that the precluded line of questioning was "completely speculative[.]" (Resp. Mem. at 16).

---

[10] Citations to "Reply" refer to petitioner's Reply Memorandum of Law in Support of Petition for a Writ of Habeas Corpus, filed on March 3, 2022, ECF No. 11.

In reply, petitioner argues that this case is distinguishable from Padilla because that case dealt with "general impeachment of a witness's credibility—a wholly distinct issue from cross-examination into a motive to fabricate."  (Reply at 3).  Thus, according to petitioner, Padilla is "irrelevant to this petition, which relates exclusively to C.R.'s bias and motive to fabricate, and the similarities between this case and Olden and Davis remain unrebutted by respondent."  (Id.).

E.  Merits of Petitioner's Claim

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  This right is tantamount to the opportunity to cross-examine adverse witnesses.  Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (citing Davis v. Alaska, 415 U.S. 308, 315 (1974)).  The Sixth Amendment's confrontation clause was incorporated into the due process clause of the Fourteenth Amendment, and thus applies to state courts as well as federal courts.  Pointer v. Texas, 380 U.S. 400, 406 (1965).

Under the Sixth Amendment, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'"  Michigan v. Lucas, 500 U.S. 145, 149 (1991) (quoting Delaware v. Van Arsdall, 475 U.S. at 679).  Similarly, a defendant's right to present a complete defense through the introduction of relevant evidence is not absolute.  The right to present evidence "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  Id. (quoting Rock v. Arkansas, 483 U.S. 44, 55 (1987)); Crane v. Kentucky, 476 U.S. 683, 689-90 (1986) (citing Delaware v. Van Arsdall, 475 U.S. at 679)

(holding that it is permissible for a state court to exclude evidence to prevent "harassment, prejudice, [or] confusion of the issues").

Moreover, even where a trial court's rulings excluding relevant evidence are erroneous, those rulings "do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only* where petitioner can show that the error deprived [him] of a *fundamentally fair* trial." Taylor v. Curry, 708 F.2d 886, 891 (2d Cir.1983) (citing Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973)) (emphasis in original).

This case is distinguishable from both Olden and Davis. In Olden v. Kentucky, the defendant was accused of kidnapping, repeatedly raping, and forcibly sodomizing the complainant. 488 U.S. at 228. On the night of the alleged crimes, the complainant's boyfriend witnessed her exiting a car in which she had been riding with defendant. Id. at 229. Upon exiting the vehicle, the complainant immediately reported the alleged crimes to her boyfriend. Id. The defendant argued at trial that he had engaged in consensual intercourse with the complainant, and that she had alleged rape in order to protect her relationship with her boyfriend. Id. at 230. In support of this defense, the defendant attempted to introduce evidence of the complainant's cohabitation with her boyfriend at the time of trial, but the trial court precluded all evidence regarding the complainant's living arrangement. Id. The jury convicted the defendant of forcible sodomy. Id.

On appeal, the Kentucky Court of Appeals upheld the defendant's conviction, reasoning that, had evidence of complainant's cohabitation with her boyfriend been admitted, it may have created "extreme prejudice" against the complainant who was white, while her boyfriend was African American. Id. at 231 (internal quotation marks and citations omitted). In a *per curiam*

decision, the United States Supreme Court concluded that the state trial court had violated the defendant's Sixth Amendment right of confrontation by precluding counsel's inquiry into the complainant's living arrangement.  Id. at 230-33.

In Davis v. Alaska, the other case relied on by petitioner, the defendant was accused of stealing a safe from a bar. 415 U.S. at 309-310.  The safe was recovered near the home of the prosecution's key witness, who identified the defendant in a photo lineup as a person with whom he had spoken near his property around the time that the safe was stolen.  Id.  Defendant's trial counsel attempted to introduce evidence at trial that the identifying witness was on probation for a burglary conviction when he identified the defendant.  However, the state court precluded any evidence of the witness' prior burglary charge because the witness was a juvenile at the time of conviction and his criminal record had been sealed.  Id. at 311.  Thus, during defense counsel's cross-examination of the witness, the witness's representations that he was unconcerned that the police might have suspected him of the theft, and that he had never been questioned in a similar way by law enforcement before being questioned in the underlying case, went unchallenged.  Id. at 311-14.  Defendant was convicted at trial and his conviction was upheld on appeal through the state court system.  Id. at 314-15.

On appeal, the United States Supreme Court held that the jury was entitled to consider that the witness was on probation when he identified the defendant.  Id. at 317-19.  Having been precluded from questioning the witness about his probation, defense counsel was unable to "make a record from which to argue why" the witness "might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial."  Id. at 318.

Petitioner argues that the fact that the complainant in Olden lived with her boyfriend at the time of the trial "implied a long-standing relationship serious enough to implicate a motive to

24

fabricate[.]" (Petr's Mem. at 17).  Similarly, in this case, petitioner contends that  "C.R.'s letter, though written after the incident, evidenced a long-standing fear of her parents."  (Id. at 17-18). Even if the letter only referenced threats made and hostility developed after C.R. accused petitioner of sexually assaulting her, petitioner argues that the letter "strongly suggested that an abusive relationship between C.R. and her mother had existed for years."  (Id. at 18).  Under petitioner's theory, this abusive relationship provided C.R. with a motive to lie about the assault by petitioner.

Moreover, according to petitioner, like the defendant in Davis, defense counsel was limited in the scope of his cross-examination.  (Id.)  In petitioner's case, defense counsel was only allowed to ask "general questions about C.R.'s relationship with her mother," but petitioner contends that counsel was prohibited from asking questions "that could have revealed C.R.'s abuse and fear[,]" and, thus, petitioner could not adequately put forward his theory of defense. (Id. at 19).  According to petitioner, "C.R.'s fear of being banished to Jamaica and of being physically and psychologically abused is an entirely different—and much more extreme—motive to fabricate, one that the jury never heard."  (Id.)

Contrary to petitioner's position, in Olden, there was evidence that the complainant and her boyfriend were in a relationship on the night that she claimed to have been raped by the defendant.  At the time of trial, the complainant was cohabiting with her boyfriend, providing a motive to protect that relationship by lying about having consented to the contact with the defendant as he claimed.  In reviewing the trial court's ruling, the Supreme Court held that the state courts' "[s]peculation as to the effect of jurors' racial biases" could not "justify exclusion of cross-examination with such strong potential to demonstrate the falsity of the complainant's allegations."  Olden v. Kentucky, 488 U.S. at 232.  Similarly, in Davis, it was an undisputed fact

that the witness was on probation when he identified the defendant, and thus may have succumbed to "undue pressure" when making the identification.  Davis v. Alaska, 415 U.S. at 317-18.  By contrast, in this case, far from being evidence with a "strong potential to demonstrate the falsity" of C.R.'s allegations, C.R.'s February 2014 letter was, at best, a speculative lead that, perhaps, C.R. might testify in a way that would support petitioner's claim that she fabricated the allegations of sexual assault for fear of parental discipline.

However, unlike the existent relationship between the complainant and her boyfriend in Olden and the fact that the witness was on probation when he identified the defendant in Davis, there is no indication in C.R.'s letter that she actually feared her mother or that she had ever been abused by her mother prior to making her allegations against the petitioner, or, in fact, that Angella had ever abused C.R. at any point.  Indeed, there is nothing at all in the letter about prior abuse, physical or otherwise.  Instead, in the February 2014 letter, C.R. simply wrote that her mother was angry with her—"my mother hates me" and says that "I have no respect for her"— and that her mother believed that the alleged conduct was C.R.'s "fault[.]"  (ECF No. 1-8).

Moreover, while C.R. wrote to her teacher that her mother had threatened to send her to Jamaica to live with her "abusive father[,]" and that Angella would not financially support C.R. while she was in Jamaica, nothing in the letter indicates that this was a long-standing threat as opposed to a unique reaction to the revelation that C.R. had been raped and impregnated by petitioner.  (Id.)  In fact, C.R. testified unequivocally during trial that her mother had not threatened her prior to the alleged crimes.  (Tr. at 242:10-12).  Nothing in the letter contradicts this statement.  Similarly, nothing in the letter contradicted C.R.'s claims that, leading up to the alleged assault, she and Angella "kept" their disputes to a "minimum" and argued mostly about school.  (Id. at 240-42).

Finally, there is nothing in the letter to support defense counsel's speculative theory that C.R.'s fear of parental discipline had caused her to identify petitioner as the perpetrator in order to preserve or hide her relationship with a peer, to the extent that such a relationship actually existed. There is no mention in the letter about a relationship with a peer nor any suggestion that C.R. fabricated her allegations against petitioner to protect a peer relationship. Moreover, nothing in the letter indicates that revealing a sexual relationship with a peer would lead to parental discipline worse than Angella's reaction to C.R.'s claim that petitioner raped her. Indeed, it could be argued that, logically, if Angella was an abusive parent and truly believed that her daughter had "no respect" for her mother and was at "fault," presumably for seducing Angella's boyfriend, as C.R. claims in her letter, then C.R. had more of a motive to lie by accusing someone other than petitioner. As such, the letter arguably cuts against petitioner's theory regarding C.R.'s motive to fabricate.

Here, the trial court correctly precluded the introduction of the February 2014 letter after finding no evidence in the letter to suggest either that C.R. had ever been abused by her mother or that C.R. was falsely accusing petitioner of sexual abuse in order to hide a relationship with a peer and thus avoid punishment, as defense counsel argued. Far from "strongly suggest[ing] that an abusive relationship between C.R. and her mother had existed for years[,]" C.R.'s letter to her teacher could only be read to evince prior abuse after several inferential leaps, none of which are justified here. As such, the precluded line of questioning bore the hallmarks of a fishing expedition.

Moreover, as the state trial court observed, the precluded line of questioning ran the risk of introducing evidence concerning Angella's apparently hostile reaction to her daughter's allegations of rape, which might have refocused the jurors' attention on Angella's fitness as a

mother in 2014 and away from answering whether petitioner had repeatedly sexually assaulted C.R. in 2012 and 2013.  As the state court put it, the precluded line of questioning served only to "tarnish" Angella as a witness, even when there was no actual evidence of any abuse whatsoever. (See Tr. at 141-42).

Nevertheless, and even though the 2014 letter was petitioner's only basis for arguing that Angella had abused C.R., the trial court encouraged counsel to "bring out . . . the domestic relationship within the family" through C.R. when she testified.  (Tr. at 142:8-11).  Defense counsel was permitted to question C.R. regarding whether she ever had "disputes" or "arguments" with her mother, and whether she had ever run away from home.  (Id. at 240-43). In response, C.R. testified that she had disputes with her mother, but that they "kept it at a minimum[,]" that her disagreements with her mother were "mostly about school[,]" and that she had once walked out of her home after an argument with Angella and stood on a corner until her mother retrieved her.  (Id. at 240-42).  Defense counsel also asked C.R. whether her mother had "ever threaten[ed]" her "before September of 2012[,]"[11] to which C.R. replied "[n]o."  (Id. at 242:10-12).

Moreover, defense counsel had ample additional material with which to impeach C.R.'s credibility.  Counsel elicited testimony from C.R. that she had previously lied about not having had sex with people other than petitioner, an admission that was supported by DNA evidence that established conclusively that the fetus was not that of petitioner and conclusively determined that C.R. had in fact been sexually active with individuals other than petitioner.

Defense counsel exploited this evidence effectively in making his arguments during summation.  (Tr. at 554:16-23, 555:14-19, 559:9-18).  According to defense counsel, when C.R.

---

[11] September 2012 is when the alleged sexual abuse began.

realized that she was pregnant, she was "not in a good position.  She points the finger at somebody.  She says that this is the only person who she's sexually active with.  She lied to the doctors, she points the finger, and it's not his baby.  Something's wrong there.  Something's wrong there."  (Id. at 559:12-17).  Defense counsel hypothesized to the jury in summation that C.R. might have lied to "deflect blame" and "prevent" anticipated punishment.  (Id. at 555:20-25).  Of course, even if the jury determined that C.R. failed to disclose her relationship with a peer, it is unclear how that would have diminished the impact of petitioner's multiple confessions to raping and sexually assaulting C.R., a minor.

Thus, unlike in Olden and Davis and the Second Circuit cases that petitioner has cited in support of his position (Petr's Mem. at 19-21 (citing Nappi v. Yelich, 793 F. 3d 246 (2d Cir. 2015), and Henry v. Speckard, 22 F. 3d 1209 (2d Cir. 1994)), there is no reason to believe that defense counsel's cross-examination of C.R. about her relationship with Angella or her credibility was anything less than exhaustive.

Far from violating petitioner's right to present a defense and confront the witnesses against him, the trial court's ruling in this case fell within the "wide latitude" to reasonably limit cross-examination afforded to trial courts.  Delaware v. Van Arsdall, 475 U.S. at 679.  Moreover, courts in this circuit have rejected defendants' claims raised under the Sixth and Fourteenth Amendments in similar circumstances.  See, e.g., Al-Sabahi v. Schiraldi, No. 10 CV 5748, 2013 WL 6506257, at *12-13 (S.D.N.Y. Dec. 12, 2013) (holding that it was appropriate and not a violation of petitioner's constitutional rights for a state court to preclude evidence that only speculatively provided a basis to impeach a witness's credibility); Felix v. Ercole, No. 09 CV 4003, 2010 WL 2606341, at *6 (E.D.N.Y. June 22, 2010) (holding that petitioner's constitutional rights were not violated where the trial court precluded questioning for which there was no good

29

faith basis); <u>Brown v. Breslin</u>, No. 04 CV 7970, 2008 WL 857767, at *12 (S.D.N.Y. Mar. 31, 2008) (same).

Even if the trial court had erred in precluding defense counsel's examination into C.R.'s relationship with her mother—which it did not—this ruling would "not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus" unless petitioner could demonstrate that "the error deprived [him] of a *fundamentally fair* trial." <u>Taylor v. Curry</u>, 708 F.2d at 891 (citing <u>Chambers v. Mississippi</u>, 410 U.S at 302-03) (emphasis in the original). Given the overwhelming evidence of petitioner's guilt in this case, it is not surprising that the jury reached the conclusion that it did. Petitioner repeatedly admitted to having had intercourse with C.R. when she was between 12 and 13 years old. Not only was his oral confession recorded, but he subsequently memorialized it in a writing where he offered money to C.R.'s mother in exchange for her promise not to reveal the abuse.

Moreover, the details of C.R.'s testimony as to the repeated sexual assaults, including where and how they occurred, and minutia such as that petitioner instructed C.R. to wash her bloody clothing with disinfectant soap, suggests that these allegations were not fabricated from whole cloth. Similarly, Angella and C.R. testified in detail regarding petitioner's proposed solutions regarding how to keep his crimes secret, including by sending C.R. to another country or taking her to an abortion clinic that would not report her pregnancy. In contrast, petitioner's self-serving claim that he capitulated to Angella and repeatedly admitted to serially raping a minor because of his military experience was simply not credible.

Petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and thus has failed to establish a claim under 28 U.S.C. §

2254(d)(1).  Petitioner advances no other claim for relief in the instant petition.  Therefore, applying this Court's "extremely narrow" power to review the state court's decision, <u>Cotto v. Herbert</u>, 331 F.3d at 233, and finding that petitioner was not deprived of a fundamentally fair trial, the Court finds that the instant petition lacks merit and is therefore denied.

<u>CONCLUSION</u>

For the aforementioned reasons, petitioner has failed to meet his burden under 28 U.S.C. § 2254(d).  Thus, the Petition for a writ of habeas corpus is denied, and the case dismissed. Since petitioner has not made a substantial showing that his constitutional rights were denied, a certificate of appealability shall not issue.  <u>See</u> 28 U.S.C. § 2253(c)(2).  The Court further finds that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be in good faith, and, therefore, petitioner is denied <i>in forma pauperis</i> status for the purpose of an appeal. <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      June 27, 2022

                                    /s/ Cheryl L. Pollak
                                    Cheryl L. Pollak
                                    Chief United States Magistrate Judge
                                    Eastern District of New York